**FILED**

FEB - 6 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DAVID TALBOT                          :
327 Montcalm Street                   :
San Francisco, CA 94110               :
                                      :
    **and**                             :
                                      •

JEFFERSON MORLEY                      CASE NUMBER  1:07CV00277
1804 Kenyon Street, N.W.
Washington, D.C. 20010                JUDGE: Richard J. Leon

    **v.**                              DECK TYPE: TRO/Preliminary Injunctio

CENTRAL INTELLIGENCE AGENCY           DATE STAMP: 02/06/2007
Washington, D.C. 20505
                                      :
    **and**                             :
                                      :
U.S. DEPARTMENT OF STATE              :
Washington, D.C. 20520                :
                                      :
      **Defendants**                :

## COMPLAINT FOR INJUNCTIVE RELIEF
### [Freedom of Information Act, 5 U.S.C. § 552, et seq.]

### JURISDICTION AND PARTIES

    1.  **Plaintiffs bring this action under the expedited process
-ing provision of the Freedom of Information Act, 5 U.S.C. § 552(a)
(6)(E).**

    2.  **Plaintiff David Talbot ("Talbot") is a journalist and the
founder of Salon.com.  He is author of a forthcoming book Brothers:
The Hidden History of the Kennedy Years (Free Press/Simon &
Schuster).  He is a resident of San Francisco, California.**

    3.  **Plaintiff Jefferson Morley ("Morley") is a news editor at
washingtonpost.com.  He is also author of a forthcoming book, Spies**

*1*

2

and Knaves: **Win Scott and the Rise of the CIA** (University Press of Kansas), a biography of Winston Scott, who was the CIA's station chief in Mexico City at the time President John F. Kennedy was assassinated. He is a resident of the District of Columbia.

4. Defendant **CENTRAL INTELLIGENCE AGENCY ("CIA")** is an agency of the United States Government and has possession and control of records requested by plaintiff Talbot which are the subject of this action.

5. Defendant **U.S. DEPARTMENT OF STATE ("DOS")** is an agency of the United States Government and has possession and control of records requested by plaintiff Morley which are the subject of this action.

## FIRST CAUSE OF ACTION

6. By letter dated December 7, 2006, Talbot submitted a request for two categories of records pertaining to George Joannides, David Morales, and Gordon Campbell:

a. All records pertaining to temporary duty (TDY) travel during the period January-December, 1968, including but not limited to all Current Residence and Dependency Reports.

b. All photographs of George Joannides, David Morales, or Gordon Campbell, whether taken individually or in groups, including any photographs in disguise. **See** Exhibit 1.

7. Talbot asked that he be accorded status as a representative of the news media pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II).

8. Talbot also asked that his request be given expedited

<u>3</u>

processing in accordance with the provisions of 5 U.S.C. § 552(a)(6)(E). As grounds for his request, Talbot stated that last November BBC-TV had aired a documentary in which it reported that three former CIA officials who had worked for the Agency's JM/WAIVE station in Miami, Florida during the 1960s appeared in films taken at the Ambassador Hotel in Los Angeles the night Senator Robert F. Kennedy was assassinated. <u>Id</u>.

9.    Talbot further stated that one of the three, David Morales, had long been the subject of speculation that he was involved in the assassination of President Kennedy, and on at least two occasions he is said to have made statements implicating himself in the President's assassination, and on one occasion the assassination of Senator Robert Kennedy as well. <u>Id</u>.

10.    Talbot further represented that these allegations appeared to be backed by some credible witnesses and thus "raise an issue of great public urgency," noting that, "[i]f true, the implications are potentially far-ranging and explosive. If the allegations made on the BBC program are not founded in fact, the public record should be clarified to show that as soon as possible." <u>Id</u>.

11.    Talbot noted that the allegations aired in the British documentary were also the subject of an article in <u>The  Guardian</u> and that the <u>Baltimore  Chronicle</u> ran a lengthy piece by a British historian calling for a reopening of both the JFK and RFK assassinations. He attached copies of these two articles to his request. <u>See</u> Exhibit 1.

<u>4</u>

12.  Additionally, Talbot pointed out that the BBC program had generated significant online discussion in the comment boards for both <u>The</u> <u>Guardian</u> and BBC web sites.  Moreover, the popular news aggregator del.icio.us.com reported that 57 people stored the story for future reference.  Looking at the site's daily rankings, this indicates that the BBC allegations are probably among the five or ten most referenced Web articles.  <u>Id</u>., citing http://del.icio.us/popular/?new of recent weeks.

13.  By letter dated December 15, 2006, Mr.Scott Koch ("Koch"), Information and Privacy Coordinator of the CIA, responded to Talbot's request.  He asserted that two former clients of Talbot's attorney had failed to pay search fees for requests they submitted in 1995 and 1999.  He alleged that because of this, CIA regulations prevented the Agency from accepting Talbot's request.  He further stated that upon payment of the sum owed, Talbot's request could be resubmitted.  <u>See</u> Exhibit 2.

14.  By letter dated December 23, 2006, Mr. James H. Lesar, Talbot's counsel, sent the CIA a check for the fees owed by his former clients.  <u>See</u> Exhibit 3.

15.  By letter dated January 12, 2007, Talbot resubmitted his request via facsimile.  In this letter his counsel informed the CIA that Talbot and another reporter had signed a contract to do a story for <u>The</u> <u>New</u> <u>Yorker</u> magazine "which will report on the claim made on BBC-TV that three CIA officers connected to [the CIA's] JM/WAVE station were present at the Ambassador Hotel in Los Angeles the night Senator Robert F. Kennedy was assassinated.  He also

<u>5</u>

stated that they had a March 1, 2007 deadline for submitting their story to <u>The New Yorker</u>. <u>See</u> Exhibit 4.

16. By letter dated January 23, 2007, the CIA advised Talbot that it was denying his request for expedited processing of his request, asserting that it "does not demonstrate a 'compelling need'" under its regulations. <u>See</u> Exhibit 5.

17. No further correspondence has been exchanged between the parties.

18. Plaintiff has exhausted his administrative remedies.

19. Plaintiff has a legal right under the FOIA to have defendant expedite the processing of his request and there is no legal basis for its denial of said right.

20. Plaintiff is entitled to status as a representative of the news media and there is no basis for defendant's denial of said right.

## SECOND CAUSE OF ACTION

21. Plaintiff Morley realleges paragraphs 1-5 and 18-20 above and incorporates them herein by reference.

22. By letter dated January 12, 2007, Morley submitted a request to the Department of State for "all passport and visa records pertaining to Mr. George Joannides for the years 1963-1964 and 1967-1968. He requested expedited processing of his request pursuant to 5 U.S.C. § 552(A)(6)(E). <u>See</u> Exhibit 6 (attachments omitted as they duplicate those appended to Talbot's December 7, 2007 request).

**6**

23.  DOS received Morley's request on January 18, 2007.  **See** Exhibit 7.

24.  In support of his demand for expedited processing, Morley stated the same facts and justifications as are set forth in paragraphs 9-13 above, and these are incorporated herein by reference. **Id**.

25.  No response from DOS has been received to date.

WHEREFORE, plaintiffs pray that this Court:

(1) order defendants CIA and DOS to expedite the processing of their request;

(2) order defendants CIA and DOS to grant plaintiffs status as representatives of the news media pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II);

(3) award plaintiffs reasonable attorney's fees and costs as provided in 5 U.S.C. § 552((a)(4)(E); and

(4) grant such other and further relief as the Court may deem just and proper.

JAMES H. LESAR
1003 K Street, N.W.
Suite 640
Washington, D.C. 20001
Phone:  (202) 393-1921

Counsel for Plaintiffs

DATED:  February 6, 2007

## JAMES H. LESAR

ATTORNEY AT LAW
1003 K STREET, N.W., SUITE 640
WASHINGTON, D.C. 20001

TELEPHONE (202) 393-1921
FAX (202) 393-7310

## FREEDOM OF INFORMATION ACT REQUEST
## AND REQUEST FOR EXPEDITED PROCESSING

December 7, 2006

Mr. Scott Koch
Freedom of Information and Privacy
      Coordinator
Central Intelligence Agency        **VIA FACSIMILE AND CERTIFIED MAIL**
Washington, D.C. 20505             NO. 7002 2410 0006 2154 7391

        Re:  George Joannides, David
             Morales and Gordon Campbell

Dear Mr. Koch:

       I represent **Mr.** David Talbot.  **Mr. Talbot is an author and
journalist** and was founder of Salon.com, for which he also writes.
He is author of a forthcoming book on the Kennedy administration.

       Pursuant to the Freedom of Information Act, 5 U.S.C. § 552, et
leg., Mr. Talbot requests the following records pertaining to
George Joannides, David Morales, and Gordon Campbell be provided,
and that their processing be expedited:

       1.   All records pertaining to temporary duty (TDY) travel
during the period January-December, 1968, including but not limited
to all Current Residence and Dependency Reports.

       2.   All photographs of Joannides, Morales, or Campbell,
whether taken individually or in groups, including any photographs
in disguise.

       The search for these records should include CIA Headquarters
and your stations in Miami, New Orleans, and Los Angeles.

       The search should also include any **pseudonyms, cryptonyms,
code names** or aliases used by these individuals.  Mr. Joannides
also used the name "Walter Newby."

       Please immediately advise all CIA *components* which may have
records responsive to this request that it is unlawful to destroy
such records while this request is pending.

       As a journalist and author, Mr. Talbot is a representative of
the news media under 5 U.S.C. § 552(a)(4)(A)(ii)(II) and cannot be
charged search fees.

<u>Exhibit 1</u>

**FILED**

07 0277   FEB - 6 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Pursuant to 5 U.S.C. § 552 (a) (6) (E) (1) , Mr. **Talbot requests**
expedited processing of these records.  In conformity with your
regulation governing expedited processing, 32 C.F.R. § 1900.34(c),
Mr.  Talbot is a person primarily engaged in disseminating in-
formation and the information he seeks is "relevant to a subject of
public urgency concerning an actual or alleged Federal government
activity.

On November 21, 2006, **BBC-TV aired a documentary** which re-
ported that three former CIA officials who had worked for the CIA's
JMWAVE station in Miami, Florida during the 1960s appeared in films
taken at the Ambassador Hotel in Los Angeles the night Senator
Robert F. Kennedy was assassinated.   One of the three, David
Morales, has long been the subject of speculation that he was in-
volved in the assassination of President Kennedy, and on at least
two occasions he is said to have made statements implicating him-
self in the Presidents assassination, and on one occasion the
assassination of Senator Robert Kennedy as well.

These allegations, which appear to be backed by some credible
witnesses, raise issues of great public urgency.  If true, the im-
plications are potentially *far-ranging* and explosive. If the alle
gations made on the BBC program are not founded in fact, the public
record should be clarified to show that as soon as possible.

Mr. Talbot also urgently needs to obtain the requested materi-
als as he faces a publishing deadline which expires in March, 2007.

In addition to the BBC-TV documentary, these allegations were
the subject of a an article in <u>The Guardian</u>.  In addition, the
Baltimore <u>Chronicle</u> ran a lengthy piece by a British historian
calling for a reopening of both the JFK and RFK assassinations.
Copies of these two articles are attached.

The BBC program has also **generated significant** *online* dis-
*cussion in* the comment boards for the both the Guardian and BBC web
sites.  In addition, the popular news aggregator <u>del.icio.us.com</u>
reports that 57 people have stored the BBC story for future refer-
ence.  Looking at the sites daily *rankings,* this indicates that
the BBC allegations are probably among the five or ten most
referenced Web articles.   <u>See</u> <u>http://del.icio.us/popular/?new</u> of
recent weeks

The Freedom of Information Act provides that you have ten
calendar days to make a. determination whether or not to expedite
processing of this request.  Please advise me of your decision my
fax or email.  My fax number is (301) 657-3699.  My email address
is <u>jlesar@mi.ndspring.com</u>.

*61.ncereiy your*,*


CgSTI1'IC71TIO-T

i, Davic Talbot, hereby *ortify, to the best of my knowledge and belief, that the following facts are true and correct..

1.  I an a journa3,ist primarily **engaged in the dissemination of information**.  "

2.  **I ha've a compelling used to obtain the above-requested information apccdily as i have a publication deadline in march,** 2007.

3.  On Novvember 21, 2006, BBC-TV aired a **documentary which re**-ported that three fosnee CIA officials who had worked for the CIA, a JmRAVB **statio1 in Niami;- florida during the 1960s appeared in films taken at the Ambassador Hotel in Los Angeles** the **night senator Robert P. Kennedy was assassinated.   one of the three, David morals, has long been the subject of speculation that he was in**-volved in the assassination of president ]Kennedy, and according to an article in The Gua ian he is said to have **made statements on at least two different occasions implicating him-self in** the assassi-nation or President Kennedy, and on one occasion the **assassina**-tion of Senator Robert Kennedy as well.


                              **DAVID TALBOT    ·.   _V**

# Did the CIA kill Bobby Kennedy?

In 1968, Robert Kennedy seemed likely to follow his brother, John, into the White House. Then, on June 6, he was assassinated - apparently by a lone gunman. But Shane O'Sullivan says he has evidence implicating three CIA agents in the murder

Monday November 20, 2006
The Guardian

At first, it seems an open-and-shut case. On June 5 1968, Robert Kennedy wins the California Democratic primary and is set to challenge Richard Nixon for the White House. After midnight, he finishes his victory speech at the Ambassador hotel in Los Angeles and is shaking hands with kitchen staff in a crowded pantry when 24-year-old Palestinian Sirhan Sirhan steps down from a tray-stacker with a "sick, villainous smile" on his face and starts firing at Kennedy with an eight-shot revolver.

As Kennedy lies dying on the pantry floor, Sirhan is arrested as the lone assassin. He carries the motive in his shirt-pocket (a clipping about Kennedy's plans to sell bombers to Israel) and notebooks at his house seem to incriminate him. But the autopsy report suggests Sirhan could not have fired the shots that killed Kennedy. Witnesses place Sirhan's gun several feet in front of Kennedy, but the fatal bullet is fired from one inch behind. And more bullet-holes are found in the pantry than Sirhan's gun can hold, suggesting a second gunman is involved. Sirhan's notebooks show a bizarre series of "automatic writing" - "RFK must die RFK must be killed - Robert F Kennedy must be assassinated before 5 June 68" - and even under hypnosis, he has never been able to remember shooting Kennedy. He recalls "being led into a dark place by a girl who wanted coffee", then being choked by an angry mob. Defence psychiatrists conclude he was in a trance at the time of the shooting and leading psychiatrists suggest he may have be a hypnotically programmed assassin

Three years ago, I started writing a screenplay about the assassination of Robert Kennedy, caught up in a strange tale of second guns and "Manchurian candidates" (as the movie termed brainwashed assassins). As I researched the case I uncovered new video and photographic evidence suggesting that three senior CIA operatives were behind the killing. I did not buy the official ending that Sirhan acted alone, and started dipping into the nether-world of "assassination research", crossing paths with David Sanchez Morales, a fearsome Yaqui Indian.

Morales was a legendary figure in CIA covert operations. According to close associate Tom Clines, if you saw Morales walking down the street in a Latin American capital, you knew a coup was about to happen. When the subject of the Kennedys came up in a late-night session with friends in 1973, Morales launched into a tirade that finished: "I was in Dallas when we got the son of a

bitch and I was in Los Angeles when we got the little bastard." From this line grew my odyssey into the spook world of the 60s and the secrets behind the death of Bobby Kennedy.

Working from a Cuban photograph of Morales from 1959, I viewed news coverage of the assassination to see if I could spot the man the Cubans called El Gordo - The Fat One. Fifteen minutes in, there he was, standing at the back of the ballroom, in the moments between the end of Kennedy's speech and the shooting. Thirty minutes later, there he was again, casually floating around the darkened ballroom while an associate with a pencil moustache took notes.

The source of early research on Morales was Bradley Ayers, a retired US army captain who had been seconded to JM-Wave, the CIA's Miami base in 1963, to work closely with chief of operations Morales on training Cuban exiles to run sabotage raids on Castro. I tracked Ayers down to a small town in Wisconsin and emailed him stills of Morales and another guy I found suspicious - a man who is pictured entering the ballroom from the direction of the pantry moments after the shooting, clutching a small container to his body, and being waved towards an exit by a Latin associate.

Ayers' response was instant. He was 95% sure that the first figure was Morales and equally sure that the other man was Gordon Campbell, who worked alongside Morales at JM-Wave in 1963 and was Ayers' case officer shortly before the JFK assassination.

I put my script aside and flew to the US to interview key witnesses for a documentary on the unfolding story. In person, Ayers positively identified Morales and Campbell and introduced me to David Rabern, a freelance operative who was part of the Bay of Pigs invasion force in 1961 and was at the Ambassador hotel that night. He did not know Morales and Campbell by name but saw them talking to each other out in the lobby before the shooting and assumed they were Kennedy's security people. He also saw Campbell around police stations three or four times in the year before Robert Kennedy was shot.

This was odd. The CIA had no domestic jurisdiction and Morales was stationed in Laos in 1968. With no secret service protection for presidential candidates in those days, Kennedy was guarded by unarmed Olympic decathlete champion Rafer Johnson and football tackler Rosey Grier - no match for an expert assassination team.

Trawling through microfilm of the police investigation, I found further photographs of Campbell with a third figure, standing centre-stage in the Ambassador hotel hours before the shooting. He looked Greek, and I suspected he might be George Joannides, chief of psychological warfare operations at JM-Wave. Joannides was called out of retirement in 1978 to act as the CIA liaison to the House Select Committee on Assassinations (HSCA) investigating the death of John F Kennedy.

Ed Lopez, now a respected lawyer at Cornell University, came into close contact with Joannides when he was a young law student working for the

committee. We visit him and show him the photograph and he is 99% sure it is Joannides. When I tell him where it was taken, he is not surprised: "If these guys decided you were bad, they acted on it.

We move to Washington to meet Wayne Smith, a state department official for 25 years who knew Morales well at the US embassy in Havana in 1959-60. When we show him the video in the ballroom, his response is instant: 'That's him, that's Morales." He remembers Morales at a cocktail party in Buenos Aires in 1975, saying Kennedy got what was coming to him. Is there a benign explanation for his presence? For Kennedy's security, maybe? Smith laughs. Morales is the last person you would want to protect Bobby Kennedy, he says. He hated the Kennedys, blaming their lack of air support for the failed Bay of Pigs invasion in 1961.

We meet Clines in a hotel room near CIA headquarters. He does not want to go on camera and brings a friend, which is a little unnerving. Clines remembers "Dave" fondly. The guy in the video looks like Morales but it is not him, he says: "This guy is fatter and Morales walked with more of a slouch and his tie down." To me, the guy in the video does walk with a slouch and his tie is down.

Clines says he knew Joannides and Campbell and it is not them either, but he fondly remembers Ayers bringing snakes into JM-Wave to scare the secretaries and seems disturbed at Smith's identification of Morales. He does not discourage our investigation and suggests others who might be able to help. A seasoned journalist cautions that he would expect Clines "to blow smoke", and yet it seems his honest opinion.

As we leave Los Angeles, I tell the immigration officer that I am doing a story on Bobby Kennedy. She has seen the advertisements for the new Emilio Estevez movie about the assassination, Bobby. "Who do you think did it? I think it was the Mob," she says before I can answer.

"I definitely think it was more than one man," I say, discreetly.

Morales died of a heart attack in 1978, weeks before he was to be called before the HSCA. Joannides died in 1990. Campbell may still be out there somewhere, in his early 80s. Given the positive identifications we have gathered on these three, the CIA and the Los Angeles Police Department need to explain what they were doing there. Lopez believes the CIA should call in and interview everybody who knew them, disclose whether they were on a CIA operation and, if not, why they were there that night.

Today would have been Robert Kennedy's 81st birthday. The world is crying out for a compassionate leader like him. If dark forces were behind his elimination, it needs to be investigated

Shane O'Sullivan's investigation will be shown tonight on Newsnight, BBC2, 10.30pm.

It's Time to Re-Open the Investigation of RFK and JFK Assassination...     http://baltimorechronicle.com/2006/112206CARMICHAEL.shtmi

JFK Research Site
Browse and search the largest digital
archive available.

Politics in Pictures
Boston Globe photo archives. JFK,Jackie,
Clinton, Kerry.

Place a  Ad ...
Ads by Goooooogle

**Baltimore & Maryland**
11.21 New Zealand's Earthrace Boat
and Crew To Visit Inner Harbor
on Nov. 23 & 24
11.02 This Election, the Medium Really
Is the Message

**Art & Entertainment**
11.21 Isikoff on Iraq: "At a minimum
negligence in the commission of
a fraud"

**Environment**
Ref:  What is Global Warming, and
what can citizens do about it?

**Advice**
11.17 How Rent Makes Poverty

**U.S. News Media Criticism**
11.22 2008
11.17 Alternative Media Can Balance
Establishment's Experts
**11.10** Morning-After Pundits Take
Winners to Task
11.07 Midterms and the Media
10.30 Catapulting the Propaganda
with the Washington Post

**Letters**
Open Letters:
11.09 Rumsfeld replacement (Robert
Gates) was director of voting
company
11.07 The best defense is a good
offense, so VOTE!
11.06 Pick a Number
11.06 If You Care About Higher
Education in Maryland, the
Gubernatorial Choice is Clear:
O'Malley
Editorials & Op-Eds
11.22 It's Time to Re-Open the
Investigation of RFK and JFK
Assassinations
11.21 Congress Should Immediately
Terminate the 2001 AUMF
11.06 Statewide Questions on the
Ballot: Yes for 1, 2 and 3; No
for 4
10.25 Forget her "Pledge," She Took
an Oath: Why Pelosi is Wrong
on Impeachment
10.24 Let's March in January! An
Impeachment Call to Action

**United States**
11.23 Gates & the Iran Arms Sales
11.21 TH*NK*NG REALITIES
11.20 Daggers Drawn - DLC versus
DNC
11.17 Forget About Centrism: We
Must Reclaim the Inspired Edge
11.15 Delusions of Separation
11.15 Blackmail & Bobby Gates
11.15 Family Feud: Little Bush Hits
Back at Daddy
11.15 Credit Ned Lamont with
Democrats' Antiwar Position
11.15 Why Impeachment, Sadly, Is a
Non-Starter

ANALYSIS:

### It's Time to Re-Open the Investigation of RFK and JFK Assassinations

by MICHAEL CA"ICHAEL

Nov. 22, 2006–Planning to write a
film script about the case, Shane
O'Sullivan, an independent
researcher, investigated the
assassination of RFK. But, O'Sullivan
found much more than he had
hoped.

On Monday night, the BBC broadcast
O'Sullivan's report on their
high-profile programme,
"Newsnight." O'Sullivan's findings
shocked many people. Working
through an exhaustive analysis of videotapes made at the
Ambassador Hotel on the night of RFK's assassination, O'Sullivan
identified three figures as former agents of the CIA. Two of the
agents O'Sullivan identified could be seen moving away from the
hotel pantry shortly after the shooting of RFK.

Following his preliminary identifications, O'Sullivan presented the
video images to more authoritative sources, men who knew the
three agents personally. While there was a slender degree of
uncertainty (circa 5-10%) the men in the videos were positively
identified as the former CIA agents:

 o David Sanchez Morales;
 o Gordon Campbell and
 - George Joannides

Morales was known to be involved in coups d etats throughout
Latin America and he had a reputation of a dangerous man with
an explosive temper who was capable of violence. To entertain
his friends, Morales would tell stories about his involvement in
the killing and capture of Che Guevara, coups in Latin America
and other nefarious covert activities.

Two of the CIA agents in the Ambassador Hotel: Morales and
Joannides are now dead, while the whereabouts of the third,
Campbell, are presently unknown.

O'Sullivan interviewed Bradley Ayers, U.S. Army Captain retired,
who had been stationed at IM-Wave, the Miami base for the CIA.
In 1963, David Morales was the Chief of Operations at IM-Wave.
Ayers and Morales trained Cuban exiles in the arts of sabotage to
be deployed in covert action against the regime of Fidel Castro.
On camera, Ayers identified Morales and Campbell with what he
described as 95% accuracy. Following that positive identification,
Ayers introduced O'Sullivan to David Rabern, a freelance
mercenary who had been contracted by the CIA to participate in
the Bay of Pigs invasion in 1961. Rabern had been in the
ballroom of the Ambassador Hotel on the fateful night in 1968.

While Rabern did not know Morales and Campbell by name, he
had noticed them talking to each other in the hotel lobby prior to
the assassination. Earlier in the same year, Rabern had noticed
Campbell in and around several police stations. If true, this
report is rather odd, considering that the CIA has no jurisdiction

**BALTIMORE**
**Chronicle**
'tare,

the assassination of J FK
could seem to be an eternal
mystery that has long since
passed into the realm of myth;
however, that is not the case
for today; technoloLy has
provided a kealth of neu tools
scith which to examine
evidence in criminal
cases-even cold cases over
forte years old.

The Zapruder
Film at MPI
The Zapruder
assassination
images restored on
DVD at MPI. Order
Now!
vide~.com)

Law2000, inc.
Computer Forensic
Experts Criminal,
Civil, Corporate
I.MV.Law2l0OV.net

john f kennedy
Free information
and resources
about john f
kennedy
john-f-kerr~e::y saffix corr

Positive ID
Solutions
Forensic &
Investigation
Equipment Priced
to Fit Your Budget
mvv.Altemal;HForoe.cor*.

Advertise on this site

The basic package
has 60 channels
featuring Free
Speech TV & Link
TV + local
channels, and it
includes FREE
Digital Video
Recorders and
HDTV Receivers.
Check for
promotional
offers!

11/25/06 5:57 PM

It's Time to Re-Open the Investigation of RFK and JFK Assassination...    http://baltimorechronicle.com/2006/112206CARMICHAEL.shtml

11.13 The Democrats and Civil Liberties
11.13 Impeach for Change Kicks off National Campaign
11.13 Bush's Belated Accountability Moment
11.10 What Vote-Theft Conspiracy?
11.09 The Secret World of Robert Gates
11.09 Gates of Hell: Another Constitution-Betraying Bushist in the Pentagon
11.08 Election Postmortem: What's Next?
11.08 American Voters Just Say No
11.07 Is Bush Next?
11.06 It's Election Eve, Do You Know Where Your Country Is?
11.06 America's Slide to Totalitarianism
11.06 Reader Response to Lindorff: An Intentional Strategy to Discredit Reality
11.02 America's Point of No Return
11.02 Kerry and Bush: The Joke's on Us
11.02 Eminent-Domain Chutzpah
11.01 Postcards of the Hanging: Race and Sex in Tennessee
11.01 How Neocon Favorites Duped U.S.
10.31 All the President's Lies
10.31 The "War for Oil" Comes Home
10.27 The Crimes of Greed vs. the Crimes of Government
10.27 Election Perspective: Misreading al-Qaeda on Iraq
10.24 How Democrats Might Blow It

Middle East
11.21 American Policy in Iraq Provides the Excuse Not to Leave
11.21 Killing Hope in Beit Hanoun
11.16 Bush's "New" Iraq Strategy Revealed: More Troops, More War
11.14 No Exit: The Baker Commission and the Trap of Reality
11.13 Call It What It Is: a Massacre
11.06 "The Iraqis didn't do it."
11.03 Just a wall?
11.03 Territorial fragmentation of the West Bank
11.02 Rogue President
10.25 Blood and Gravy II: The Jackal's Feast Goes on
10.23 Israel, Palestine, and Canada
10.23 Iraq: Time for Truth and Consequences
10.21 Giving Osama What He Really Wants

The Rest of the World
11.22 Chertoff's "Chilling Vision"
11.02 Space War
10.27 Hail to the Hungarians!
10.26 The Veil and the British Male Elite

We are a Public Non-profit Newspaper. Your donation is essential to our survival.

on U.S. soil. Another bizarre fact: Morales was officially stationed in Laos in 1968.

O'Sullivan found video images of Campbell with another figure who has now been identified as George Joannides, a pivotal figure in the CIA and the re-investigation of the assassination of JFK.

Joannides had been the Chief of Psychological Warfare Operations at IM-Wave. He had retired from his CIA post, but in 1978 he returned to active duty, as it were, as the liaison between the House Select Committee on Assassinations (HSCA) during its re-investigation of the assassinations of JFK and Martin Luther King.

Puzzling, perplexing and problematic, Joannides failed to inform his colleagues at the HSCA that he had ever worked at IM-Wave. This is a troubling enigma, for it suggests that he intended to maintain his covert identity-a fact that would compromise his involvement in the HSCA and jeopardize the entire congressional investigation.

A former researcher with the HSCA, Ed Lopez, identified Joannides as the person in the Ambassador Hotel video with what he described on camera as 99% accuracy. More: Lopez recalled Joannides' obstructive practice of denying the HSCA access to crucial documents in the re-investigation of the assassination of JFK.

O'Sullivan did not stop there. Moving to Washington, he met Wayne Smith, a veteran State Department official who worked with Morales at the US embassy in Havana in the final year of the Batista regime through the Cuban Revolution in 1959 and 1960. When O'Sullivan asked him to respond to the Ambassador Hotel video, Smith immediately stated, "That's him, that's Morales." From a conversation in 1975, Smith recalled that Morales stated that JFK deserved to be assassinated. From Smith's testimony, O'Sullivan learned that Morales "hated the Kennedys"-because of their cancelling the air support for the failed Bay of Pigs invasion of 1961.

In a hotel near the CIA headquarters (now named the George H. W. Bush Center for Central Intelligence) in Langley, Virginia, O'Sullivan met with a former agent, Tom Clines who said that all of the men in the Ambassador Hotel video were misidentified as former CIA agents. When O'Sullivan informed him that Ayers and Smith had positively identified the men as Morales, Campbell and Joannides, Clines became "disturbed," and he refused to go on camera for the interview.

Following his interview of Clines, senior journalists in Washington advised O'Sullivan to take his testimony with a grain of salt as he was known to "blow smoke" deliberately as a routine function to dissemble facts for the press and public.

Gaeton Fonzi was the lead investigator of the HSCA investigation of the assassination of JFK. In his book, The Last Investigation, Fonzi reported the testimony of Bob Walton, a man who met Morales and discussed JFK with him. According to Fonzi's account, Morales asserted his direct involvement in the assassination of JFK as revenge for the Bay of Pigs.

On the Watergate tapes, Richard Nixon always referred to the assassination of JFK as "the Bay of Pigs thing." During Eisenhower's presidency, Nixon served as the White House liason with the CIA. As Vice-President, Nixon worked directly with Allen Dulles and other senior staff at the CIA on the planning of the Bay of Pigs operation. It should be noted that George H. W. Bush has been known to have been integral to the Bay of Pigs operation since the publication of the enormously popular

*-1 omen's 1.etc Et nter', lanplo, meat I.aw ftolline: ('ali 7'u1_I-'ree t-877-421-9400 uwsder, 0 ' Oe-m-€ p m i slartmg Dec 5) Free +o eI- Man land rcs'uen's:*

*just because you're throw(ng it out doesn't make it trash.*

It's Time to Re-Open the Investigation of RFK and JFK Assassination...    http://baltimorechronicle.com/2006/112206CARMICHAEL.shtml

bestselling book of 1991, *Plausible Denial*, by Mark Lane.

During his campaign for the presidency in 1960, Nixon was shocked that JFK made public the contents of his top-secret intelligence briefings-and had moved to Nixon's right to advocate overt military intervention against Cuba. The CIA planned to overthrow Castro in an invasion manned with exiled Cubans trained by the staff at JM-Wave. From our perspective today, it is perfectly understandable why JFK would have been compelled to make this policy position public in his presidential campaign. Had he not done so, JFK could have been tarnished with a charge of being "weak on communism," by Nixon, who had been one of the leading witch-hunters of the disgraceful McCarthy Era.

Upon his inauguration as president, JFK continued to support the plans to attack Cuba with the force of exiled Cubans-a project that Nixon had nurtured, supported and managed for the Eisenhower White House. However, JFK decided to withhold U.S. air support in order to maintain an arm's length separation from the Cuban invasion.

The Bay of Pigs became a fiasco. JFK accepted the blame, and he immediately ordered a thorough-going reorganization of the CIA. A few months later, Allen Dulles, who had been a free-wheeling manufacturer of coups d etats while serving as Director of Central Intelligence (DCI), 'retired' after a formal conversation with JFK. JFK promptly named a new director, and John McCone, who had been the director of the Atomic Energy Commission, soon took Dulles's place as DCI.

JFK's reorientation of the CIA did not stop there. Recognizing that the agency's mission to wage a covert Cold War was dangerously counterproductive, JFK ordered the CIA to make nuclear non-proliferation its top priority. Eventually, JFK would successfully negotiate the Test Ban Treaty with Nikita Khruschev in the aftermath of the Cuban Missile Crisis-by far the most significant strategic confrontation of the entire Cold War.

While rogue elements in the U.S. intelligence community have long been suspected of meddling in his assassination and those of his brother and Martin Luther King, Jr., Shane O'Sullivan's identification of three CIA agents in the Ambassador Hotel on the night of the assassination of RFK suggests strongly that the case should be reopened. The third agent in the Ambassador Hotel, George Joannides, now appears to have been engaged in a sabotage mission during the HSCA investigation of JFK's assassination.

The assassination of JFK would seem to be an eternal mystery that has long since passed into the realm of myth; however, that is not the case for today; technology has provided a wealth of new tools with which to examine evidence in criminal cases-even cold cases over forty years old.

While O'Sullivan is calling for a re-opening of the case of RFK, it is only reasonable to re-open JFK's case, as well.

In 1968, I was in my final year at the University of North Carolina. From my meeting with a close associate of RFK, I worked as a college and university organizer in his presidential campaign. At the time of his assassination, RFK was the leading candidate for the presidency-far ahead of his nearest rival in the polls and definitely on track to win the November election.

Seeing the BBC broadcast of videotape evidence of three unassigned CIA agents in the Ambassador Hotel Ballroom at the

11/25/06 5:57 PM

It's Time to Re-Open the Investigation of RFK and JFK Assassination...    http://baltimorechronicle.com/2006/112206CARMICHAEL.shtml

time of RFK's assassination shocked me. The federal government, Congress and the criminal justice system of the United States failed to protect the president of the United States and its leading presidential candidates. Worse. They have failed to tell the truth to the American people.

Today, on the anniversary of one of the most tragic dates in American history-I propose that the cases of RFK and JFK should be re-opened in either the 110th or the 111th Congress.

We must follow the evidence exhaustively and relentlessly, leaving no stone unturned and no document unexamined regardless of its current status: Sensitive; Secret, Top Secret or Above Top Secret. To do any less would be to become complicit in the lies and cover-ups that have denied the American people of the truth.

Michael Carmichael is a historian and author based in Oxford, England, UK. He is the founder and chief executive officer of planetarymovement.org. This article is republished in the Baltimore Chronicle with permission of the author. The complete illustrated and referenced article "Death of a Presidency" by Michael Carmichael is online here.

Copyright © 2006 The Baltimore Chronicle. All rights reserved.

Republication or redistribution of Baltimore Chronicle content is expressly prohibited without their prior written consent.

This story was published on November 22, 2006.

11/25/06 5:57 PM

Central Intelligence Agency



Washington, D.C. 20505

DEC 15 2006

James H. Lesar, Esquire
1003 K Street, N.W., Suite 640
Washington, DC 20001

Reference: F-2007-00419

Dear Mr. Lesar:

The office of the Information and Privacy Coordinator has received your 7 December 2006 Freedom of Information Act (FOIA) request on behalf of your client, Mr. David Talbot, for records regarding **George Joannides, David Morales, and Gordon Campbell.** We have assigned your request the reference number above. Please use this number when corresponding so that we can identify it easily.

Our records indicate you have outstanding balances in the amounts of $66.50 and $300.00 from two previous FOIA requests, F-1997-02111 and F-1999-01937, respectively (enclosed). In accordance with our Code of Federal Regulations, *requests and appeals on requests, referrals, or coordinations received from members of the public who owe outstanding fees for information services at this or other federal agencies will not be accepted and action on all pending requests shall be terminated in such circumstances.* Therefore we are canceling your case.

If you wish to settle your account, please send me your check or money order in the amount of $ 366.50 payable to the *Treasurer of the United States* citing Reference Numbers F-1997-02111 and F-1999-01937 to ensure proper credit to your account. Once the balance has been paid in full, you may resubmit your request.

Sincerely,

*Charles C. L* 07 0277

Scott Koch
Information and Privacy Coordinator

**FILED**

Enclosures                    **Exhibit 2**

FEB - 6 2007

**NANCY MAYER WHITTINGTON, CLERK**
**U.S. DISTRICT COURT**

JAMES H. LESAR
ATTORNEY AT LAW
1003 K STREET, N.W., SUITE 640
WASHINGTON, D.C. 20001
—
TELEPHONE (202) 393-1921
FAX (202) 393-7310

## FREEDOM OF INFORMATION ACT REQUEST

December 23, 2006

Mr. Scott Koch
Freedom of Information and Privacy
Coordinator
Central Intelligence Agency
Washington, D.C. 20505

VIA EMAIL AND CERTIFIED MAIL
NO. 7002 2410 0006 2154 7384

Re:  F-2007-00419

Dear Mr. Koch:

In your letter dated December 15, 2006 you advised me that you would not accept the above request which I made on behalf of Mr. David Talbot because two other clients of mine owed money for searches allegedly conducted in response to their requests of a decade ago.  Since I did not submit any of these requests on my own behalf but on the behalf of others, I believe you have improperly applied your regulation to this situation.

Nevertheless, I enclose a check in the amount of $366.50 to pay for the amount claimed to be owing on the referenced requests, F-1997-02111 and F-1999-01937.  I should add that I have no record or recollection of ever having received the October 27, 1999 letter from Ketheryn I. Dyer advising me that $66.50 in search fees had been incurred with regard to request F-1997-02111.  I also note that Ms. Dyer's October 27, 1999 letter was sent to an address I had moved from some four months before.

Sincerely yours,

*James H. Lesar*   07 0277

James H. Lesar

**FILED**

FEB - 6 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Exhibit 3

JAMES H. LESAR

ATTORNEY AT LAW
1003 K STREET, N.W., SUITE 640
WASHINGTON, D.C. 20001
——
TELEPHONE (202) 393-1921
FAX (202) 393-7310

January 12, 2007

Mr. Scott Koch
Freedom of Information and
    Privacy Coordinator
Central Intelligence Agency
Washington, D.C. 20505                    <u>VIA FACSIMILE</u>

        Re:  F-2007-00419

Dear Mr. Koch:

        By letter dated January 3, 2007, I resubmitted the above-referenced request of my
client, Mr. David Talbot, for expedited treatment pursuant to 5 U.S.C. 552(a)(6)(E).  The
CIA letter received this letter on January 8, 2007, making your response due on or before
January 18, 2007.

        In further support of that application, I wish to inform you that Mr. Talbot and
another reporter have signed a contract to do a story for New Yorker magazine which
will report on the claim made on BBC-TV that three CIA officers connected to your
JM/WAVE station were present at the Ambassador Hotel in Los Angeles the night
Senator Robert F. Kennedy was assassinated.  Their deadline for submitting their story is
March 1, 2007.  Thus, a response to Mr. Talbot's request is urgently needed.

        As soon as you have made your determination of Mr. Tablot's request, I would
appreciate notification by fax or telephone as to the nature of the determination and, if
documents will be released, the time and method of their transmittal to me.

        To clarify the request, I ask that any photographs be provided in duplicate 8x10
glossies with negatives of each photograph.

                        Sincerely yours,

                        *James H. Lesar*

                        James H. Lesar

07 0277

<u>Exhibit 4</u>

**FILED**

FEB - 6 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Central Intelligence Agency



Washington, D.C. 20505

JAN 2 3 2007

James H. Lesar, Esquire
1003 K Street, N.W., Suite 640
Washington, DC 20001

Dear Mr. Lesar:

    The office of the Information and Privacy Coordinator has received your
3 Januray 2007 Freedom of Information Act (FOIA) request, received in this office on
12 January 2007, on behalf of your client, Mr. David Talbot. Our officers will review it,
and will advise you should they encounter any problems or if they cannot begin the search
without additional information.

    You have requested expedited processing. We handle all requests in the order we
receive them: that is, "first-in, first-out." We make exceptions to this rule only when a
requester establishes a compelling need under the standards in our regulations. A
"compelling need" exists: 1) when the matter involves an imminent threat to the life or
physical safety of an individual, or 2) when a person primarily engaged in disseminating
information makes the request and the information is relevant to a subject of public
urgency concerning an actual or alleged Federal government activity. Your request does
not demonstrate a "compelling need" under these criteria and, therefore, we deny your
request for expedited processing.

    We have assigned your request Reference No. F-2007-00555. Please use this
number when corresponding with us about this request so that we can identify it easily.

                                   Sincerely,

                                   Scott Koch
                          Information and Privacy Coordinator

07 0277

**FILED**

FEB - 6 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

<u>Exhibit 5</u>

JAMES H. LESAR
ATTORNEY AT LAW
1003 K STREET, N.W., SUITE 640
WASHINGTON, D.C. 20001
—
TELEPHONE (202) 393-1921
Fax (202) 393-7310

## FREEDOM OF INFORMATIN ACT REQUEST

January 12, 2007

The Department of State
Research and Liaison Branch
1111 19th Street, N.W.
Room 500
Washington, D.C. 20524

VIA CERTIFIED MAIL NO.
7005 1160 0002 9259 7662

Re: Visa and Passport Records on David
Morales and Gordon Campbell

Dear Sir or Madam:

I represent Mr. Jefferson Morley, a reporter for The Washington Post.Com .
Pursuant to the Freedom of Information Act 5 U.S.C. 552, et seq., Mr. Morley requests
all passport and visa records pertaining to Mr. George Joannides during the years 1963-
1964 and 1967-1968. He requests that the processing of this request be expedited
pursuant to 5 U.S.C. 552(a)(6)(E)(1).

The search for these records should include a search under any code names,
cryptonyms, pseudonys or aliases used by Mr. Joannides. Mr. Joannides is known to
have used the name "Walter Newby."

Mr. Joannides is a deceased former CIA officer. (A of an obituary is attached.)
On November 20, 2006, BBC-TV ran a documentary which reported that three former
CIA officials who had worked at the CIA's JM/WAVE station in Miami, Florida during
the 1960s had been identified as appearing in photographs taken at the Ambassador Hotel
in Los Angeles the night Senator Robert F. Kennedy was assassinated. One of these
three, David Morales, has long been the subject of speculation that he was involved in the
assassination of President Kennedy, and on at least two occasions he is said to have
statements implicating himself in the President's assassination, and on one occasion, the
assassination of Senator Robert Kennedy as well.

These allegations, which appear to be backed by some credible witnesses, raise
issues of great public urgency. If true, the implications are potentially far-reaching and
explosive. If the allegations made on the BBC program are not founded in fact, the
public record should be clarified to show that as soon as possible.

07 027~

**FILED**

FEB - 6 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Exhibit 6

2

Mr. Morley and another reporter have signed a contract with The New Yorker Magazine to write a story reporting on the BBC-TV allegations. Their publication deadline is March 1, 2007.

In addition to the BBC-TV documentary, these allegations were the subject of an article in The Guardian., a copy of which is attached. The Baltimore Chronicle also ran a lengthy article by a British historian calling for a reopening of both the JFK and RFK assassinations. A copy of this article is also attached.

The BBC program also generated significant discussions in the comment boards for both The Guardian and BBC-TV web sites. Furthermore, the popular news aggregator del.icio.us.com 57 people have stored the British story for future reference. Looking at the sites daily ranking, this indicates that the BBC-TV allegations are probably among the five or ten most referenced Web articles. See: http://del. icio.us/popular/?new for the period November 20-December 7, 2006.

As an author and journalist, Mr. Morley is a "representative of the news media" and cannot be charged search fees. 5 U.S.C. 552(a)(4)(A)(ii)(II).

The FOIA provides that you have ten calendar days to make a determination whether or not to expedite processing of this request. Please advise me of you decision by fax or email. My fax number is (301) 657-3699. My email address is jlesar@mind-spring.com.

I hereby certify that the foregoing statements are true and correct to the best of my knowledge and belief.

Sincerely yours,

James H. Lesar

Felsinger of Coolidge; eight grandchildren and one great-grandson.

# David Morales

WILLCOX: Services for David Sanchez Morales, 52, who died May 8 in Tucson, were held at Sacred Heart Catholic Church with Fr. John Williams officiating.

Burial was in Sunset Cemetery, under direction of Westlawn Chapel and Mortuary.

Mr. Morales was born Aug. 26, 1925, in Phoenix, and had maintained an Arizona home while working for the Foreign Service, much of the time as a consular. He moved to Willcox two years ago upon retirement, and became active in civic affairs, including the Willcox Lions Club and as adjutant for the American Legion Post in Willcox.

He was graduated from the University of California at Los Angeles in 1947, and was a football player while a student at Phoenix Union High School.

Surviving are his wife, Joan, of Willcox; four daughters, Juanita Gago of Studio City, Calif.; Martha J. Morales of Bakersfield, Calif., and Maureen and Marianne Morales, both of Willcox; four sons, James of Newton, Mass., Anthony of Amhurst, Mass., and Ernesto and Gregory, both of Willcox; two brothers, Raymond and Robert Morales, both of Phoenix; two sisters, Carmen Fronteres and Frances Baguio, both of Arvin, Calif., and one grandchild.

# Eleanor Dustin

BYLAS: Services for Mrs.



**UNITED STATES POSTAL SERVICE®**

Home | Help | Sign In

Track & Confirm          FAQs

# Track & Confirm

## Search Results

Label/Receipt Number: 7005 1160 0002 9259 7662
Status: **Delivered**

Your item was delivered at 11:17 AM on January 18, 2007 in
WASHINGTON, DC 20524.

( Additional Details > ) ( Return to USPS.com Home > )

**Track & Confirm**

Enter Label/Receipt Number.

( Go > )

Notification Options

**Track & Confirm by email**

Get current event information or updates for your item sent to you or others by email.   ( Go > )



POSTAL INSPECTORS     site map   contact us   government services   jobs   **National & Premier Accounts**
Preserving the Trust          Copyright © 1999-2004 USPS. All Rights Reserved. Terms of Use  Privacy Policy

07 0277

<u>Exhibit 7</u>

# FILED

FEB - 6 2007

**NANCY MAYER WHITTINGTON, CLERK**
**U.S. DISTRICT COURT**

2/4/2007 1:03 AM

JS-44
(Rev.1/05 DC)

02-277
RJL

**I (a) PLAINTIFFS** David Talbot
Jefferson Morley

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

**DEFENDANTS** Central Intelligence Agency
Department of State

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TR____

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
James H. Lesar
1003 K Street, N.W., Suite 640
Washington, D.C. 20001

CASE NUMBER   1:07CV00277

JUDGE:  Richard J. Leon

DECK TYPE:  TRO/Preliminary Injunction

DATE STAMP:  02/__/2007

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☐ 3 Federal Question
(U.S. Government Not a Party)

☒ 2 U.S. Government
Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties
in item III)

**III CITIZENS**
FOR PLAINTIFF

|  | PTF | DFT |  | | |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV.  CASE ASSIGNMENT AND NATURE OF SUIT**
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

☐ **A.  Antitrust**

☐ 410 Antitrust

☐ **B.  Personal Injury/
Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

☐ **C.  Administrative Agency
Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If
Administrative Agency is Involved)

☒ **D.  Temporary Restraining
Order/Preliminary
Injunction**

Any nature of suit from any category may
be selected for this category of case
assignment.

*(If Antitrust, then A governs)*

☐ **E.  General Civil (Other)  OR  ☐ F.  Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or
defendant
☐ 871 IRS-Third Party 26
USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of
Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational
Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC
Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt
Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/
Exchange
☐ 875 Customer Challenge 12 USC
3410
☐ 900 Appeal of fee determination
under equal access to Justice
☐ 950 Constitutionality of State
Statutes
☐ 890 Other Statutory Actions (if not
administrative agency review or
Privacy Act

④

| ☐ G. Habeas Corpus 2255 | ☐ H. Employment Discrimination | ☒ I. FOIA/PRIVACY ACT | ☐ J. Student Loan |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☒ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ☐ K. Labor/ERISA (non-employment) | ☐ L. Other Civil Rights (non-employment) | ☐ M. Contract | ☐ N. Three-Judge Court |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ Multi district Litigation  ☐ 7 Appeal to District Judge from Mag. Judge

---

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

*Freedom of Information Act, 5 U.S.C. 8552*

**VII. REQUESTED IN COMPLAINT**   CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23   **DEMAND $**   Check YES only if demanded in complaint   **JURY DEMAND:** ☐ YES   ☐ NO

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   ☐ YES  ☐ NO   If yes, please complete related case form.

DATE **2/6/07**   SIGNATURE OF ATTORNEY OF RECORD   *James H. Lesar*

---

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

