**FILED**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

FEB - 6 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

DAVID TALBOT, <u>et</u> <u>al</u>.              :
                                             :
        Plaintiffs                    CASE NUMBER  1:07CV00277

        v.                            JUDGE: Richard J. Leon

CENTRAL INTELLIGENCE AGENCY,          DECK TYPE: TRO/Preliminary Injunctio
        <u>et</u> <u>al</u>.
                                      DATE STAMP: 02/██/2007
        Defendants


<u>**PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER**</u>

    Plaintiffs David Talbot and Jefferson Morley respectfully move for
entry of a temporary restraining order against the unlawful attempts of
defendants Central Intelligence Agency ("CIA") and Department of State
("DOS") to impede plaintiffs' efforts to obtain on a timely basis
records which will help resolve the issue of whether three former CIA
operations officers were present in the Ambassador Hotel in Los Angeles
the night Senator Robert F. Kennedy was assassinated there as claimed in
a BBC-TV documentary which aired November 20, 2006.

    Plaintiffs have a compelling need for this information because they
have been commissioned to do a story on the claims set forth in the BBC-
TV documentary which is slated for publication in the April 15, 2007
issue of <u>The</u> <u>New</u> <u>Yorker</u> magazine.  In addition, a book by plaintiff
Talbot, <u>Brothers:  The Hidden History of the Kennedy Years</u> (Free Press/
Simon & Schuster), will be published simultaneously and will also
include material on this topic.  The information sought is critical
resolving these claims.

2

A Memorandum of Points and Authorities, a proposed order, and the declaration of James H. Lesar are submitted in support of this motion.

Respectfully submitted,

James H. Lesar #114413
1003 K Street, N.W.
Suite 640
Washington, D.C. 20001
Phone:  (202) 393-1921

Counsel for Plaintiffs

DATED:  February 6, 2007

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DAVID TALBOT, <u>et</u> <u>al</u>.            :
                                            :
            Plaintiffs                     :
                                            :
    v.                                      :
                                            :
CENTRAL INTELLIGENCE AGENCY,  :
    <u>et</u> <u>al</u>.                    :
                                            :
            Defendants                      :

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
<u>PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER</u>**de-

James H. Lesar
1003 K Street, N.W.
Suite 640
Washington, D.C. 20001
Phone:  (202) 393-1921

Counsel for Plaintiffs

07 0277

FILED

FEB - 6 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| Statement of Facts | | 2 |
| The Requests and the Application for Expedited Processing | | 2 |
| A. | David Talbot's Request | 2 |
| B. | Jefferson Morley's Request | 4 |
| ARGUMENT | | 4 |
| I. | This Court Has Jurisdiction to Grant the Relief Sought | 6 |
| II. | Plaintiffs Are Entitled to a Temporary Restraining Order | 7 |
| A. | Plaintiffs Are Likely to Prevail on the Merits | 8 |
| | 1. The Requests Concern a Matter of Current Exigency | 9 |
| | 2. Delay Would Compromise a Significant Interest | 13 |
| | 3. The Requests Concern Federal Government Activity | 14 |
| B. | Plaintiffs Will Suffer Irreparable Harm If the Requested Injunctive Relief Is Not Granted | 14 |
| C. | Injunctive Relief Will Not Burden Others' Interest | 16 |
| D. | The Public Interest Favors the Requested Relief | 16 |
| CONCLUSION | | 17 |

i

## TABLE OF CASES

**Page**

**Allen v. Central Intelligence Agency**, 636 F.2d 1287 (D.C.
    Cir.1980)          9

**Al-Fayed v. CIA** ("**Al-Fayed I**") No. 00-2092 (CKK), 2000 U.S.
    Dist. LEXIS 21476 (D.D.C. 2000)      6

**Al-Fayed v. CIA** ("**Al-Fayed II**"), 254 F.3d 300 (D.C.Cir. 2001)  8,14

**Ctr. to Prevent Handgun Violence v. Dep't of the Treasry**,
    49 F. Supp. 2d 3 (D.D.C.1999)      17

**Dep't of Justice v. Reporters Committee for Freedom of the
    Press**, 489 U.S. 749 (1989)      17

**Elec. Privacy Info. Ctr v. DOJ**, 416 F. Supp. 2d 30 (D.D.C.
    2006)      16

**Jacksonville Port Authority v. Adams**, 556 F.2d 52 (D.C.Cir.
    1977)      17

**Local Lodge No. 1266, Int'l Ass'n of Machinists and Aerospace
    Workers v Panoramic Corp.**, 668 F.2d 276 (7th Cir. 1981)   15

**Martin Marietta Corp. v. Bendix Corp.**, 690 F.2d 558 (6th Cir.
    1982)      14

**Nat'l Archives & Records Admin. v. Favish**, 541 U.S. 157 (2004)  15

**United States v. BNS, Inc.**, 858 F.2d 456 (9th Cir.1988)   14

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


DAVID TALBOT, et al.                      :
                                          :
    Plaintiffs                            :
                                          :
    v.                                    :
                                          :
CENTRAL INTELLIGENCE AGENCY,              :
    et al.                                :
                                          :
    Defendants                            :


MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDERde-

This case arises under the provisions of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(A)(6)(E), which requires expedited processing of a certain narrow category of cases in which a person who regularly disseminates information to the public has a compelling need to obtain information expeditiously.  Here, plaintiffs, David Talbot ("Talbot") and Jefferson Morley ("Morley"), seek information which will help confirm or refute allegations which appeared in a BBC-TV documentary claiming that three former CIA operations officers connected to the Agency's JM/WAVE station in Miami were photographed at the Ambassador Hotel in Los Angeles on June 5, 1968, when Senator Robert F. Kennedy was assassinated.

Because the two requests at issue fit clearly within the statutory mandate that such requests are entitled to expedited processing, defendants Central Intelligence Agency ("CIA") and Department of State ("DOS") are unlawfully impeding plaintiffs' right to prompt access to these records, they have repaired to this Court seeking to have the agencies'

2

unlawful conduct restrained.  The reasons why plaintiffs are clearly

entitled to this relief will be set forth in detail below.


## STATEMENT OF FACTS

### The Requests and the Application for Expedited Processing

#### A.  David Talbot's Request

Plaintiff David Talbot initially submitted his request by letter

dated December 7, 2006.  It sought:

> a.  All records pertaining to temporary
> duty (TDY) travel during the period January-
> December, 1968, including but not limited  to
> all Current Residence and Dependency Reports.
>
> b.  All photographs of George Joannides,
> David Morales, or Gordon Campbell, whether
> taken individually or in groups, including any
> photographs in disguise.

See Exhibit 1.  He also requested expedited processing pursuant to

5 U.S.C. § 552(a)(6)(E), and that he be granted status as a repre-

sentative of the news media under 5 U.S.C. § 552(a)(4)(A)(ii)(II).

Id.

In support of the request for expedited processing, Talbot

advised the CIA that last November BBC-TV had aired a documentary

in which an Irish filmmaker had reported that in researching photo-

graphic archives on the shooting of Senator Robert F. Kennedy he

had discovered photographs of three men taken at the Ambassador

Hotel on June 5, 1968, the evening Senator Kennedy was assassinated

there, and that he had subsequently obtained identifications of the

three men as George Joannides, David Morales, and Gordon Campbell,

all of whom were CIA operational officials working at the Agency's

3

JM/WAVE station in Miami. Talbot noted that these identifications appeared to be backed by some credible witnesses. Wayne Smith, a former State Department official who was stationed at the American Embassy in Havana, Cuba, in 1959-60, identified David Morales. Ed Lopez, an investigator for the House Select Committee on Assassinations ("HSCA") in 1976-1978 when Joannides was liaison between the CIA and the HSCA, identified Joannides.

Talbot also advised the CIA that the BBC-TV allegations were the subject of a story in The Guardian, a noted British journal, and an of an article in the Baltimore Chronicle by a British historian calling for the reopening of the assassinations of President John F. and Senator Robert F. Kennedy. See Exhibits 2-3.

Additionally, Talbot pointed out that the BBC program had generated significant online discussion in the comment boards for both The Guardian and BBC web sites. Moreover, the popular news aggregator del.icio.us.com reports that 57 people have stored the BBC story for future reference. Looking at the site's daily rankings, this indicated that the BBC allegations were probably among the five or ten most referenced Web articles. Id., citing http:// del.icio.us/popular/?new of recent weeks. See Exhibit 1.

By letter dated December 15, 2006, the CIA informed Talbot's attorney that it could not accept Talbot's request because two former clients of his attorney had failed to pay search fees. He was advised that the request could be resubmitted once the search fees had been paid. Talbot's attorney paid the search fees, then resubmitted the request by letter dated January 12, 2007, and faxed

4

to the CIA on that date. In this letter, Talbot supplemented his request for expedited treatment, informing the CIA that he and another reporter had signed a contract to do a story on the subject of the BBC-TV documentary's allegations for **The New Yorker** magazine, and that their deadline for submitting their story was March 1, 2007.

By letter dated January 23, 2007, the CIA denied the request for expedited processing. It gave no explanation of its reasons for denying the request other than conclusorily stating that it failed to demonstrate "compelling need" under its regulations.

B.   **Jefferson Morley's Request**

By letter dated January 12, 2007, Morley submitted a request to the Department of State for "all passport and visa records pertaining to Mr. George Joannides for the years 1963-1964 and 1967-1968." He requested expedited processing of his request pursuant to 5 U.S.C. § 552(a)(6)(E), and that he be granted status as a representative of the news media pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II). **See** Exhibit 4.

Morley's request for expedited treatment set forth the same facts as were contained in Talbot's request for expedited processing.

<u>**ARGUMENT**</u>

The Freedom of Information Act provides that ". . . each agency, upon any request for records . . ., shall make the records <u>promptly</u> available to any person." 5 U.S.C. § 552(a)(3)(A) (emph-

5

asis added).   Because of the public popularity of the FOIA and
insufficient resources applied to the task, the command of Congress
that disclosure be prompt has been honored more often in the breach
than the observance.   However, in 1996, Congress, recognizing that
delay in processing requests of exceptional urgency and interest to
the public undermined the fundamental goals of the FOIA, amended it
to provide for expedited processing in a narrow category of cases.

This case fits clearly within that category. Indeed, if this
case does not fit within its ambit, it is difficult to imagine a
case that would.   Plaintiffs have a fixed publication deadline.
They are investigating a story which involves two of the greatest
crimes ever committed in American history, the assassinations of
President John F. Kennedy and a presidential candidate, his bro-
ther Senator Robert F. Kennedy.  If the allegations are true, they
raise questions about the involvement of CIA officials in both
assassinations  and would indicate a coverup that has been ongoing
for over forty years.   The implications of this and their impor-
tance to the American body politic are enormous.  Similarly, if the
allegations are false, there is an overriding public interest in
disproving them immediately.

The evidence sought by plaintiffs goes directly to the heart
of the issue which must be resolved.   They seek photographs and
travel records which should provide a basis for confirming or
rejecting photographic identifications which have been made and
show the whereabouts of the CIA officials allegedly present in the
Ambassador Hotel when Senator Kennedy was shot.  Neither from the

6

personal standpoint of the journalists investigating this story nor from the public interest perspective could there be a more compelling need to expedite the processing of their FOIA requests.

## I.  THIS COURT HAS JURISDICTION TO GRANT THE RELIEF SOUGHT

This Court clearly has jurisdiction to grant the relief requested.  The FOIA provides:

> On complaint, the District Court of the United States . . . in the District of Columbia has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant.  In such a case the court shall determine the matter de novo.

5 U.S.C. § 552(a)(4)(B).

The expedited processing provision of the FOIA authorizes judicial review of challenges to "Agency action to deny or affirm a denial of a request for expedited processing pursuant to this subparagraph. . . ."  5 U.S.C. § 552(a)(6)(E)(iii).  This Court has held that "[t]his language of alternatives clearly indicates that judicial review is appropriate at either of two moments:  when the agency has denied a request for expedited processing, or when the agency has, upon administrative appeal, affirmed the denial of such a request."  Al-Fayed v. CIA, No. 00-2092 (CKK), 2000 U.S. Dist. LEXIS 21476 (D.D.C. 2000)("Al-Fayed I"),

Since the CIA has denied Talbot's request for expedited processing, he has clearly exhausted his administrative remedies. The State Department has failed to make a timely determination of Morley's request.  DOS has, in effect, denied his request by

7

failing to make a determination within the 10-calendar-day period
prescribed by the statute.

While no authority has been found which directly supports this
argument, several reasons make it clear that it is the only proper
construction of the expedited processing provision.   First, as
noted in <u>Al-Fayed I</u>, the statutory language "authorizes judicial
review for challenges to "Agency action <u>to deny or affirm denial of</u>
a request for expedited processing. . . ."   <u>Id</u>. (emphasis in orig-
inal).    Thus, no appeal of a denial is required.   An agency's
failure to meet its mandatory 10-day time period for determining a
request for expedited treatment by remaining silent is a <u>de</u> <u>facto</u>
denial of the request.   Second, treating failure to make a determi-
nation as other than a denial of the request undermines the statu-
tory scheme and is particularly inappropriate since no appeal need
be made of a denial.   Third, not treating a failure to determine as
a denial would in effect grant an agency an extension of time up to
the twenty-working-days period when it must determine a normal FOIA
request.   This more than doubling of the permissible time would
plainly thwart the intent of Congress to require a resolution of
such matters in a timely manner.


II.   <u>PLAINTIFFS ARE ENTITLED TO A TEMPORARY RESTRAINING ORDER</u>

In considering plaintiffs' request for a temporary restraining
order ("TRO") compelling defendants to process their requests on an
expedited basis, this Court must assess four factors:   (1) whether
plaintiff has a substantial likelihood of success on the merits;

8

(2) whether the plaintiff would suffer irreparable injury were an injunction not granted; (3) whether an injunction would substantially injure other interested parties; and (4) whether the grant of an injunction would further the public interest. Al-Fayed v. CIA, 254 F.3d 300, 303 (D.C.Cir. 2001)("Al-Fayed II").

Consideration of these factors in this case weighs unequivocally in favor of granting an order requiring defendants to expedite the processing of plaintiffs' requests.

A.    Plaintiffs Are Likely to Prevail on the Merits

Given the clarity of plaintiffs' right to expedited processing under the statute, there is a substantial likelihood that they will prevail on the merits.

The pertinent part of the expedited processing provision provides that a "compelling need" exists when a request is made by a "person primarily engaged in disseminating information" who has some "urgency to inform the public concerning actual or alleged Federal Government activity." 5 U.S.C. 552 § 552(a)(6)(E)(v)(II).

Plaintiffs unquestionably comply with these requirements. Both are experienced journalists and authors of books, thus they are "primarily engaged in disseminating information." Their need to obtain the information requested is urgent. They have a joint contract to publish a story in The New Yorker magazine and their deadline for submitting their story is March 1, 2007. The New Yorker is scheduled to publish the story in April, 2007. In addition, Talbot has a book which will be published at the time of

9

**The New Yorker** magazine article and will include material gathered during their joint investigation.

The Court of Appeals has established a three-part test for determining whether there is an "urgency to inform the public concerning actual or alleged Federal Government activity." First, a court must consider whether the request "concerns a matter of current exigency to the American public." Second, whether "the consequences of delaying a response would compromise a significant recognized interest." Third, whether the request concerns Federal Government activity. Id., 254 F.3d at 310.

1.  **The Requests Concern a Matter of Current Exigency**

Plaintiffs' requests concern a matter of great current exigency to the American public. J. Edgar Hoover, then Director of the FBI, which was the Warren Commission's principal investigative arm, testified to the Warren Commission: "Well, I can ensure you that as far as the FBI concerned, the case will be continued in an open classification for all time. That is, any information coming to us or any report coming to us from any source will be thoroughly investigated, so that we will be able to either prove or disprove the allegation." Warren Commission Hearings, Vol. V, p. 100.

The Court of Appeals for the District of Columbia Circuit has taken note of the profound interest in President Kennedy's assassination, stating in Allen v. Central Intelligence Agency, 636 F.2d 1287, 1300 (D.C.Cir.1980), that "plaintiff's request . . . seems in part to be motivated by a desire to determine whether the CIA has frustrated the investigation into or had a role in the assassina-

10

tion of President Kennedy--an event in which the public has dem-
onstrated an almost unending interest." The Court also termed the
request to be "in an area of great public interest. . . ." Id.

The current public interest remains high. This is evidenced
first and foremost by the fact that The New Yorker, a major nation-
al magazine, has commissioned the article which will run in April.
Another national magazine was also interested in pursuing the
story. Their judgment as to what the public is currently
interested in is highly credible. The public interest is further
indicated that the story appeared initially on the BBC-TV, perhaps
the world's most prestigious news network, and in The Guardian, a
notable British journal, and the BBC-TV program generated signifi-
cant online discussion in the comment boards for the both the
Guardian and BBC web sites. "In addition, the popular news aggre-
gator del.icio.us.com reports that 57 people have stored the BBC
story for future reference. Looking at the site's daily rankings,
this indicates that the BBC allegations are probably among the five
or ten most referenced Web articles." December 7, 2007 letter from
James H. Lesar to Scott Koch requesting expedited treatment citing
http://del.icio.us/popular/?new of recent weeks. See Exhibit 1.

That there is current public interest in this topic is further
evidenced by the fact that several major books have been published
within the past four years, and that more will be published this
year. See Declaration of James H. Lesar ("Lesar Decl."), ¶ 5.
Moreover, there are many web sites which are concerned with Presi-
dent Kennedy's assassination. See Lesar Declaration, Id., ¶ 7.

11

The JFK/RFK assassinations are to this date still of great interest to the public because they are unsolved crimes in which allegations of government coverup and incompetence have endured for over four decades.  The public interest in such matters has caused the government to undertake repeated investigations of President Kennedy's assassination, including the Warren Commission, the Rockefeller Commission, the Senate Select Committee on Intelligence Activities with Respect to Government Operations ("the Church Committee"), and the House Select Committee on Assassinations,  In 1992, such concerns led Congress to unanimously pass the President John F. Kennedy Assassinations Records Collection Act ("JFK Act"), the most liberal disclosure act ever enacted in the United States. It established a presumption of immediate disclosure of all JFK-assassination-related records so the public could make up their own minds about the case.

That the current public interest in the JFK case remains active and strong is further evidence by the fact that Joan Mellen recently delivered a speech on the subject to a packed audience at the 92nd Street Y in New York City, the most prestigious venue in the city for debating public issues.  Lesar Decl., ¶ 8.

The unsolved murders of the President of the United States and a presidential candidate, his brother, remain of great public interest until solved because of they represent profound threats to functioning democracy and national security.  Indeed, the public interest in the unsolved murder of all political and social leaders continues long after the crimes were committed.  This has been evi-

12

denced in recent years by the substantial news media coverage of the trials and convictions of persons alleged to have murdered civil rights leaders forty or more years ago. Nor is the public interest limited to just this class of unsolved crimes. See, e.g., some of the examples of news coverage of such cases appened as Attachment 1 to the Lesar Declaration.

The circumstances present here are far different than those which led the Court of Appeals in Al-Fayed II to hold that the plaintiffs there had not demonstrated that their quest for certain records pertaining to the accident involving Princess Diana and Dodi Al-Fayed related to a matter of current exigency to the American public. Unlike Al-Fayed II, where the Court of Appeals noted that the requests related to events that had occurred "two to three years before plaintiffs made their requests for expedited processing," the initial requests here were made three to eight weeks of the triggering event. See 254 F.3d at 311. With respect to one particular event in which plaintiffs alleged current public interest, the Court in Al-Fayed II held that they had not shown that "there is substantial public interest either on the part of the American public or the media" in that event. Id. Here, by contrast, plaintiffs have shown that there is substantial current interest in the subject about which they seek information. And, contrary to the Al-Fayed plaintiffs' inability to show any sig- nificant adverse consequences if their request for expedited treatment were denied, Talbot and Morley have made a clear and sub- stantial showing that that would be the result if their requests

13

for expedited processing are denied.    (For details, see the
discussion of the consequences of delay in the section which
immediately ensues this section.)

Given these circumstances, there is no ground for maintaining
that the records sought by plaintiffs are not of great interest to
the American public.

2.  **Delay Would Compromise a Significant Interest**

The second factor to be considered in determining whether "the
consequences of delaying a response would compromise a significant
recognized interest."  The answer here is clearly that it will.
The interest is the right of the public to have prompt access to
information bearing on vital political issues and choices.  Con-
gress repeatedly emphasized this right when it passed the JFK Act
in 1992.  Four of the seven "findings" that it made regarding the
basis for the legislation stress the need to disclose information
pertaining to the JFK assassination quickly.  The second finding
made by Congress states that all Kennedy assassination records
"should carry a presumption of immediate disclosure."  See S.Rep.
No. 102-328 102d Cong., 2d Sess. 2 (1992)(findings 2, 5, 6, and 7).

Unless expedited processing is ordered, plaintiffs will not
have access to what could be definitive evidence resolving the
issue of whether there is credible evidence that CIA officials were
involved in the assassination of Senator Robert F. Kennedy, and by
implication, in the assassination of President John F. Kennedy as
well.  This will compromise the right of the American people to

14

know what that evidence shows and, on the basis of that knowledge
to petition the Government to take appropriate actions.

   3.   <u>The Requests Concern Federal Government Activity</u>

   Plaintiffs meet the third factor, which is whether the infor-
mation concerns alleged or actual Federal Government activity.  It
deals with three persons who were CIA operations officers when they
were allegedly photographed in the Ambassador Hotel in Los Angeles
on June 5, 1968, when Senator Robert F. Kennedy was assassinated.

   In addition to these three factors, <u>Al-Fayed II</u> also mentioned
a fourth consideration as being relevant, "[t]he credibility of the
requester.'"   <u>Id</u>, 254 F.3d at 310, quoting H.Rep. No. 104-795, at
28.  Both requesters here are highly credible, as is attested to by
their association with noted journals such as Washingtonpost.com
and Salon.com, and the fact that they have been commissioned by a
notable national magazine, <u>The New Yorker</u>, to do this story.

   B.   <b>Plaintiffs Will Suffer Irreparable Harm If the
        <u>Requested Injunctive Relief Is Not Granted</u></b>

   Unless the defendants' unlawful failure to expeditiously
comply with plaintiffs' request is immediately enjoined, they will
suffer irreparable harm.  The very nature of the right they seek to
vindicate in this action--expedited processing--depends upon time-
liness.  The courts have recognized that the requisite injury is
present, and preliminary injunctive relief is appropriate, in cases
where time is of the essence."  <u>See</u>, <u>e.g.</u>, <u>United States v. BNS,
Inc.</u>, 858 F.2d 456, 465 (9th Cir.1988); <u>Martin Marietta Corp. v.
Bendix Corp.</u>, 690 F.2d 558, 568 (6th Cir.1982).  Under the statu-
tory scheme established in the FOIA, it is clear that "time is of

15

the essence" here and that any further delay in the processing of
plaintiffs' request will cause irreparable injury.  Unless defen-
dants are ordered to process plaintiffs' requests immediately,
plaintiffs' undisputed right to expedition under the FOIA will be
irretrievably lost.

In addition to the loss of their clearly established statutory
right, any further delay in the processing of their requests will
irreparably harm their ability, and that of the public, to obtain
in a timely fashion, information that is of vital importance to the
article they will be publishing shortly.  They will be deprived of
the very information that is most critical to the story they are
writing.  For the purposes of this article, the information will be
lost and not made available to the public as it should be.

The public oversight mechanism provided by the FOIA is central
to open and democratic debate on critical issues.  As the Supreme
Court has observed, the FOIA is "a means for citizens to know 'what
the Government is up to.'  This phrase should not be dismissed as
a convenient formalism.  It defines a structural necessity in a
real democracy."  Nat'l Archives & Records Admin. v. Favish, 541
U.S. 157, 171-172 (2004)(emphasis added; citation omitted).

It is clear that if the information is to be made available
through an article in The New Yorker, plaintiffs' request must be
expedited.  Because time is of the essence,plaintiffs will be ir-
reparably harmed unless the Court acts now, "when it [is] still
possible to grant effective relief, and before "all opportunity to
grant the requested relief [is] foreclosed."  Local Lodge No. 1266,

16

<u>Int'l Ass'n of Machinists and Aerospace Workers v Panoramic Corp.</u>, 668 F.2d 276, 290 (7th Cir. 1981). As this Court recently noted:

> The 1996 amendments to FOIA creating the statutory right to expedition in certain cases "underlined Congress' recognition of the value in hastening release of certain information." As [plaintiff] correctly notes, the loss of that 'value' constitutes a recognized harm." As time is necessarily of essences in cases like this, such harm will likely be irreparable.

<u>Elec. Privacy Info. Ctr v. DOJ</u>, 416 F. Supp. 2d 30, 40-41 (D.D.C. 2006)(citations omitted)(granting preliminary injunction).

C. <u>Injunctive Relief Will Not Burden Others' Interests</u>

Defendants cannot be said to be "burdened" by a requirement that the comply with the law.  The immediate relief sought by plaintiffs will require nothing more of defendants than the law already mandates--the expeditious processing of their FOIA requests. Nor will the requested relief burden the interests of other parties who have submitted FOIA requests to them in any manner not foreseen by Congress.  In providing for the expedited processing of certain FOIA requests, Congress intended that such requests should take precedence over those that do not qualify for such treatment.  Fulfillment of the legislative mandate cannot be characterized as a burden on any party's interests.

D. <u>The Public Interest Favors the Requested Relief</u>

The last criterion for granting a preliminary injunction is overwhelmingly satisfied in this case. First, the D.C. Circuit has recognized that "there is an overriding public interest . . . in

17

the general importance of an agency's faithful adherence to its
statutory mandate." <u>Jacksonville Port Authority v. Adams</u>, 556 F.2d
52, 59 (D.C.Cir.1977).   Here, that includes faithful compliance
with the FOIA's expedited processing feature.

The public interest will also be served by the expedited re-
lease of the requested records, which will serve the FOIA's core
purpose of "shedding light on an agency's performance of its stat-
utory duties." <u>Dep't of Justice v. Reporters Committee for Freedom
of the Press</u>, 489 U.S. 749, 773 (1989).   As this Court has noted,
"[t]here is public benefit in the release of information that adds
to the citizens' knowledge" of government activities.   <u>Ctr. to Pre-
vent Handgun Violence v. Dep't of the Treasry</u>, 49 F. Supp. 2d 3, 5
(D.D.C.1999).   Obviously, information bearing on whether CIA offi-
cials transgressed their statutory duties and had some role in the
RFK/JFK assassinations eminently qualifies under these standards.


<u>CONCLUSION</u>

For the reasons set forth above, plaintiffs' motion should be
granted.   Pursuant to Local Rule 65.1(d), plaintiffs request that
the Court schedule a hearing on this motion at the Court's earliest
convenience.

Respectfully submitted,

James H. Lesar #114413
1003 K Street, N.W.
Suite 640
Washington, D.C. 20001
Phone:  (202) 393-1921

Counsel for Plaintiffs

JAMES H. LESAR
ATTORNEY AT LAW
1003 K STREET, N.W., SUITE 640
WASHINGTON, D.C. 20001

TELEPHONE (202) 393- 1921
FAX (202) 393-7310

**FREEDOM OF INFORMATION ACT REQUEST
AND REQUEST FOR EXPEDITED PROCESSING**

December 7, 2006

Mr. Scott Koch
Freedom of Information and Privacy
    Coordinator
Central Intelligence Agency          VIA FACSIMILE AND CERTIFIED MAIL
Washington, D.C. 20505               NO. 7002 2410 0006 2154 7391

        Re:  George Joannides, David
             Morales and Gordon Campbell

Dear Mr. Roch:

        I represent **Mr.** David Talbot.  Mr. **Talbot is an author and
journalist** and was founder of Salon.com, for which he also writes.
He is author of a forthcoming book on the Kennedy administration.

        Pursuant to the Freedom of Information Act, 5 U.S.C. § 552, et
leg., Mr. Talbot requests the following records pertaining to
George Joannides, David Morales, and Gordon Campbell be provided,
and that their processing be expedited:

        1.    All records pertaining to temporary duty (TDY) travel
during the period January-December, 1968, including but not limited
to all Current Residence and Dependency Reports.
                s
        2.    All photographs of Joannides, Morales, or Campbell,
whether taken individually or in groups, including any photographs
in disguise.

        The search for these records should include CIA Headquarters
and your stations in Miami, New Orleans, and Los Angeles.

        The search should also include any pseudonyms, cryptonyms,
code names or aliases used by these individuals.  Mr. Joannides
also used the name "Walter Newby."

        Please immediately advise all CIA *components* which may have
records responsive to this request that it is unlawful to destroy
such records while this request is pending.

        As a journalist and author, Mr. Talbot is a representative of
the news media under 5 U.S.C. § 552(a)(4)(A)(ii)(II)  and cannot be
charged search fees.

07 0277

**Exhibit 1**

FILED

FEB - 6 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Pursuant to 5 U.S.C. § 552 (a) (6) (E) (1) , Mr. **Talbot requests expedited processing of these records.** In conformity with your regulation governing expedited processing, 32 C.F.R. § 1900.34(c), **Mr. Talbot is a person primarily engaged in disseminating information and the information he seeks is "relevant to a subject of public urgency concerning an actual or alleged Federal government activity.**

On November 21, 2006, **BBC-TV aired a documentary which reported that three former CIA officials who had worked for the CIA's JMWAVE station in Miami, Florida during the 1960s appeared in films taken at the Ambassador Hotel in Los Angeles the night Senator Robert F. Kennedy was assassinated.** One of the three, David Morales, has long been the subject of speculation that he was involved in the assassination of President Kennedy, and on at least two occasions he is said to have made statements implicating himself in the Presidents assassination, and on one occasion the assassination of Senator Robert Kennedy as well.

These allegations, which **appear to be backed by some credible witnesses, raise issues of great public urgency.** If true, the implications are potentially *far-ranging* and explosive. If the alle gations made on the BBC program are not founded in fact, the public record should be clarified to show that as soon as possible.

Mr. Talbot also urgently needs to obtain the requested materials as he faces a publishing deadline which expires in March, 2007.

In addition to the BBC-TV documentary, **these allegations were the subject of a an article in** <u>The Guardian</u>. In addition, the Baltimore <u>Chronicle</u> ran a lengthy piece by a British historian calling for a reopening of both the JFK and RFK assassinations. Copies of these two articles are attached.

**The BBC program** has also **generated significant** *online* dis-*cussion in* the comment boards for the both the Guardian and BBC web sites. In addition, the popular news aggregator <u>del.icio.us.com</u> reports that 57 people have stored the BBC story for future reference. Looking at the sites daily *rankings,* this indicates that the BBC allegations are probably among the five or ten most referenced Web articles. <u>See</u> <u>http://del.icio.us/popular/?new</u> of recent weeks.

**The Freedom of Information Act provides that** you have ten calendar days to make a. determination whether or not to expedite processing of this re~~ :4t. Please advise me of your decision my fax or email. **My fax' number is (301) 657-3699. My email address is** <u>jlesar@mindspring.com</u>.

*61.ncereiy your\*,*

CgSTI1:IC71TIO=T

i, *David Talbot, hereby \*ortify, to the best of my knowledge and belief, t:hat the following facts are true and correct..*

1.  I am a journa3,ist primarily *engaged in the dissemination of information.*  "

2.  *I have a compelling used to obtain the above-requested information apoodily as i have a publication deadline in march,* 2007.

3.  On November 21, 2006, BBC-TV aired a *documentary which re-*ported that three fosnee CIA officials who had worked for the CIA,a JmRAVB *station in Niami;- florida during the 1960s appeared in films taken at the Ambassador' Hotel in Los Angeles the night senator Robert P. Kennedy was assassinated. one of the three, David morals, has long been the subject of speculation that he was in-*volved in the assassination of president ]Kennedy, and according to an article in The Guaian he is said to have *made statements on at least two different occasions implicating him-self in* the assassi-nation or President Kennedy, and on one occasion the *assassina-*tion of Senator Robert Kennedy as well.

DAVID TALBOT   · .  _V

# Did the CIA kill Bobby Kennedy?

In 1968, Robert Kennedy seemed likely to follow his brother, John, into the White House. Then, on June 6, he was assassinated - apparently by a lone gunman. But Shane O'Sullivan says he has evidence implicating three CIA agents in the murder

Monday November 20, 2006
The Guardian

At first, it seems an open-and-shut case. On June 5 1968, Robert Kennedy wins the California Democratic primary and is set to challenge Richard Nixon for the White House. After midnight, he finishes his victory speech at the Ambassador hotel in Los Angeles and is shaking hands with kitchen staff in a crowded pantry when 24-year-old Palestinian Sirhan Sirhan steps down from a tray-stacker with a "sick, villainous smile" on his face and starts firing at Kennedy with an eight-shot revolver.

As Kennedy lies dying on the pantry floor, Sirhan is arrested as the lone assassin. He carries the motive in his shirt-pocket (a clipping about Kennedy's plans to sell bombers to Israel) and notebooks at his house seem to incriminate him. But the autopsy report suggests Sirhan could not have fired the shots that killed Kennedy. Witnesses place Sirhan's gun several feet in front of Kennedy, but the fatal bullet is fired from one inch behind. And more bullet-holes are found in the pantry than Sirhan's gun can hold, suggesting a second gunman is involved. Sirhan's notebooks show a bizarre series of "automatic writing" - "RFK must die RFK must be killed - Robert F Kennedy must be assassinated before 5 June 68" - and even under hypnosis, he has never been able to remember shooting Kennedy. He recalls "being led into a dark place by a girl who wanted coffee", then being choked by an angry mob. Defence psychiatrists conclude he was in a trance at the time of the shooting and leading psychiatrists suggest he may have be a hypnotically programmed assassin.

Three years ago, I started writing a screenplay about the assassination of Robert Kennedy, caught up in a strange tale of second guns and "Manchurian candidates" (as the movie termed brainwashed assassins). As I researched the case, I uncovered new video and photographic evidence suggesting that three senior CIA operatives were behind the killing. I did not buy the official ending that Sirhan acted alone, and started dipping into the nether-world of "assassination research", crossing paths with David Sanchez Morales, a fearsome Yaqui Indian.

Morales was a legendary figure in CIA covert operations. According to close associate Tom Clines, if you saw Morales walking down the street in a Latin American capital, you knew a coup was about to happen. When the subject of the Kennedys came up in a late-night session with friends in 1973, Morales launched into a tirade that finished: "I was in Dallas when we got the son of a

bitch and I was in Los Angeles when we got the little bastard." From this line grew my odyssey into the spook world of the 60s and the secrets behind the death of Bobby Kennedy.

Working from a Cuban photograph of Morales from 1959, I viewed news coverage of the assassination to see if I could spot the man the Cubans called El Gordo - The Fat One. Fifteen minutes in, there he was, standing at the back of the ballroom, in the moments between the end of Kennedy's speech and the shooting. Thirty minutes later, there he was again, casually floating around the darkened ballroom while an associate with a pencil moustache took notes.

The source of early research on Morales was Bradley Ayers, a retired US army captain who had been seconded to JM-Wave, the CIA's Miami base in 1963, to work closely with chief of operations Morales on training Cuban exiles to run sabotage raids on Castro. I tracked Ayers down to a small town in Wisconsin and emailed him stills of Morales and another guy I found suspicious - a man who is pictured entering the ballroom from the direction of the pantry moments after the shooting, clutching a small container to his body, and being waved towards an exit by a Latin associate.

Ayers' response was instant. He was 95% sure that the first figure was Morales and equally sure that the other man was Gordon Campbell, who worked alongside Morales at JM-Wave in 1963 and was Ayers' case officer shortly before the JFK assassination.

I put my script aside and flew to the US to interview key witnesses for a documentary on the unfolding story. In person, Ayers positively identified Morales and Campbell and introduced me to David Rabern, a freelance operative who was part of the Bay of Pigs invasion force in 1961 and was at the Ambassador hotel that night. He did not know Morales and Campbell by name but saw them talking to each other out in the lobby before the shooting and assumed they were Kennedy's security people. He also saw Campbell around police stations three or four times in the year before Robert Kennedy was shot.

This was odd. The CIA had no domestic jurisdiction and Morales was stationed in Laos in 1968. With no secret service protection for presidential candidates in those days, Kennedy was guarded by unarmed Olympic decathlete champion Rafer Johnson and football tackler Rosey Grier - no match for an expert assassination team.

Trawling through microfilm of the police investigation, I found further photographs of Campbell with a third figure, standing centre-stage in the Ambassador hotel hours before the shooting. He looked Greek, and I suspected he might be George Joannides, chief of psychological warfare operations at JM-Wave. Joannides was called out of retirement in 1978 to act as the CIA liaison to the House Select Committee on Assassinations (HSCA) investigating the death of John F Kennedy.

Ed Lopez, now a respected lawyer at Cornell University, came into close contact with Joannides when he was a young law student working for the

committee. We visit him and show him the photograph and he is 99% sure it is Joannides. When I tell him where it was taken, he is not surprised: "If these guys decided you were bad, they acted on it.

We move to Washington to meet Wayne Smith, a state department official for 25 years who knew Morales well at the US embassy in Havana in 1959-60. When we show him the video in the ballroom, his response is instant: 'That's him, that's Morales." He remembers Morales at a cocktail party in Buenos Aires in 1975, saying Kennedy got what was coming to him. Is there a benign explanation for his presence? For Kennedy's security, maybe? Smith laughs. Morales is the last person you would want to protect Bobby Kennedy, he says. He hated the Kennedys, blaming their lack of air support for the failed Bay of Pigs invasion in 1961.

We meet Clines in a hotel room near CIA headquarters. He does not want to go on camera and brings a friend, which is a little unnerving. Clines remembers "Dave" fondly. The guy in the video looks like Morales but it is not him, he says: "This guy is fatter and Morales walked with more of a slouch and his tie down." To me, the guy in the video does walk with a slouch and his tie is down.

Clines says he knew Joannides and Campbell and it is not them either, but he fondly remembers Ayers bringing snakes into JM-Wave to scare the secretaries and seems disturbed at Smith's identification of Morales. He does not discourage our investigation and suggests others who might be able to help. A seasoned journalist cautions that he would expect Clines "to blow smoke", and yet it seems his honest opinion.

As we leave Los Angeles, I tell the immigration officer that I am doing a story on Bobby Kennedy. She has seen the advertisements for the new Emilio Estevez movie about the assassination, Bobby. "Who do you think did it? I think it was the Mob," she says before I can answer.

"I definitely think it was more than one man," I say, discreetly.

Morales died of a heart attack in 1978, weeks before he was to be called before the HSCA. Joannides died in 1990. Campbell may still be out there somewhere, in his early 80s. Given the positive identifications we have gathered on these three, the CIA and the Los Angeles Police Department need to explain what they were doing there. Lopez believes the CIA should call in and interview everybody who knew them, disclose whether they were on a CIA operation and, if not, why they were there that night.

Today would have been Robert Kennedy's 81st birthday. The world is crying out for a compassionate leader like him. If dark forces were behind his elimination, it needs to be investigated

  Shane O'Sullivan's investigation will be shown tonight on Newsnight, BBC2, 10.30pm.

It's Time to Re-Open the Investigation of RFK and JFK Assassination...

ᴮALTIMORE  **8** ᴾᴿᴵᴹ
Chronicle    ᴱᴹᴬᴵᴸ
OWl    ꜰᴇᴇᴅʙᴀᴄᴋ

JFK Research Site
Browse and search the largest digital
archive available.

Politics in Pictures
Boston Globe photo archives. JFK,Jackie,
Clinton, Kerry.

### Baltimore & Maryland

11.21 New Zealand's Earthrace Boat
and Crew To Visit Inner Harbor
on Nov. 23 & 24

11.02 This Election, the Medium Really
Is the Message

### Art & Entertainment

11.21 Isikoff on Iraq: "At a minimum
negligence in the commission of
a fraud"

### Environment

Ref.:  What is Global Warming, and
what can citizens do about it?

### Advice

11.17 How Rent Makes Poverty

### U.S. News Media Criticism

11.22 2008

11.17 Alternative Media Can Balance
Establishment's Experts

**11.10** Morning-After Pundits Take
Winners to Task

11.07 Midterms and the Media

10.30 Catapulting the Propaganda
with the Washington Post

### Letters

Open Letters:

11.09 Rumsfeld replacement (Robert
Gates) was director of voting
company

11.07 The best defense is a good
offense, so VOTE!

11.06 Pick a Number

11.06 If You Care About Higher
Education in Maryland, the
Gubernatorial Choice is Clear:
O'Malley

### Editorials & Op-Eds

11.22 It's Time to Re-Open the
Investigation of RFK and JFK
Assassinations

11.21 Congress Should Immediately
Terminate the 2001 AUMF

11.06 Statewide Questions on the
Ballot: Yes for 1, 2 and 3; No
for 4

10.25 Forget her "Pledge," She Took
an Oath: Why Pelosi is Wrong
on Impeachment

10.24 Let's March in January! An
Impeachment Call to Action

### United States

11.23 Gates & the Iran Arms Sales

11.21 TH*NK*NG REALITIES

11.20 Daggers Drawn - DLC versus
DNC

11.17 Forget About Centrism: We
Must Reclaim the Inspired Edge

11.15 Delusions of Separation

11.15 Blackmail & Bobby Gates

11.15 Family Feud: Little Bush Hits
Back at Daddy

11.15 Credit Ned Lamont with
Democrats' Antiwar Position

11.15 Why Impeachment, Sadly, Is a
Non-Starter

ANALYSIS:

BALTIMORE
Chronicle
'tare,

# It's Time to Re-Open the Investigation of
RFK and JFK Assassinations

by MICHAEL CA*ICHAEL

Nov. 22, 2006-Planning to write a
film script about the case, Shane
O'Sullivan, an independent
researcher, investigated the
assassination of RFK. But, O'Sullivan
found much more than he had
hoped.

On Monday night, the BBC broadcast
O'Sullivan's report on their
high-profile programme,
"Newsnight." O'Sullivan's findings
shocked many people. Working
through an exhaustive analysis of videotapes made at the
Ambassador Hotel on the night of RFK's assassination, O'Sullivan
identified three figures as former agents of the CIA. Two of the
agents O'Sullivan identified could be seen moving away from the
hotel pantry shortly after the shooting of RFK.

Following his preliminary identifications, O'Sullivan presented the
video images to more authoritative sources, men who knew the
three agents personally. While there was a slender degree of
uncertainty (circa 5-10%) the men in the videos were positively
identified as the former CIA agents:

   o David Sanchez Morales,
   o Gordon Campbell and
   • George Joannides

Morales was known to be involved in coups d etats throughout
Latin America and he had a reputation of a dangerous man with
an explosive temper who was capable of violence. To entertain
his friends, Morales would tell stories about his involvement in
the killing and capture of Che Guevara, coups in Latin America
and other nefarious covert activities.

Two of the CIA agents in the Ambassador Hotel: Morales and
Joannides are now dead, while the whereabouts of the third,
Campbell, are presently unknown.

O'Sullivan interviewed Bradley Ayers, U.S. Army Captain retired,
who had been stationed at IM-Wave, the Miami base for the CIA.
In 1963, David Morales was the Chief of Operations at IM - Wave
Ayers and Morales trained Cuban exiles in the arts of sabotage to
be deployed in covert action against the regime of Fidel Castro.
On camera, Ayers identified Morales and Campbell with what he
described as 95% accuracy. Following that positive identification,
Ayers introduced O'Sullivan to David Rabern, a freelance
mercenary who had been contracted by the CIA to participate in
the Bay of Pigs invasion in 1961. Rabern had been in the
ballroom of the Ambassador Hotel on the fateful night in 1968.

While Rabern did not know Morales and Campbell by name, he
had noticed them talking to each other in the hotel lobby prior to
the assassination. Earlier in the same year, Rabern had noticed
Campbell in and around several police stations. If true, this
report is rather odd, considering that the CIA has no jurisdiction

hhe assassination of .) f K
~f'ould seem to be an eternal
mvsterp that has long since
passed into the realm or myth:
however, that is not the case
for today; technoloLy has
provided a Kealth or neu tools
scith which to examine
evidence in criminal
cases-even cold cases over
forte years old.

Place ᵖ. Ad ...
Ads by Goooooogle

The Zapruder
Film at MPI
The Zapruder
assassination
images restored on
DVD at MPI. Order
Now!
vide~.com)

Law2000, Inc.
Computer Forensic
Experts Criminal,
Civil, Corporate
J'M.V.La4v2UOV.net

john f kennedy
Free information
and resources
about john f
kennedy
john-f-kerr~e::y zaffix corr

Positive ID
Solutions
Forensic &
Investigation
Equipment Priced
to Fit Your Budget
mvv. AltemajHForoc. cer".

Advertise on this site

The basic package
has 60 channels
featuring Free
Speech TV & Link
TV + local
channels, and it
includes FREE
Digital Video
Recorders and
HDTV Receivers.
Check for
promotional
offers!

11/25/06 5:57 PM

It's Time to Re-Open the Investigation of RFK and JFK Assassination...    http://baltimorechronicle.com/2(:06/112206CARMICHAEL.shtml

11.13 The Democrats and Civil Liberties

11.13 Impeach for Change Kicks off National Campaign

11.13 Bush's Belated Accountability Moment

11.10 What Vote-Theft Conspiracy?

11.09 The Secret World of Robert Gates

11.09 Gates of Hell: Another Constitution-Betraying Bushist in the Pentagon

11.08 Election Postmortem: What's Next?

11.08 American Voters Just Say No

11.07 Is Bush Next?

11.06 It's Election Eve, Do You Know Where Your Country Is?

11.06 America's Slide to Totalitarianism

11.06 Reader Response to Lindorff: An Intentional Strategy to Discredit Reality

11.02 America's Point of No Return

11.02 Kerry and Bush: The Joke's on Us

11.02 Eminent-Domain Chutzpah

11.01 Postcards of the Hanging: Race and Sex in Tennessee

11.01 How Neocon Favorites Duped U.S.

10.31 All the President's Lies

10.31 The "War for Oil" Comes Home

10.27 The Crimes of Greed vs. the Crimes of Government

10.27 Election Perspective: Misreading al-Qaeda on Iraq

10.24 How Democrats Might Blow It

Middle East

11.21 American Policy in Iraq Provides the Excuse Not to Leave

11.21 Killing Hope in Beit Hanoun

11.16 Bush's "New" Iraq Strategy Revealed: More Troops, More War

11.14 No Exit: The Baker Commission and the Trap of Reality

11.13 Call It What It Is: a Massacre

11.06 "The Iraqis didn't do it."

11.03 Just a wall?

11.03 Territorial fragmentation of the West Bank

11.02 Rogue President

10.25 Blood and Gravy II: The Jackal's Feast Goes on

10.23 Israel, Palestine, and Canada

10.23 Iraq: Time for Truth and Consequences

10.21 Giving Osama What He Really Wants

The Rest of the World

11.22 Chertoff's "Chilling Vision"

11.02 Space War

10.27 Hail to the Hungarians!

10.26 The Veil and the British Male Elite

We are a Public Non-profit Newspaper. Your donation is essential to our survival.

on U.S. soil. Another bizarre fact: Morales was officially stationed in Laos in 1968.

O'Sullivan found video images of Campbell with another figure who has now been identified as George Joannides, a pivotal figure in the CIA and the re-investigation of the assassination of JFK.

Joannides had been the Chief of Psychological Warfare Operations at IM-Wave. He had retired from his CIA post, but in 1978 he returned to active duty, as it were, as the liaison between the House Select Committee on Assassinations (HSCA) during its re-investigation of the assassinations of JFK and Martin Luther King.

Puzzling, perplexing and problematic, Joannides failed to inform his colleagues at the HSCA that he had ever worked at IM-Wave. This is a troubling enigma, for it suggests that he intended to maintain his covert identity-a fact that would compromise his involvement in the HSCA and jeopardize the entire congressional investigation.

A former researcher with the HSCA, Ed Lopez, identified Joannides as the person in the Ambassador Hotel video with what he described on camera as 99% accuracy. More: Lopez recalled Joannides' obstructive practice of denying the HSCA access to crucial documents in the re-investigation of the assassination of JFK.

O'Sullivan did not stop there. Moving to Washington, he met Wayne Smith, a veteran State Department official who worked with Morales in Havana in the final year of the Batista regime through the Cuban Revolution in 1959 and 1960. When O'Sullivan asked him to respond to the Ambassador Hotel video, Smith immediately stated, "That's him, that's Morales." From a conversation in 1975, Smith recalled that Morales stated that JFK deserved to be assassinated. From Smith's testimony, O'Sullivan learned that Morales "hated the Kennedys"-because of their cancelling the air support for the failed Bay of Pigs invasion of 1961.

In a hotel near the CIA headquarters (now named the George H. W. Bush Center for Central Intelligence) in Langley, USA, O'Sullivan met with a former agent, Tom Clines who said that all of the men in the Ambassador Hotel videos had been misidentified as former CIA agents. When O'Sullivan informed him that Ayers and Smith had positively identified the men as Morales, Campbell and Joannides, Clines became "disturbed," and he refused to go on camera for the interview.

Following his interview of Clines, senior journalists in Washington advised O'Sullivan to take his testimony with a grain of salt as he was known to "blow smoke" deliberately as a routine function to dissemble facts for the press and public.

Gaeton Fonzi was the lead investigator of the HSCA investigation of the assassination of JFK. In his book, The Last Investigation, Fonzi reported the testimony of Bob Walton, a man who met Morales and discussed JFK with him. According to Fonzi's account, Morales asserted his direct involvement in the assassination of JFK as revenge for the Bay of Pigs.

On the Watergate tapes, Richard Nixon always referred to the assassination of JFK as "the Bay of Pigs thing." During Eisenhower's presidency, Nixon served as the White House liason with the CIA. As Vice-President, Nixon worked directly with Allen Dulles and other senior staff at the CIA on the planning of the Bay of Pigs operation. It should be noted that George H. W. Bush has been known to have been integral to the Bay of Pigs operation since the publication of the enormously popular

*1 omen's 1.etc
E't nter',
lanplo, meat i.aw
fioltine: ('eli
T\u,1_l-'ree
t-877-421-9400
uwsder, ‹› '.0e-m-€
p m  1 alertng  Dec 5)
Free +o el- Man land
rcs:uen's:

*just because you're throw(ng it out doesn't make it trash.*

'It's Time to Re-Open the Investigation of RFK and JFK Assassination...    http://baltimorechronicle.com/2006/112206CARMICHAEL.shtml

bestselling book of 1991, *Plausible Denial, by* Mark Lane.

**Goisle**

Search    ⅂ This site  (- Web

During his campaign for the presidency in 1960, Nixon was shocked that JFK made public the contents of his top-secret intelligence briefings-and had moved to Nixon's right to advocate overt military intervention against Cuba. The CIA planned to overthrow Castro in an invasion manned with exiled Cubans trained by the staff at JM-Wave. From-our perspective today, it is perfectly understandable why JFK would have been compelled to make this policy position public in his presidential campaign. Had he not done so, JFK could have been tarnished with a charge of being "weak on communism," by Nixon, who had been one of the leading witch-hunters of the disgraceful McCarthy Era.

Upon his inauguration as president, JFK continued to support the plans to attack Cuba with the force of exiled Cubans-a project that Nixon had nurtured, supported and managed for the Eisenhower White House. However, JFK decided to withhold U.S. air support in order to maintain an arm's length separation from the Cuban invasion.

The Bay of Pigs became a fiasco. JFK accepted the blame, and he immediately ordered a thorough-going reorganization of the CIA. A few months later, Allen Dulles, who had been a free-wheeling manufacturer of coups d etats while serving as Director of Central Intelligence (DCI), 'retired' after a formal conversation with JFK. JFK promptly named a new director, and John McCone, who had been the director of the Atomic Energy Commission, soon took Dulles's place as DCI.

JFK's reorientation of the CIA did not stop there. Recognizing that the agency's mission to wage a covert Cold War was dangerously counterproductive, JFK ordered the CIA to make nuclear non-proliferation its top priority. Eventually, JFK would successfully negotiate the Test Ban Treaty with Nikita Khruschev in the aftermath of the Cuban Missile Crisis-by far the most significant strategic confrontation of the entire Cold War.

While rogue elements in the U.S. intelligence community have long been suspected of meddling in his assassination and those of his brother and Martin Luther King, Jr., Shane O'Sullivan's identification of three CIA agents in the Ambassador Hotel on the night of the assassination of RFK suggests strongly that the case should be reopened. The third agent in the Ambassador Hotel, George Joannides, now appears to have been engaged in a sabotage mission during the HSCA investigation of JFK's assassination.

Shane O'Sullivan's identification of three (AA agents in the Ambassador Hotel on the night of the assassination of 121• K suggests strongly- that the case should he reopened.

The assassination of JFK would seem to be an eternal mystery that has long since passed into the realm of myth; however, that is not the case for today; technology has provided a wealth of new tools with which to examine evidence in criminal cases-even cold cases over forty years old.

While O'Sullivan is calling for a re-opening of the case of RFK, it is only reasonable to re-open JFK's case, as well.

In 1968, I was in my final year at the University of North Carolina. From my meeting with a close associate of RFK, I worked as a college and university organizer in his presidential campaign. At the time of his assassination, RFK was the leading candidate for the presidency-far ahead of his nearest rival in the polls and definitely on track to win the November election.

Seeing the BBC broadcast of videotape evidence of three unassigned CIA agents in the Ambassador Hotel Ballroom at the

11/25/06 5:57 PM

time of RFK's assassination shocked me. The federal government, Congress and the criminal justice system of the United States failed to protect the president of the United States and its leading presidential candidates. Worse. They have failed to tell the truth to the American people.

Today, on the anniversary of one of the most tragic dates in American history-I propose that the cases of RFK and JFK should be re-opened in either the 110th or the 111th Congress.

We must follow the evidence exhaustively and relentlessly, leaving no stone unturned and no document unexamined regardless of its current status: Sensitive; Secret, Top Secret or Above Top Secret. To do any less would be to become complicit in the lies and cover-ups that have denied the American people of the truth.

Michael Carmichael is a historian and author based in Oxford, England, UK. He is the founder and chief executive officer of planetarymovement.org. This article is republished in the Baltimore Chronicle with permission of the author. The complete illustrated and referenced article "Death of a Presidency" by Michael Carmichael is online here.

Copyright © 2006 The Baltimore Chronicle. All rights reserved.

Republication or redistribution of Baltimore Chronicle content is expressly prohibited without their prior written consent.

This story was published on November 22, 2006.

11/25/06 5:57 PM

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DAVID TALBOT, et al.10            :
                                 :
          Plaintiffs             :
                                 :
     v.                          :
                                 :
CENTRAL INTELLIGENCE AGENCY,     :
     et al.                      :
                                 :
          Defendants             :


## DECLARATION OF JAMES H. LESAR

     I, James H. Lesar, declare and say as follows:

     1.   I am attorney for the plaintiffs in the above-captioned
case.

     2.   I hold a B.A. degree from the University of Illinois, from
which I graduated in 1962 with  a major in history.  I received my
J.D. from the University of Wisconsin in 1969.  I also completed
all course work for a Master's in History from the University of
Illinois.  I did not complete the Master's in History because I
volunteered from the Peace Corps, then got drafted.

     3.   In 1970, I came to Washington, D.C. to work as a volunteer
for the Committee to Investigate Assassinations.  Later, 1984, I
became a co-founder, with Bernard ("Bud") Fensterwald, Jr. of the
Assassination Records and Research Center ("AARC").  Upon Mr. Fen-
sterwald's death in 1991, I became President of the AARC, a nonpro-
fit organization which is devoted to obtaining, preserving and dis-
seminating information on American political assassinations, par-
ticularly those of President John F. Kennedy, Senator Robert F.

FILED

07 0277       FEB - 6 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

2

Kennedy, and Dr. Martin Luther King, Jr.  I remain president of the AARC until this day.

4.  As a result of the experience outlined in the preceding paragraph, I am quite familiar with developments on the assassina-tions of President John F. Kennedy and Dr. Martin Luther King, Jr. In particular, I am keenly aware of the current and past public interest in the subject.

5.  The assassination of President John F. Kennedy has always been of exceptionally high public interest.  Hundreds of books have been published on the subject, and many books continued to publish-ed.  Within the past four years several books have been published by scholars, including **The Zapruder Film:    Reframing JFK's Assassina-ion** (University Press of Kansas, 2003), by Prof. David Wrone; **Breach of Trust:   How the Warren Commission Failed the Nation and Why** (University Press of Kansas, 2005), by Prof. Gerald D. Mc-Knight; **A Farewell to Justice:    Jim Garrison, JFK's Assassination, and the Case That Should Have Changed History** (Potomac Press, 2005), by Prof. Joan Mellen.    Other recently published books include **Ultimate Sacrifice:    John and Robert Kennedy, the Plan for a Coup in Cuba and the Murder of JFK** (Carroll & Graf, 2005), by Lamar Waldron and Thom Hartman; **The Zenith Secret** (Vox Pop/Drench Kiss Media Corporation, 2006).

6.  This year will again see the publication of books which address the assassination of President Kennedy either directly or in some fashion, including **Brothers:   The Hidden History of the Kennedy Years** (Free Press/Simon & Schuster), by David Talbot.

3

Vincent Bugliosi, the prosecutor of Charlie Manson, recently informed me in a telephone call that he has a 1,650 page book on the JFK assassination which will be published in late May.  Noted historian David Kaiser is working on a book on the subject which will be published in 2008.

7.    There are many web sites which carry information on the assassination of President John F. Kennedy, including, but in no way limited to, the following:

> aarclibrary.org
> historymatters.com
> maryferrell.org
> jfklancer.com
> mcadams.posc.mu.edu
> eika.net
> jfk-assassination.de
> ourworld.cs.com/mikegriffith1/id35.htm
> jfk-info.com
> spartacus.schoolnet.co.uk/JFKIndex.htm
> pages.prodigy.net/whisky/99/
> fiftiesweb.com/kennedy/kennedy=assassination.htm
> karws.gso.uri.edu/JFK/JFK.html
> jfk-online.comaa
> assassinationscience.com
> kennedyassassinationarchive.com
> webcom.com/~/pease/collection/assassinations/jfk.htm
> jfkmurdersolved.com
> spot.acorn.net/jfkplace/09/fp.back.backissues.html

8.    Joan Mellen recently spoke at the 92nd Street Y in New York City.  I am advised by her that this is the most prestigious venue in New York City for debating issues of interest to the public.  She spoke on the JFK assassination to a packed audience.  This week the 92nd Street Y is to hear a response from Vincent Bugliosi.

9.    The mere fact that an unsolved criminal case is old does not mean that it is not of current public interest.  In recent

4

years several important civil rights cases, such as the Birmingham
Church bombing in September 1963 and the slaying of Medgar Evers
have received considerable attention in the press because of new
developments.  This applies not only to this kind of case, but to
others as well.  <u>See</u> Attachment 1 for some examples.

I declare under penalty of perjury that the foregoing is true
and correct.  Executed this 5th day of February, 2007.

_____
JAMES H. LESAR

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DAVID TALBOT, et al.                    :
                                        :
          Plaintiffs                    :
                                        :
     v.                                 :
                                        :
CENTRAL INTELLIGENCE AGENCY,            :
     et al.                             :
                                        :
          Defendants                    :

<u>CERTIFICATE OF COUNSEL PURSUANT TO LOCAL RULE 65.1(a)</u>

I certify that at approximately _____ P.M. on the 6th day of February, 20007, I served a *courtesy* copy of the complaint, motion for a temporary restraining order and all supporting papers by leaving them at the receptionist's desk of the United States Attorney's Office as instructed by Assistant United States Attorfney Daniel Van Horn.

James H. Lesar #114413
1003 K Street, N.W.
Suite 640
Washington, D.C. 20001
Phone:  (202) 393-1921

Counsel for Plaintiffs

07 0277

**FILED**

FEB - 6 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT