UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| DAVID TALBOT and ) | |
| JEFFERSON MORLEY ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| ) | |
| v. ) | Civil Action No. 07-0277 (RJL) |
| ) | |
| CENTRAL INTELLIGENCE AGENCY ) | |
| and ) | |
| U.S. DEPARTMENT OF STATE ) | |
| ) | |
| Defendants. ) | |
| ) | |
| _____) | |

REPLY

Defendant, Central Intelligence Agency (CIA), respectfully submits this Reply to
plaintiff's opposition to defendant's request for an Open America stay.

Despite the CIA's diligence and strenuous efforts to comply with the time limits FOIA
imposes for responding to a request, the nature of the information involved as well as the volume
of information review demands necessarily results in unavoidable delays in processing in many
cases. CIA's records systems, like the CIA itself, are diverse, decentralized, and compartmented.
The Declaration of Nancy J. Ward, filed in this case in support of CIA's Motion for an Open
America stay and incorporated herein by reference, describes the additional administrative
burdens the nature of the records systems and the information at issue impose as well as the
necessity of referring records to various CIA components and other agencies to ensure that the

CIA does not inadvertently disclose classified information, intelligence sources and methods, or otherwise exempt information.  Declaration of Scott A. Koch, Information and Privacy Coordinator, Central Intelligence Agency (Koch Dec) at ¶ 7.

Plaintiff's principal contention in his Opposition,  that "[t]he CIA is not 'deluged with a volume of requests for information vastly in excess of that anticipated by Congress'" is without merit for multiple reasons. First, Plaintiff's analysis of the FOIA backlog is keyed to and dependent on the number of requests received by the CIA in FY 1998, which is dated and, for reasons explained below, reflects a situation which no longer exists.   Second, it is based solely on FOIA requests. The totality of information review and release demands with which CIA is dealing significantly exceed anticipated levels, both in terms of overall volume of requests and complexity of issues raised.  *Id*. at ¶ 8.

As noted above, in addition to being outdated, FY 1998 was atypical. It was the first year in which agencies implemented any of the changes the Electronic Freedom of Information Act Amendments of 1996 (EFOIA) specified (principally changes in reporting requirements), and it was the last full year in which CIA processed a particular category of requests, which typically accounted for 1500 to 1800 requests annually. As noted in a subsequent annual report, CIA established "a new processing protocol that eliminated the need for two other federal agencies to coordinate with CIA a specific category of requests which previously accounted for a significant number of new requests." *Id*. at ¶ 9.   Thus, the volume of requests received in FY 1998 is both outdated and no longer representative of the situation; its use as the benchmark data point skews the analysis and distorts the overall state of CIA's current backlog and precludes an accurate assessment of CIA's backlog reduction efforts.  *Id*.

2

Since FY 2000, the CIA has received on average 2935 FOIA requests annually. *Id*. at ¶ 10. In FY 2006 the number of actual FOIA requests received by CIA was 2500 requests. *Id*. Projections based on the number of requests received indicate that the CIA will likely receive over 3,000 FOIA requests this year (FY 2007). *Id*.

At the same time, this apparent decline in the number of actual FOIA requests is more than offset by the number of requests for information made to CIA's Electronic FOIA Reading Room. *Id*. at ¶ 11. As previously explained, CIA has increasingly focused on populating its FOIA website as expeditiously as possible. *See* Ward Dec. at ¶ 32. The CIA is now current in posting documents; whereas, at the beginning of FY 2006, CIA was more than two years behind in posting documents. Koch Dec. at ¶ 11.

As a result of the increased availability of information on CIA's website, a significant number of inquiries which heretofore would have been received as actual FOIA requests are now being satisfied directly from CIA's FOIA Electronic Reading Room. *Id*. at ¶ 12. The five most frequently requested topics from the FOIA reading room in April and May 2007, (the most recent months for which data is available), were the result of over 3873 and 5530 individual inquiries, respectively. *Id*. Although it is impossible to say how many of these inquiries would have arrived as actual FOIA requests had this information not been available in the FOIA reading room, given the nature of the information requested, it clearly would have been substantial. *Id*. Regardless, requests for information from the CIA's FOIA Electronic Reading Room require the expenditure of CIA resources and are a fundamental part of the FOIA process and backlog reduction efforts. *Id*.

In addition, non-FOIA information demands on the CIA, including requests for

3

mandatory declassification review ("MDR") under Executive Order 12958 which, like FOIA, the

Agency receives from members of the public, adversely affect the processing of FOIA requests.

*Id*. at ¶ 13.   Every year the CIA receives several hundred such requests. For example, during FY

2001-2005, the CIA received an average of 693 MDR requests annually. However, the number of

MDR requests rose significantly last year. In FY 2006, the CIA received 959 MDR requests, a 38

per cent increase over the average annual number received during the preceding five years. With

three months remaining in FY 2007, CIA has already received over 960 new MDR requests.  *Id*.

Delays in the CIA's processing of FOIA and MDR requests largely occur as a result of

non-FOIA demands placed upon the CIA's information and release system.  *Id*. at ¶ 14.   These

demands range from competing statutory mandates which require the search, review and

declassification of records,  to ad hoc information review requests that Presidential commissions

or Congressional committees.  Demands also come from numerous civil, criminal, and

Congressional investigations and inquiries, which vary widely in scope and urgency.  *Id*. at ¶ 14.

Among the more significant developments affecting FOIA and other information release

programs in the last five and a half years have been the events of September 11, 2001, and their

aftermath, that is, the continuing war on terrorism. *Id*. at ¶ 16.   Foremost among these were

requests generated by the Senate Select Committee on Intelligence and House Permanent Select

Committee on Intelligence Joint Inquiry Into the Terrorist Attacks of September 11, 2001 ("Joint

Inquiry"), the National Commission on Terrorist Attacks upon the United States (colloquially

known as the "9-11 Commission"), and the President's Commission on the Intelligence

Capabilities of the United States Regarding Weapons of Mass Destruction (WMI)).  *Id.*  These

efforts not only involved direct support, i.e., addressing requests from the commissions,

conducting records searches and classification reviews, and coordinating proposed responses, but also addressing the inevitable follow on requests for declassification of the reports and the underlying documentation which often continue long after a commission may have completed work. *Id.*  For example, in February 2007, the Archivist of the United States requested that CIA review for declassification and public release records of the 9-11 Commission.  *Id.*

In addition, information review and release officers also support various civil and criminal investigations and prosecutions. *Id.* at ¶ 17.  For example, information review personnel are engaged in reviewing records as part of ongoing efforts to prosecute individuals supporting international terrorism, including those designated with providing material support to international terrorism or as enemy combatants.  *Id.*  In a recently concluded trial, hundreds if not thousands of hours were expended reviewing a variety of CIA's most sensitive intelligence products and briefings, including the President's Daily Brief (PDB).  *Id.*  Thousands of documents are currently under review in connection with another high profile criminal prosecution of a former, senior government official.  *Id.*  During such cases, requests are frequently received to review transcripts of closed hearings, pleadings and other associated filings for declassification and immediate public release. It is generally impossible to predict such requests in advance; several such proceedings are currently underway and, as a result, they place additional burdens on limited information review resources.  *Id.*  These cases are often complicated by overlapping and multiple official inquiries or litigations. A prime example are the multiple inquiries, investigations, and litigations relating to or stemming from revelations concerning the CIA employment of a former member of the National Clandestine Service, including a recently filed lawsuit involving pre-publication review as well as a Congressional

subpoena relating to the events which resulted in the public revelation of her employment. *Id.*
In addition, there is a myriad of litigation relating to employment issues, security clearances, tort
claims, FOIA, and other more routine matters. *Id.*

As is revealed from the nature of the information review activities described above, the
review of classified material sometimes requires deliberative judgments by senior officials as to
whether the release of these records reasonably could be expected to cause identifiable damage to
the national security. *Id*. at ¶ 18. These judgments cannot be made solely by information review
officers; rather, they must be made by senior officials who are actively involved in the conduct
and management of intelligence collection or analytical activities, and who are also increasingly
engaged in the review of CIA records in connection with criminal investigations and
prosecutions and Congressional and Executive Branch investigations. Such officials are often
called upon to respond quickly to international crises and pressures, and therefore cannot, as a
practical matter, instantly devote disproportionate time and effort to all FOIA matters without
consequent damage to intelligence activities, which are the CIA's primary responsibility. *Id*.

Also, competing legal mandates, that is, other statutes that direct records on specific
topics or issues be reviewed for declassification and release, have and continue to impact CIA's
ability to process FOIA requests. *Id*. at ¶ 19. Most notable are the president John F. Kennedy
Assassination Records Collection Act of 1992 (JFK Records Act ), and the Nazi War Crimes
Disclosure Act (NWCDA). *Id*. The CIA has transferred to the National Archives and Records
Administration approximately 364,000 pages under the JFK Records Act and nearly 44,000
pages of CIA material and 1.2 million pages from the Office of Strategic Services, CIA's
predecessor, under the NWCDA. Notwithstanding that the independent Assassination Records

Review Board has ceased operations, there are continuing commitments to re-review certain records under the JFK Records Act. *Id.* Similarly, the Nazi War Crimes and Japanese Imperial Government Records Interagency Working Group, which was originally set to disband in 2005, was extended until 2007. *Id.* Thus, as with many of the independent and Congressional commissions, Agency obligations to re-review (frequently multiple times) records for declassification and release extend far beyond the life of the respective group or board. Id.

When CIA's FOIA office received plaintiff's request and payment for outstanding fees on 12 January 2007, the CIA had over 960 FOIA requests in various stages of processing. Approximately 465 cases currently remain ahead of plaintiff's request in the complex queue. *Id*. at ¶ 20.

The CIA is making all reasonable efforts to comply with the FOIA's requirements and deadlines. *Id*. at ¶ 21. Regrettably, compliance with these deadlines is not always possible. The most equitable way to reduce the cases on hand and ensure that each request receives the attention it deserves is to process these requests pursuant to the first in/first out system described in Ms. Ward's declaration. *See* Ward Dec. at ¶ 30. Based upon the request, the manner and level of the records search, the nature of potentially responsive documents, the careful, multi-step review the CIA must conduct to prevent the inadvertent release of classified national security or other exempt information, relative placement in the queue and overall information review demands, the best estimate continues to be that, barring any unforeseen additional burdens, such as complex litigation or Congressionally-mandated reviews, CIA will be able to complete processing plaintiff's request by December 2007. *Id*. at ¶ 21.

CONCLUSION

The CIA has demonstrated reasonable progress in reducing its backlog of pending requests, has demonstrated exceptional circumstances, and has shown that it is exercising due diligence in processing FOIA requests. Therefore, the motion for a stay should be granted.      .

Respectfully Submitted,

_____
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney


_____
RUDOLPH  CONTRERAS, D.C. Bar #434122
Assistant United States Attorney


_____
RHONDA C. FIELDS
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
202/514/6970

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DAVID TALBOT, et al.          )
                              )
        Plaintiffs,           )
                              )
        v.                    )    Civil Action No. 07-0277 (RJL)
                              )
CENTRAL INTELLIGENCE          )
AGENCY, et al.                )
                              )
        Defendants.           )
_____)

**DECLARATION OF SCOTT A. KOCH**
**INFORMATION AND PRIVACY COORDINATOR**
**<u>CENTRAL INTELLIGENCE AGENCY</u>**

I, SCOTT A. KOCH, hereby declare and say:

1.  I am the Chief, Public Information Programs Division (PIPD), within the office of Information Management Services (IMS), office of the Chief Information Officer, Central Intelligence Agency (CIA).  I am also the CIA Information and Privacy Coordinator (Coordinator).  I have held these positions since August 9, 2004.

2.  I have served with the United States Government for approximately sixteen years and, in addition to my current positions, have held other supervisory positions with the CIA in the field of information review and release.

3.   In my capacities as Chief of PIPD/IMS and Coordinator, I am responsible for managing the Freedom of Information Act (FOIA), Privacy Act, and Executive Order 12958 Mandatory Declassification Review programs in the CIA.  These responsibilities include directing searches of CIA records systems pursuant to public requests for records under these programs, and coordinating the reviews of any records retrieved in such searches.  These review processes include undertaking any intra-agency and inter-agency coordination and referrals necessary in light of the information found in responsive records.

4.   As part of my official duties, I ensure that the Agency administratively processes FOIA and Privacy Act requests, including the search, retrieval, analysis, review, redaction, and release of documents, in accordance with the law and as efficiently as possible with the personnel and resources available.

5.   Through the exercise of my official duties, I am familiar with plaintiff's request for information that is the subject of this civil action.  I make the following statements based upon my personal knowledge and the information made available to me in my official capacity.

6.   The purpose of this declaration is to

clarify the status of the CIA's FOIA processing efforts within the context of the information review and release demands upon CIA, update the status of plaintiff's case within the FOIA queue, and thus further explain CIA's need for adequate time to complete processing of plaintiff's request.

7.  Despite the CIA's diligence and strenuous efforts to comply with the time limits FOIA imposes for responding to a request, the nature of the information involved as well as the volume of information review demands necessarily results in unavoidable delays in processing in many cases. CIA's records systems, like the CIA itself, are diverse, decentralized, and compartmented.  The Declaration of Nancy J. Ward, filed in this case in support of CIA's Motion for an Open America stay and incorporated herein by reference, describes the additional administrative burdens the nature of the records systems and the information at issue impose as well as the necessity of referring records to various CIA components and other agencies to ensure that the CIA does not inadvertently disclose classified information, intelligence sources and methods, or otherwise exempt information.

8.  Plaintiff's principal contention that "[t]he CIA is not 'deluged with a volume of requests for information

vastly in excess of that anticipated by Congress'" is
without merit for multiple reasons.  First, Plaintiff's
analysis of the FOIA backlog is keyed to and dependent on
the number of requests received by the CIA in FY 1998,
which is dated and, for reasons explained below, reflects a
situation which no longer exists[1]. Second, it is based
solely on FOIA requests. The totality of information review
and release demands with which CIA is dealing significantly
exceed anticipated levels, both in terms of overall volume
of requests and complexity of issues raised.

9.  As noted above, in addition to being outdated,
FY 1998 was atypical. It was the first year in which
agencies implemented any of the changes the Electronic
Freedom of Information Act Amendments of 1996 (EFOIA)
specified (principally changes in reporting requirements),
and it was the last full year in which CIA processed a
particular category of requests, which typically accounted
for 1500 to 1800 requests annually.  As noted in a
subsequent annual report, CIA established "a new processing
protocol that eliminated the need for two other federal
agencies to coordinate with CIA a specific category of

---

[1] Interestingly, plaintiff complains that the CIA's accounting of its
backlog for FY2006, is "outdated." The information relating to backlog
included in the Ward Declaration was drawn from CIA's *Annual Report
FY2006* which complied with the 1 February 2007 deadline established by
the EFOIA and had been issued a few weeks before the declaration was
executed.

requests which previously accounted for a significant number of new requests."[2]  Thus, the volume of requests received in FY 1998 is both outdated and no longer representative of the situation; its use as the benchmark data point skews the analysis and distorts the overall state of CIA's current backlog and precludes an accurate assessment of CIA's backlog reduction efforts.

10.  Since FY 2000, the CIA has received on average 2935 FOIA requests annually. In FY 2006[3] the number of actual FOIA requests received by CIA was 2500 requests. Whether this decline is the beginning of a trend or an isolated instance, it is too early to tell. However, projections based on the number of requests received indicate that the CIA will likely receive over 3,000 FOIA requests this year (FY 2007).

11.  At the same time, this apparent decline in the number of actual FOIA requests is more than offset by the number of requests for information made to CIA's Electronic

---

[2] *CIA FOIA Annual Report FY 2000,* Section V available at www.foia.cia.gov/txt/annual report_[year].  The principal beneficiaries of this protocol were the other federal agencies involved and their FOIA requesters since its adoption eliminated the need for them to coordinate with the CIA, thereby reducing the processing time and saving resources.  For CIA, the elimination of this category of requests—high volume, "low cost," simple requests (less than one FTE per year)--left CIA with requests which were largely complex and statistically resulted in seemingly higher processing times for the remaining cases.

[3] FY 2006 is the last complete year for which data is officially reported and publicly available.

FOIA Reading Room. As previously explained, CIA has increasingly focused on populating its FOIA website as expeditiously as possible. (See Ward Decl. ¶ 32.)  The CIA is now current in posting documents; whereas, at the beginning of FY 2006, CIA was more than two years behind in posting documents.

12.  As a result of the increased availability of information on CIA's website, a significant number of inquiries which heretofore would have been received as actual FOIA requests are now being satisfied directly from CIA's FOIA Electronic Reading Room. The five most frequently requested topics from the FOIA reading room in April and May 2007, (the most recent months for which data is available), were the result of over 3870 and 5530 individual inquiries, respectively. Although it is impossible to say how many of these inquiries would have arrived as actual FOIA requests had this information not been available in the FOIA reading room, given the nature of the information requested, it clearly would have been substantial. Regardless, requests for information from the CIA's FOIA Electronic Reading Room require the expenditure of CIA resources and are a fundamental part of the FOIA process and backlog reduction efforts.

13.   In addition, non-FOIA information demands on the CIA, including requests for mandatory declassification review ("MDR") under Executive Order 12958 which, like FOIA, the Agency receives from members of the public, adversely affect the processing of FOIA requests. Every year the CIA receives several hundred such requests. For example, during FY 2001-2005, the CIA received an average of 693 MDR requests annually.  However, the number of MDR requests rose significantly last year. In FY 20006, the CIA received 959 MDR requests, a 38 per cent increase over the average annual number received during the preceding five years. With three months remaining in FY 2007, CIA has already received over 960 new MDR requests.

14.   Delays in the CIA's processing of FOIA and MDR requests largely occur as a result of non-FOIA demands placed upon the CIA's information and release system. These demands range from competing statutory mandates which require the search, review and declassification of records to ad hoc information review requests that Presidential commissions or Congressional committees levy. Demands also come from numerous civil, criminal, and Congressional investigations and inquiries, which vary widely in scope and urgency.

7

15. One need only read the newspaper or listen to the evening news to appreciate some of the increased demands on CIA's information review and release resources and the sensitive information issues which have arisen, including the declassification review of specific President's Daily Briefs (PDBs) and various National Intelligence Estimates.

16. Not surprisingly, among the more significant developments affecting FOIA and other information release programs in the last five and a half years have been the events of September 11, 2001, and their aftermath, that is, the continuing war on terrorism. Foremost among these were requests generated by the Senate Select Committee on Intelligence and House Permanent Select Committee on Intelligence Joint Inquiry Into the Terrorist Attacks of September 11, 2001 ("Joint Inquiry"), the National Commission on Terrorist Attacks upon the United States (colloquially known as the "9-11 Commission"), and the President's Commission on the Intelligence Capabilities of the United States Regarding Weapons of Mass Destruction (WMD). These efforts not only involved direct support, i.e., addressing requests from the commissions, conducting records searches and classification reviews, and coordinating proposed responses, but also addressing the inevitable follow on requests for declassification of their

8

reports and the underlying documentation which often continue long after a commission may have completed work. For example, in February 2007, the Archivist of the United States requested that CIA review for declassification and public release records of the 9-11 Commission.

17.   In addition, information review and release officers also support various civil and criminal investigations and prosecutions. For example, information review personnel are engaged in reviewing records as part of ongoing efforts to prosecute individuals supporting international terrorism, including those designated with providing material support to international terrorism or as enemy combatants. In a recently concluded trial, hundreds if not thousands of hours were expended reviewing a variety of CIA's most sensitive intelligence products and briefings, including the PDB. Thousands of documents are currently under review in connection with another high profile criminal prosecution of a former, senior government official. During such cases, requests are frequently received to review transcripts of closed hearings, pleadings and other associated filings for declassification and immediate public release.  It is generally impossible to predict such requests in advance; several such proceedings are currently underway and, as a result, they

place additional burdens on limited information review resources. These cases are often complicated by overlapping and multiple official inquiries or litigations. A prime example are the multiple inquiries, investigations, and litigations relating to or stemming from revelations concerning the CIA employment of a former member of the National Clandestine Service, including a recently filed lawsuit involving pre-publication review as well as a Congressional subpoena relating to the events which resulted in the public revelation of her employment. In addition, there is a myriad of litigation relating to employment issues, security clearances, tort claims, FOIA, and other more routine matters.

18. As one can appreciate from the nature of the information review activities described above, the review of classified material sometimes requires deliberative judgments by senior officials as to whether the release of these records reasonably could be expected to cause identifiable damage to the national security. These judgments cannot be made solely by information review officers; rather, they must be made by senior officials who are actively involved in the conduct and management of intelligence collection or analytical activities, and who are also increasingly engaged in the review of CIA records

in connection with criminal investigations and prosecutions and Congressional and Executive Branch investigations. Such officials are often called upon to respond quickly to international crises and pressures, and therefore cannot, as a practical matter, instantly devote disproportionate time and effort to all FOIA matters without consequent damage to intelligence activities, which are this Agency's primary responsibility.

19. Also, competing legal mandates, that is, other statutes that direct records on specific topics or issues be reviewed for declassification and release, have and continue to impact CIA's ability to process FOIA requests. Most notable are the President John F. Kennedy Assassination Records Collection Act of 1992 (JFK Records Act)[4] and the Nazi War Crimes Disclosure Act (NWCDA).[5] The CIA has transferred to the National Archives and Records Administration approximately 364,000 pages under the JFK Records Act and nearly 44,000 pages of CIA material and 1.2 million pages from the Office of Strategic Services, CIA's predecessor, under the NWCDA. Notwithstanding that the independent Assassination Records Review Board has ceased operations, there are continuing commitments to re-review

[4] Pub. L. 102-526, 106 Stat. 3443, reprinted at 44 U.S.C. § 2107 note (Supp. 2007).
[5] Pub. L. No. 105-246, 112 Stat. 1859, reprinted at 5 U.S.C. § 552 note (2007).

certain records under the JFK Records Act. Similarly, the Nazi War Crimes and Japanese Imperial Government Records Interagency Working Group, which was originally set to disband in 2005, was extended until 2007. Thus, as with many of the independent and Congressional commissions, Agency obligations to re-review (frequently multiple times) records for declassification and release extend far beyond the life of the respective group or board.

20.  When CIA's FOIA office received plaintiff's request and payment for outstanding fees on 12 January 2007, the CIA had over 960 FOIA requests in various stages of processing. Approximately 465 cases currently remain ahead of plaintiff's request in the complex queue.[6]

21.  The CIA is making all reasonable efforts to comply with the FOIA's requirements and deadlines. Regrettably, compliance with these deadlines is not always possible.  The most equitable way to reduce the cases on hand and ensure that each request receives the attention it deserves is to process these requests pursuant to the first

---

[6] Plaintiff's counsel asserts that "any new requests received between the end of FY 2006 and the receipt of Talbot's request should have been processed by June 2007," based on a processing rate of 215 requests per month which he computed from the total number of FOIA requests processed by CIA in FY 2006.  However, counsel's calculation includes requests processed on both tracks—simple and complex; whereas, Mr. Talbot's request is in the complex queue.  A more realistic measure in terms of the current operating environment and overall information demands on the CIA is the rate of closure for those FOIA cases ahead of plaintiff's in the complex queue--approximately 82 per month.

in/first out system described in Ms. Ward's declaration.
(See Ward Decl. ¶30.)  Based upon the request, the manner
and level of the records search, the nature of potentially
responsive documents, the careful, multi-step review the
CIA must conduct to prevent the inadvertent release of
classified national security or other exempt information,
relative placement in the queue and overall information
review demands, the best estimate continues to be that,
barring any unforeseen additional burdens such as complex
litigation or Congressionally-mandated reviews, CIA will be
able to complete processing this request by December 2007.


                    *    *    *

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30th day of July, 2007.

Scott A. Koch, Ph.D.
CIA Information & Privacy Coordinator
Central Intelligence Agency