UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ )<br><br>JEFFERSON MORLEY )<br><br>Plaintiff, )<br><br>v. )<br><br>U.S. DEPARTMENT OF STATE )<br><br>Defendant. )<br>_____ ) | <br><br><br><br><br><br>Civil Action No. 07-0277 (RJL) |

## **DEPARTMENT OF STATE'S  MOTION FOR SUMMARY JUDGMENT**

Defendant, through its undersigned attorneys, respectfully moves for summary judgment

on behalf of the U.S. Department of State  (Department) on the grounds that there are no material

facts in dispute and the Department is entitled to judgment in its favor as a matter of law.  Fed. R.

Civ. P. 56.  In support of this motion are Defendant's Memorandum of Points and Authorities,

Statement of Material Facts Not In Dispute and the attached declaration of Margaret P. Grafeld,

the  Department's Information and Privacy Coordinator and the Director of the Department's

Office of Information Programs and Services (IPS).

Therefore, because the defendant has complied with all FOIA requirements, the complaint with regard to this agency should be dismissed.

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney


_____/s/_____
RUDOLPH  CONTRERAS, D.C. Bar #  434122
Assistant United States Attorney


_____/s/_____
RHONDA C. FIELDS
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
202/514/6970

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| ) | |
| JEFFERSON MORLEY ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | |
| v. ) | Civil Action No. 07-0277 (RJL) |
| ) | |
| ) | |
| U.S. DEPARTMENT OF STATE ) | |
| ) | |
| Defendant. ) | |
| ) | |
| _____) | |

**STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE**

Defendant submits this statement of material facts as to which there is no genuine dispute in accordance with Local Rule 7.1.

1.    In a letter dated January 12, 2007, attorney James H. Lesar requested on behalf of his client, Jefferson Morley, "all passport and visa records pertaining to Mr. George Joannides during the years 1963-1964 and 1967-1968" (Exhibit 1).  This letter was addressed to the Department's Research and Liaison Branch within the Department's Office of Passport Services (PPT).  By Department regulation at 22 C.F.R. § 171.5, requests made under the Freedom of Information Act should be addressed to IPS, which is the office within the Department that is responsible for responding to FOIA requests.   Grafeld Dec. at ¶ 4.

2.    The January 12 letter asked that searches include "a search under any code names,

cryptonyms, pseudonys [sic] or aliases used by Mr. Joannides," and alleged that Mr. Joannides was a deceased former CIA officer.     *Id*. at ¶ 6.

3.  By letter dated April 23, 2007 (Exhibit 5), attorney James H. Lesar advised IPS that the request sought passport and visa records on George E. Joannides and David Morales.  *Id*. at ¶ 11.

4.  By letter dated June 22, 2007 (Exhibit 6), IPS advised Mr. Lesar that the Department now had enough information to process the request.  This letter from IPS also advised that for processing reasons separate case numbers had been assigned to the requests for records concerning Mr. Joannides (case number 200701176) and Mr. Morales (case number 200703072). IPS further advised that the search would target records pertaining to the subjects for the years 1963-64 and 1967-68, and that the plaintiff had been placed in the "media" category for fee purposes.  *Id*. at ¶ 12.

5.  Passport and visa records are maintained by PPT and the Office of Visa Services (VO).  These offices were provided with the information in the request (including the names of the individuals and their dates and places of birth and death), and instructed to search not only for records that themselves dated from the years specified in the request, but also for any records that would have applied to the years there indicated (for example, a passport application from before 1963 for a passport that still might have been valid in 1963).  These searches were performed by individuals employed within these offices who are familiar with both the subject matter of the request and the relevant record system holdings of their respective offices.  There are no other offices in the Department that it would be reasonable to search for an individual's passport or visa records.  The searches were reasonably calculated to yield all records responsive to the requests.

2

*Id*. at ¶ 13.

6.    By letter dated July 16, 2007 (Exhibit 7), IPS advised Mr. Lesar that, with regard to plaintiff's request for records concerning George E. Joannides (case number 200701176), searches had been completed of the records of PPT and VO and had resulted in the retrieval of three documents.  IPS advised that since billable costs fell below the minimum amount charged, the request had been processed without charge and the processing of the request now had been completed.  IPS advised that, as explained in a separate letter from PPT also dated July 16, 2007 (Exhibit 8), these documents were released in part with redactions under FOIA exemption (b)(6). IPS added that "on national security grounds we can neither confirm nor deny the potential existence of records under, in the words of your request letter, 'code names, cryptonyms, pseudonys [sic], or aliases.'"  (Alteration in original IPS letter.)   *Id*. at ¶ 14.

7.    By another letter dated July 16, 2007 (Exhibit 9), IPS advised Mr. Lesar that, with regard to his request for records concerning David Morales (case number 200703072), searches had been initiated of the records of PPT and VO, and that these searches had been completed and had resulted in the retrieval of one document.  IPS advised that, as explained in a separate letter from PPT dated July 16, 2007 (Exhibit 10), this document was released in part with redactions under FOIA exemption (b)(6).  IPS advised that since billable costs fell below the minimum amount charged, the request had been processed without charge and the processing of the request

now had been completed.  *Id*. at ¶ 15.

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney

_____/s/_____
RUDOLPH  CONTRERAS, D.C. Bar #  434122
Assistant United States Attorney

_____/s/_____
RHONDA C. FIELDS
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
202/514/6970

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————————— )
                                            )
JEFFERSON MORLEY                            )
                                            )
            Plaintiff,                      )
                                            )
                                            )
      v.                                    )        Civil Action No. 07-0277 (RJL)
                                            )
                                            )
U.S. DEPARTMENT OF STATE                    )
                                            )
            Defendant.                      )
                                            )
———————————————————————— )

## MEMORANDUM IN SUPPORT OF DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

This case arises under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and pertains to the processing of plaintiff's FOIA request by the U.S. Department of State (Department). The attached declaration of Margaret P. Grafeld, the Department's Information and Privacy Coordinator and the Director of the Department's Office of Information Programs and Services (IPS) describes the defendant's response to plaintiff Morley's FOIA request.

### Factual and Procedural Background

In a letter dated January 12, 2007, attorney James H. Lesar requested on behalf of his client, Jefferson Morley, "all passport and visa records pertaining to Mr. George Joannides during the years 1963-1964 and 1967-1968" (Exhibit 1).  This letter was improperly addressed to the Department's

Research and Liaison Branch within the Department's Office of Passport Services (PPT).  By Department regulation at 22 C.F.R. § 171.5, requests made under the Freedom of Information Act should be addressed to IPS, which is the office within the Department that is responsible for responding to FOIA requests.  Grafeld Dec. at ¶ 4.

The January 12 letter was never received directly by IPS from plaintiff Morley or his representative.  IPS received the letter from PPT on February 28, 2007.  Although the letter indicated that an obituary was attached, no obituary was attached to the version IPS received from PPT. Instead, as later indicated in the letter, two articles were attached about the assassination of Senator Robert F. Kennedy.  (The version of the letter attached as exhibit 7 to the plaintiff's amended complaint differs in that it has no articles and one obituary attached, but the obituary is for an individual other than George Joannides.)  *Id*. at ¶ 5.

The January 12 letter asked that searches include "a search under any code names, cryptonyms, pseudonys [sic] or aliases used by Mr. Joannides," and alleged that Mr. Joannides was a deceased former CIA officer.  The letter also asked that the request be expedited and advised that plaintiff Morley and another reporter had a pending publication deadline.  *Id*. at ¶ 6.

By letter dated February 26, 2007 (Exhibit 2), the Department's Law Enforcement Liaison Division within PPT's Office of Legal Affairs advised plaintiff Morley, through his attorney, that his letter had been forwarded to IPS for "log in and assignment of a case number."  The letter instructed plaintiff to provide a date of birth for the subject of his request and stated that his request would then be returned to PPT for further action. *Id*. at ¶ 7.

By letter dated March 2, 2007 (Exhibit 3), sent by mail and by fax (to the fax number supplied by plaintiff's attorney at the end of the January 12 letter), IPS acknowledged receipt of

2

plaintiff's request and assigned it case control number 200701176. IPS advised plaintiff through his attorney that the request had been sent to the wrong address, contrary to the Department's published regulations at 22 C.F.R. Part 171, and that the request was not received in the proper office (i.e., IPS) until recently. (The letter states that it was not received until February 27, 2007; in fact, although IPS had learned late in the afternoon of February 27 that PPT would be forwarding a FOIA request, the request itself was not received in IPS until February 28.) *Id.* at ¶ 8.

In the March 2 letter, IPS noted that the subject line of the January 12 request letter listed several individuals whose names did not appear in the body of the request. Based upon the content of plaintiff's request letter, which referred solely to George Joannides, IPS informed plaintiff that it interpreted the names in the subject line as an inadvertent error on the part of the requester, and the subject of the request to be "passport and visa records pertaining solely to Mr. George Joannides . . . and not to any other individuals." IPS also advised that additional information was required in order for the Department to locate the requested records, and described the types of information plaintiff should provide to enable the Department to retrieve responsive records, including date of birth. Following Department regulations published at 22 C.F.R. § 171.12(a), the IPS letter also noted that information about a third party could not be released without written consent or proof of death. IPS also discussed access issues related to visa records and described steps the plaintiff should take to facilitate release of these records. IPS also advised that, even if the Department had been able to process his request, plaintiff had not demonstrated a compelling need for expedited treatment under the Department's regulations at 22 C.F.R. § 171.12(b). IPS explained the reasons for the denial and informed plaintiff of his right to appeal this determination within 30 days of receiving the letter. IPS informed plaintiff that since the Department could not process plaintiff's request absent additional

information, plaintiff's case had been closed and a new case would be opened to process his perfected request upon receipt of the necessary information described in IPS' letter. *Id.* at ¶ 9.

By letter dated February 21, 2007 from attorney James H. Lesar to PPT (Exhibit 4), which was received by PPT on March 8, 2007, Mr. Lesar stated: "By letter dated January 12, 2007, I submitted a request on behalf of Mr. Jefferson Morley for visa and passport records pertaining to George Joannides, David Morales, and Gordon Campbell during the years 1963-64 and 1967-19681 [sic].... This is to advise that the request for records pertaining to Gordon Campbell is withdraw [sic]." PPT forwarded a copy of this letter to IPS on March 9, 2007. *Id.* at ¶ 10.

By letter dated April 23, 2007 (Exhibit 5), attorney James H. Lesar advised IPS that the request sought passport and visa records on George E. Joannides and David Morales, and he included the dates and places of birth and death for both individuals, as well as George Joannides' social security number and a copy of an obituary for David Morales. Mr. Lesar also advised that the request for records pertaining to Gordon Campbell was withdrawn and that his client was willing to pay for the relevant records but did not waive his right to seek a fee waiver. *Id.* at ¶ 11.

Although the requester had still not provided proof of Mr. Joannides' death, as requested in the Department's March 2 letter, through good faith efforts the Department was able to confirm that the information alleged in Mr. Lesar's April 23 letter matched a March 14, 1990 obituary published in the Washington Post. By letter dated June 22, 2007 (Exhibit 6), IPS therefore advised Mr. Lesar that the Department now had enough information to process the request. This letter from IPS also advised that for processing reasons separate case numbers had been assigned to the requests for records concerning Mr. Joannides (case number 200701176) and Mr. Morales (case number 200703072). IPS further advised that the search would target records pertaining to the subjects for

4

the years 1963-64 and 1967-68, and that the plaintiff had been placed in the "media" category for fee purposes. *Id*. at ¶ 12.

Passport and visa records are maintained by PPT and the Office of Visa Services (VO). These offices were provided with the information in the request (including the names of the individuals and their dates and places of birth and death), and instructed to search not only for records that themselves dated from the years specified in the request, but also for any records that would have applied to the years there indicated (for example, a passport application from before 1963 for a passport that still might have been valid in 1963). These searches were performed by individuals employed within these offices who are familiar with both the subject matter of the request and the relevant record system holdings of their respective offices. There are no other offices in the Department that it would be reasonable to search for an individual's passport or visa records. The searches were reasonably calculated to yield all records responsive to the requests. *Id*. at ¶ 13.

By letter dated July 16, 2007 (Exhibit 7), IPS advised Mr. Lesar that, with regard to plaintiff's request for records concerning George E. Joannides (case number 200701176), searches had been completed of the records of PPT and VO and had resulted in the retrieval of three documents. IPS advised that since billable costs fell below the minimum amount charged, the request had been processed without charge and the processing of the request now had been completed. IPS advised that, as explained in a separate letter from PPT also dated July 16, 2007 (Exhibit 8), these documents were released in part with redactions under FOIA exemption (b)(6). IPS added that "on national security grounds we can neither confirm nor deny the potential existence of records under, in the words of your request letter, 'code names, cryptonyms, pseudonys [sic], or aliases.'" (Alteration in original IPS letter.) *Id*. at ¶ 14.

By another letter dated July 16, 2007 (Exhibit 9), IPS advised Mr. Lesar that, with regard to

his request for records concerning David Morales (case number 200703072), searches had been

initiated of the records of PPT and VO, and that these searches had been completed and had resulted

in the retrieval of one document.  IPS advised that, as explained in a separate letter from PPT dated

July 16, 2007 (Exhibit 10), this document was released in part with redactions under FOIA

exemption (b)(6).  IPS advised that since billable costs fell below the minimum amount charged, the

request had been processed without charge and the processing of the request now had been

completed.  *Id*. at ¶ 15.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure mandates summary judgment where "there

is no genuine issue as to any material fact and . . .the moving party is entitled to judgment as a matter

of law." *Washington Post Co. v. U.S. Dep't of Health and Human Services*, 865 F.2d 320, 325 (D.C.

Cir. 1989).  As the Supreme Court has declared, "[s]ummary judgment procedure is properly

regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules

as a whole, which are designed to secure the just, speedy and inexpensive determination of every

action."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

An agency satisfies the summary judgment requirements in a FOIA case by providing the

Court and the plaintiff with affidavits or declarations and other evidence which show, if applicable,

that the documents are exempt from disclosure.  *Hayden v. National Security Agency Cent. Sec.

Serv.*, 608 F.2d 1381, 1384, 1386 (D.C. Cir. 1979), *cert. denied*, 446 U.S. 937 (1980); *Church of

Scientology v. U.S. Dept. of Army*, 611 F.2d 738, 742 (9th Cir. 1980).  Summary judgment may be

awarded to an agency in a FOIA case solely on the basis of agency affidavits or declarations if the

6

"affidavits are 'relatively detailed, non-conclusory, and not impugned by evidence ... of bad faith on the part of the agency.'" *Public Citizen, Inc. v. Dept. of State*, 100 F.Supp.2d 10, 16 (D.D.C. 2000)(reversed in part on different issue by 276 F.3d 634 (D.C.Cir.2000) (quoting *McGhee v. Central Intelligence Agency*, 697 F.2d 1095, 1102 (D.C. Cir. 1983).

Specifically, summary judgment is available to a defendant agency upon proof that it has fully discharged its obligations under FOIA. *Miller v. U.S. Dept. of State*, 779 F.2d 1378, 1382 (8th Cir. 1985). The declaration in this matter was provided by an individual familiar with the steps taken by defendant in responding to plaintiff's FOIA request. Since it demonstrates that the defendant met its obligations under the FOIA, and the pleadings and other filings show no genuine issue as to any material fact and defendant is entitled to judgment as a matter of law, summary judgment should be granted to defendant.

## ARGUMENT

**Defendant's Search Was Adequate**.

In responding to a FOIA request, an agency is under a duty to conduct a reasonable search for responsive records. *Oglesby v. U.S. Dept. of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990); *Judicial Watch, Inc. v. U.S. Dept. of Commerce*, 337 F.Supp.2d 146, 158 (D.D.C. 2004); *Allen v. U.S. Secret Service*, 335 F.Supp.2d 95, 97 (D.D.C. 2004); *Cleary, Gottlieb, Steen & Hamilton v. Dept. of Health*, 844 F. Supp. 770, 776 (D.D.C. 1993); *Weisberg v. U.S. Dept. of Justice*, 705 F.2d 1344, 1352 (D.C. Cir. 1983). The adequacy of a search is necessarily "'dependent upon the circumstances of the case.'" *Kronberg v. Department of Justice*, 875 F. Supp. 861, 869 (D.D.C. 1995) (quoting *Truitt v. Department of State*, 897 F.2d 540, 542 (D.C. Cir. 1990)); *see also Judicial Watch, Inc.*, 337 F.Supp.2d at 158. "[A] search need not be perfect, only adequate, and adequacy is measured by the

7

reasonableness of the effort in light of the specific request." *Meeropol v. Meese*, 790 F.2d 942, 956 (D.C. Cir. 1986).

Indeed, an agency is not required to search every record system, but need only search those systems in which it believes responsive records are likely to be located. *Oglesby*, 920 F.2d at 68. Additionally, the search standards under the FOIA do not place upon the agency a requirement that it prove that all responsive documents have been located. *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 892 n.7 (D.C. Cir. 1995). Even when a requested document indisputably exists or once existed, summary judgment will not be defeated by an unsuccessful search for the document so long as the search was diligent. *Id.*; *see also Allen*, 335 F.Supp.2d at 99-100 (mere fact that plaintiff discovered one document from a third source that possibly should have been uncovered by the defendant agency "does not render the search process unreasonable.") Additionally, the mere fact that a document once existed does not mean that it now exists; nor does the fact that an agency created a document necessarily imply that the agency has retained it. *Maynard v. CIA*, 982 F.2d 546, 564 (1st Cir. 1993).

The burden rests with the agency to establish that it has "made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby*, 920 F.2d at 68. "An agency may prove the reasonableness of its search through affidavits of responsible agency officials so long as the affidavits are relatively detailed, non-conclusory and submitted in good faith." *Miller*, 779 F.2d at 1383; *Goland v. Central Intelligence Agency*, 607 F.2d 339, 352 (D.C. Cir. 1987), *cert. denied*, 445 U.S. 927 (1980). Once the agency has proffered such evidence, i.e., a legally-sufficient affidavit, the burden then shifts to the requester to rebut the evidence by a showing of bad faith on the part of the agency. *Miller*, 779

F.2d at 1383. It is insufficient, however, for a requester to attempt to rebut the agency affidavit with purely speculative claims. *See Carney v. U.S. Department of Justice*, 19 F.3d 807, 813 (1st Cir. 1994); *SafeCard Services, Inc. v. S.E.C.*, 926 F.2d 1197, 1200 (D.C. Cir. 1991).

Where the agency responds that it can neither confirm nor deny the existence of responsive records, courts do not require a detailed listing of the responsive records, but instead require a publicly filed affidavit or declaration with a detailed explanation of why the "Glomar" response is necessary to support of the agency's claim of a FOIA exemption from release. *See Burke v. U.S. Dep't of Justice*, 1999 WL 1032814 (D.D.C. Sept. 30, 1999) *(citing Enzinna v. U.S. Dep't of Justice*, 1997 WL 404327, *2 (D.C. Cir. 1997); *Wheeler v. CIA*, 2003 WL 21675312, *5 (D.D.C. June 4, 2003) *(quoting Phillippi v. CIA*, 546 F.2d 1325 (D.C. Cir. 1981)). *See generally Minier v. Central Intelligence Agency*,88 F.3d 796, 800 (9th Cir. 1996) (approving use of Glomar response where agency concession that records existed would itself provide the information that the exemption seeks to protect); *Nation Magazine v. U.S. Customs Service*, 71 F.3d 885, 894 n.8 (D.C. Cir. 1995) (same); *Hunt v. Central Intelligence Agency*, 981 F.2d 1116, 1118 (9th Cir. 1992); *Phillippi*,655 F.2d 1325 (first case authorizing such response, named after a secret U.S. government ocean vessel, the Hughes Glomar Explorer).

### Defendant processed the request adequately and conducted an adequate search

The Grafeld declaration demonstrates through detailed, non-conclusory averments that the defendant engaged in a "good faith effort to conduct a search for the requested records, using methods which [were] reasonably expected to produce the information requested." *Oglesby*, 920 F. 2d at 68. Indeed, the record demonstrates that the defendant went above and beyond the call of duty to assist the FOIA requester in this case. Plaintiff's counsel failed to send the FOIA request to the

9

proper address in the Department (*see* Grafeld Dec. at ¶ 4; 22 C.F.R. § 171.5(a)), failed to draft a request that was clear about the individuals to which it pertained (Grafeld Dec at ¶ 4-5, 9 and Exhibits 1, 3), failed to provide enough information to identify the records sought and to confirm that the subject individuals were deceased (and hence lacked privacy rights in responsive records) (*Id.*), and then failed to provide the necessary proof of death even after the Department had informed him that it was necessary (*id.* at ¶ 9, 12 and Exhibits 3, 5)—yet the Department through its good offices routed the request to the proper office, clarified immediately its reasonable interpretation of the request, solicited the additional information needed, tracked down information necessary for processing the request that the requester was instructed to provide but did not (*id.* ¶¶ 7, 9, 12; *see also* 22 C.F.R. § 171.12(a) (requiring, in FOIA requests for Department information pertaining to a third party, proof of death in the form of, for example, an obituary), and then interpreted the still-ambiguous request as broadly as the communications with requester would allow (*see id at* ¶ 13, noting that the search encompassed not only records that were themselves from the period indicated but also records that were from outside the period but would have applied to the period indicated).

Plaintiff requested all passport and visa records pertaining to George Joannides and David Morales during the years 1963-1964 and 1967-1968. Within the Department of State, passport and visa records are maintained by PPT and the Office of Visa Services (VO). Grafeld Dec. at ¶ 13. Those offices were provided with the information in the request (including the names of the individuals and their dates and places of birth and death), and instructed to search not only for records that themselves dated from the years specified in the request, but also for any records that would have applied to the years there indicated (for example, a passport application from before 1963 for a passport that still might have been valid in 1963). *Id.* The searches were performed by

individuals employed within these offices who are familiar with both the subject matter of the request and the relevant record system holdings of their respective offices, and were conducted using proper terms—that is, the names of the individuals to whom any such records would pertain, with confirmation using other data such as date and place of birth to ensure that the records identified pertained to the correct individuals. *Id.* at ¶13.

The passport and visa offices are able to retrieve information concerning applications for and denials or issuances of passports and visas by the names of individuals who received or applied for a visa or passport. Each respective office has informed IPS that it conducted its searches based on the names of the individuals at issue in the request, and that it further verified that information concerning the correct individual was retrieved based on additional identifying information such as dates and places of birth. *Id.* There are no other offices in the Department that it would be reasonable to search for an individual's passport or visa records. Thus, the searches were reasonably calculated to yield all records responsive to the requests.

Therefore, defendant conducted a reasonable search for responsive documents.

**Defendant Properly Applied FOIA Exemptions.**

### Exemptions (b) (6)

Exemption 6 permits the government to withhold all information about individuals in "personnel and medical files and similar files" when the disclosure of such information "would constitute an unwarranted invasion of personal privacy." *See* 5 U.S.C. § 552(b)(6). The threshold issue to be determined in the application of Exemption 6 was firmly established in *U.S. Dep't of State v. Washington Post Co.*, 456 U.S. 595 (1982). The Supreme Court made clear that all information that "applies to a particular individual" meets the threshold requirement for protection

11

under Exemption 6. *Id.* at 602. "The next step under Exemption 6 involves identifying the relevant privacy interests in non-disclosure and the public interests in disclosure, and determining `whether, on balance, disclosure would work a clearly unwarranted invasion of personal privacy.'" *Reed v. National Labor Relations Board, et al.*, 927 F.2d 1249, 1251 (D.C. Cir. 1991) (*quoting National Ass'n of Retired Federal Employees v. Homer*, 879 F.2d 873, 875 (D.C. Cir. 1989), *cert. denied*, 494 U.S. 1078 (1990)). "`The phrase `clearly unwarranted invasion of personal privacy' enunciates a policy that will involve a balancing of interests between the protection of an individual's private affairs from unnecessary public scrutiny, and the preservation of the public's right to governmental information.'" *Dep't of the Air Force v. Rose*, 425 U.S. 352, 372 (1976).

By letter dated July 16, 2007 (Exhibit 7), IPS advised Mr. Lesar that, with regard to plaintiff's request for records concerning George E. Joannides (case number 200701176), searches had been completed of the records of PPT and VO and had resulted in the retrieval of three documents. Grafeld Dec. at ¶ 14. By another letter dated July 16, 2007 (Exhibit 9), IPS advised Mr. Lesar that, with regard to his request for records concerning David Morales (case number 200703072), searches had been initiated of the records of PPT and VO, and that these searches had been completed and had resulted in the retrieval of one document. *Id.* at ¶ 15. The documents retrieved are as follows:

**Case Number 200701176**:

Document No. 1 is a passport application in the name of George E. Joannides, stamped March 18, 1960 consisting of three pages. It was withheld in part under FOIA exemption (b)(6). *Id.* at ¶ 20.

Document No. 2 is a passport application in the name of George E. Joannides, stamped May 22, 1962, consisting of three pages. It was withheld in part under FOIA exemption (b)(6). *Id.* at

12

¶ 21.

Document No. 3 is a passport application in the name of George E. Joannides, stamped June 1, 1964, consisting of four pages. It was withheld in part under FOIA exemption (b)(6). *Id.* at ¶ 22.

**Case Number 200703072.**

Document No. 1 is an application for the extension of the passport of David Sanchez Morales, dated May 10, 1968, consisting of two pages. It was withheld in part under FOIA exemption (b)(6). *Id.* at ¶ 23.

In all four of these documents the only information that has been withheld concerns individuals other than the passport applicants. *Id.* at ¶ 24. In Case No. 200701176, Document No. 1, the information withheld is the date and place of birth and the address of Violet Joannides, wife of the applicant, who was listed as the person to be notified in the event of death or accident. *Id.* In Document No. 2, the only information withheld is the date and place of birth of the applicant's wife. (In this case the name and address of the person to be contacted in the event of death or accident was not deleted because it was the applicant's mother, described elsewhere in the application as born in 1898, and therefore presumed to be deceased.) *Id.* In Document No. 3, the only information withheld is the name and address of the person to be contacted in the event of death or accident and the date and place of birth of the applicant's wife, again listed as Violet Joannides. *Id.* In Case No. 200703072, Document 1, the withheld information is the address of the wife of the applicant, who was listed as the person to be notified in the event of death or accident. *Id.*

Defendant determined that all of the information described above as having been deleted in these four documents is personal to an individual, and that there is no public interest in its disclosure.

13

Its release would constitute a clearly unwarranted invasion of those individuals' personal privacy and it is therefore exempt from release under FOIA exemption (b)(6).  *Id.* at ¶ 19 & 25.  All other information on the documents has been released.  *Id.*  at ¶ 25.  Therefore, the information on  the documents has been segregated properly.

**Glomar Response**:  **Exemptions (b)(1) and (b)(3)**

The State Department applied the "neither confirm nor deny response" which is also known as a "Glomar Response," *see Hunt v. Central Intelligence Agency*, 981 F.2d 1116, 1118 (9th Cir. 1992); *Phillippi v. CIA*, 655 F.2d 1325 (D.C. Cir. 1981), to portions of plaintiff's FOIA request.  "[A] government agency may issue a Glomar Response ... if the FOIA exemption would itself preclude the acknowledgment of such documents." *Minier v. Central Intelligence Agency*, 88 F.3d 796, 800-01 (9th Cir. 1996)(accepting application of Glomar involving (b)(3) exemption under the National Security Act.).    Thus, a Glomar response is "appropriate where an acknowledgment that records exist would provide the requester with the very information the exemption is designed to protect." *Nation Magazine v. U.S. Customs Service*, 71 F.3d 885, 894, n.8 (D.C. Cir. 1995).

The defendant may neither confirm nor deny the existence of records reflecting an unacknowledged, covert or clandestine intelligence source, method or activity.  This is so because the fact of the existence or nonexistence of records containing such information –- unless, of course, it has been officially acknowledged -- would be classified for reasons of national security under Section 1.4(c) (concerning intelligence sources and methods) of Executive Order 12958, as amended by Executive Order 13292 of March 15, 2003 ("Executive Order 12958," or "E.O. 12958").  Further, the Director of National Intelligence (DNI) has the responsibility and authority to protect such information from unauthorized disclosure in accordance with Subsection 403-1(i)(1) of the National

Security Act of 1947. As such, a portion of Plaintiff's request was denied pursuant to FOIA Exemptions (b)(1) and (b)(3). As in all such instances, this determination and communication neither confirms nor denies the existence of responsive records. Grafeld Dec. at ¶ 27.

### The State Department's Assertion of FOIA Exemption (b)(1) is Justified as a Matter of Law

Exemption (b)(1) provides that FOIA's disclosure requirements do not apply to records that are:

> (A) specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy and

> (B) are in fact properly classified pursuant to such Executive Order.

5 U.S.C.§ 552(b)(1). As the D.C. Circuit has explained, exemption (b)(1) "establishes a specific exemption for defense and foreign policy secrets, and delegates to the President the power to establish the scope of that exemption by executive order." *Military Audit Project v. Casey, 656 F.2d 724, 737 (D.C. Cir. 1981)*. As demonstrated below and in the attached Grafeld Declaration, the potential existence of documents requested by plaintiff is properly neither confirmed nor denied under Executive Order and−FOIA exemption (b)(1).

In determining whether an agency has fully discharged its obligations under FOIA, a district court reviews an agency's determinations de novo. 5 U.S.C. §552(a)(4)(B); *Steinberg v. U.S. Dept. of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994). In exemption (b)(1) cases, however, "courts must 'recognize that the Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse affects [sic] might occur as a result of public disclosure of a particular classified record.'" *Salisbury v. United States*, 690 F.2d 966, 970 (D. C. Cir. 1982)

15

(quoting S. Conf. Rep. No. 1200, 93rd Cong., 2d Sess. 12 (1974)).  Thus, the D.C. Circuit has held

that courts must give "substantial weight" and "utmost deference," while conducting a de novo

review of agency determinations, that information requested under FOIA is classified and barred

from disclosure.  *Id.* at 970 ("[C]ourts are to 'accord substantial weight to an agency's affidavit

concerning the details of the classified status of the disputed record.'"); *see also Bonner v.*

*Department of Justice*, 930 F.2d 350, 357 (D.C. Cir. 1991) ("What fact or bit of information may

compromise national security is best left to the intelligence experts."); *Taylor v. Department of the*

*Army*, 684 F.2d 99, 109 (D.C. Cir. 1982) (affidavits by military intelligence officers should be

accorded "utmost deference"); and S. Conf. Rep. No. 1200, 93rd Cong., 2d Sess. 12, reprinted in

1974 U.S. Code Cong. & Admin. News 6 285, 6290 ("[T]he conferees expect the Federal courts, in

making de novo determinations in section 552(b)(1) cases . . . will accord substantial weight to an

agency's affidavit concerning the details of the classified status of the disputed record.").

     The agency's affidavit(s) merely must demonstrate that 1) the agency followed proper

classification procedures and 2) that, by its description, the document logically falls within the

claimed exemption.  *Salisbury*, 690 F.2d at 970-72; *Military Audit Project*, 656 F.2d at 737; *Hayden*

*v. National Security Agency/Central Security Service*, 608 F.2d 1381, 1387 (D.C. Cir. 1979), cert.

denied, 446 U.S. 937 (1980).   Once this burden is met, courts must "not ... conduct a detailed

inquiry to decide whether [they] agree[] with the agency's opinions." *Halperin v. CIA*, 629 F.2d 144,

148 (D.C. Cir 1980).  As the D.C. Circuit has explained, judges "lack the expertise necessary to

second-guess such agency opinions in the typical national security FOIA case."  *Id*.  If the agency's

affidavits describe the withheld information and the justification for withholding with "reasonable

specificity, demonstrating a logical connection between the information and the claimed exemption,"

and "if the affidavits evidence neither bad faith on the part of the agency nor a conflict with the rest

of the record," the agency is entitled to summary judgment. *Id.* at 147-48; *see also Military Audit

Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir.1981); *Allen v. Central Intelligence Agency*, 636 F.2d

1287, 1291 (D.C. Cir.1980); *Lesar v. United States Dept. of Justice*, 636 F.2d 472, 481 (D.C.

Cir.1980).

 In its letter of July 16, 2007 (Exhibit 7), IPS informed Mr. Lesar that "on national security

grounds [the Department] can neither confirm nor deny the potential existence of records under, in

the words of your request letter, 'code names, cryptonyms, pseudonys [sic], or aliases.'" Defendant

concluded that this "Glomar" response is necessary to preclude possible damage to the national

security by revealing information that is properly classified in accordance with Executive Order

12958, as amended, and is therefore protected pursuant to FOIA Exemption (b)(1).  That conclusion

is supported by Executive Order 12958, which provides at Section 3.6(a) that:

> An agency may refuse to confirm or deny the existence or non-existence of requested
> records whenever the fact of their existence or non-existence is itself classified under
> this order or its predecessors.

Independently of this provision of the Executive Order, FOIA Exemption (b)(1) also justifies the

Department's response of neither confirming nor denying the potential existence of records here.

Grafeld Dec. at ¶29.

 Section 1.4 of Executive Order 12958 specifies categories of information that are eligible for

classification.  One category of information eligible for classification is information that concerns

"intelligence activities (including special activities), intelligence sources or methods, or cryptology."

E.O. 12958 § 1.4(c). Grafeld Dec. at ¶ 30.

 Generally, intelligence methods are the means by which an intelligence agency accomplishes

its mission.  Most organized professions or businesses employ methods to accomplish their goals and objectives that are common to and, in some cases, unique to that business or profession.  Certain intelligence methods are of a special character necessitating the protection of the fact of their use, as well as the details of their use, from unauthorized disclosure.  *Id*. at ¶ 31.

On its face Plaintiff's request for an individual's passport and visa records under "code names, cryptonyms, pseudonys [sic], or aliases" implicates alleged intelligence methods.  The existence or nonexistence of these alleged methods is itself a fact that would be classified as "Secret" under Section 1.4(c) and the other terms of the Executive Order. Grafeld Dec. at ¶ 32.  Section 1.4(c), as noted above, specifies that information may be classified if it concerns intelligence sources and methods.  Section 1.2(a)(2) of E.O. 12958 states that:

> "Secret" shall be applied to information, the unauthorized disclosure of which reasonably could be expected to cause damage to the national security that the original classification authority is able to identify or describe.

Section 6.1(j) of E.O. 12958 states that:

> Damage to the national security means harm to the national defense or foreign relations of the United States from the unauthorized disclosure of information, taking into consideration such aspects of the information as the sensitivity, value, utility and provenance of that information.

Grafeld Dec. at ¶32.

Disclosure of cryptonyms, pseudonyms, codenames, and aliases (collectively called "cryptonyms," for simplicity hereinafter), which are word and letter codes substituted for actual names or identities, could lead to the unauthorized disclosure of intelligence sources, methods, and intelligence activities.  *Id.* at ¶ 33.  Cryptonyms are used to disguise the true name of a person or entity of operational intelligence interest or engaged in certain intelligence activities.   And by

knowing a cryptonym's meaning, one may be able to identify or confirm the identity of a covert

intelligence officer or identify a covert program or clandestine intelligence activities. *Id.*

Confirmation or denial of the use of cryptonyms in a specific situation or type of record, or

with regard to a specific person, in and of itself would reveal intelligence, sources, methods and

intelligence activities. *Id.* at ¶ 34. Concomitantly, it would not be sufficient either to admit that no

responsive document exists, or to admit that a responsive document does exist but then to redact any

cryptonyms. *Id.*   In the first event, the nonexistence of responsive records would itself reveal

classified national security information and shed light on intelligence sources and methods with

regard to the use of cryptonyms. In the latter event, the mere identification of documents responsive

to such a request as well as the presence of redactions would reveal classified national security

information and intelligence sources and methods. Either way, such information would identify

individuals as having a covert or clandestine relationship (or the lack thereof) with the United States

Government and would reveal the manner in which that relationship is conducted. *Id.*   Such

disclosures would seriously damage the ability of the United States to conduct covert

intelligence-gathering activities, vital to the conduct of foreign affairs and to the defense of the

nation, by undermining their necessarily covert nature. *Id.*   Accordingly, confirming or denying the

potential existence of responsive records would result in serious damage to the national security. *Id.*

The fact of the existence or nonexistence of records evidencing a covert or clandestine interest

in specific individuals or specific types of records is so intrinsically intertwined with intelligence

sources and methods and U.S. foreign relations that this fact itself must remain classified. *Id.* at ¶

35. Therefore, the only appropriate response is for the Department to neither confirm nor deny the

existence or nonexistence of such records under FOIA Exemption (b)(1), as well as under exemption

(b)(3).

**The State Department's  Assertion of FOIA Exemption (b)(3) is  Justified**

Plaintiff requested that defendant's searches include "a search under any code names, cryptonyms, pseudonys [sic] or aliases used by Mr. Joannides," and alleged that Mr. Joannides was a deceased former CIA officer.    Grafeld Dec. at ¶ 6.

Exemption (b)(3) of the FOIA provides that the disclosure provisions of the FOIA do not apply to matters that are:

> ... specifically exempted from disclosure by statute ... provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld.

Section 102A(i)(1) of the National Security Act of 1947, as amended, 50 U.S.C.A. § 403-1(i)(1), provides that the Director of National Intelligence (DNI) shall protect intelligence sources and methods from unauthorized disclosure.   This statute clearly meets the requirements of Exemption (b)(3). *See Lahr v. National Transp. Safety Bd.,* 453 F.Supp.2d 1153, 1172 (C.D.Cal.2006) ("Section 102A(I) of the National Security Act of 1947, 50 United States Code Annotated section 403-1(i)(1), requires the Director of National Intelligence to protect intelligence sources and methods from unauthorized disclosure.. . .Material within the purview of sections 403-1 and 403g may be withheld under Exemption 3. *Minier*, 88 F.3d at 801 (citing section 403g and predecessor to 403-1).")*. See also Morley v. CIA*, 453 F. Supp. 2d 137, 150 (D.D.C. 2006) (demonstrating the court's deferential review under a similar provision of the National Security Act):

> In *CIA v. Sims,* 471 U.S. 159, 167-68, 105 S. Ct. 1881, 85 L. Ed. 2d 173 (1985), the Supreme Court specifically addressed the National Security Act of 1947 in the context of FOIA cases, holding that it is a "withholding" statute for the purposes of exemption (b)(3). As explained by our Circuit Court, the proper standard to determine whether the statue applies to given materials is whether the CIA demonstrates that an answer to the FOIA request can "reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods." *Gardels v. CIA*, 223 U.S. App. D.C. 88, 689 F.2d 1100, 1103 (D.C. Cir. 1982) (quoting *Halperin v. CIA*,

203 U.S. App. D.C. 110, 629 F.2d 144, 147 (D.C. Cir. 1980)).

Importantly, in cases such as this involving national security, as with Exemption (b)(1), courts must "accord 'substantial weight' to agency affidavits… when they aver that identified documents are exempt." *Goland*, 607 F.2d at 352 (applying "substantial weight" standard of review to Exemption 3 case); *see Halperin* 629 F.2d at 148 (holding that courts should give "substantial weight" to agency statements in "all national security FOIA cases, whether they arise formally under Exemption 1 or Exemption 3").

*Morley*, 453 F. Supp. 2d at150.

On its face, plaintiff's FOIA request seeks information whose potential existence or nonexistence could reveal intelligence sources and methods.   The fact of the existence or nonexistence of records evidencing a covert or clandestine interest in specific individuals or specific types of records is intrinsically intertwined with intelligence sources and methods.  It is therefore proper for the Department of State neither to confirm nor to deny the potential that it maintains records concerning a covert or clandestine intelligence relationship with or interest in an individual. For this reason, the DNI authorized the Department to take all necessary and appropriate measures in this case to ensure that intelligence sources and methods are protected from disclosure. Therefore, defendant's Glomar response pursuant to Exeption (b)(3)  is proper.   *Cf. Minier v. Central Intelligence Agency*,  88 F.3d 796, 800-802 (C.A.9 1996) (upholding the CIA's reliance on Exemption 3, 5 U.S.C. § 552(b)(3), to justify its Glomar Response regarding an individual's alleged employment with the CIA).

The information relating to intelligence sources and methods raised by Plaintiff's request is the same information relating to intelligence sources and methods that is covered by the Executive Order for classified information.  Therefore, the damage to national security that reasonably could be expected to result from the unauthorized disclosure of such information is co-extensive with the damage that reasonably could be expected to result from the unauthorized disclosure of classified information, which is described above. Grafeld  Dec. at ¶ 38.

Thus, the Department of State can neither confirm nor deny the potential that it maintains records concerning a covert or clandestine intelligence relationship with or interest in an individual. Such information is exempt from disclosure under the FOIA pursuant to exemption (b)(3) and, independently, as described above, exemption (b)(1).

**Defendant Disclosed All Reasonably Segregable Portions of Records.**

The District of Columbia Circuit has held that a District Court considering a FOIA action has "an affirmative duty to consider the segregability issue sua sponte." *Trans-Pacific Policing Agreement v. U.S. Customs Service*, 177 F.3d 1022, 1028 (D.C. Cir. 1999). The FOIA requires that if a record contains information that is exempt from disclosure, any "reasonably segregable" information must be disclosed after deletion of the exempt information unless the non-exempt portions are "inextricably intertwined with exempt portions." 5 U.S.C. § 552(b); *Mead Data Cent., Inc. v. U.S. Dept. of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977).

In this case, the defendant has demonstrated with reasonable specificity that all reasonably segregable information has been released. The documents described in paragraphs 20-25 of the Grafeld Declaration have been carefully reviewed for reasonable segregation of non-exempt information, and defendant determined that no additional segregation of meaningful information in the documents withheld in part can be made without disclosing information warranting protection under the law. As was indicated above, the defendant only redacted out identifying information concerning third parties. Defendant furthermore properly determined that it is necessary neither to confirm nor to deny the potential existence of certain records as described above. Grafeld Dec. at ¶ 40**.**

**CONCLUSION**

For the reasons stated herein, Plaintiff cannot establish any violation of the Freedom of Information Act and summary judgment should be entered for defendant.

Respectfully submitted,

_____/s/_____

JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney

_____/s/_____

RUDOLPH  CONTRERAS, D.C. Bar #  434122
Assistant United States Attorney

_____/s/_____

RHONDA C. FIELDS
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
202/514/6970  .

23

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| David Talbot, et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>Central Intelligence Agency, et al.,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)    Civil Action No.<br>)        07-0277<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF MARGARET P. GRAFELD

I, Margaret P. Grafeld, declare and state as follows:

1.  I am the U.S. Department of State's (Department's) Information and Privacy Coordinator and the Director of the Department's Office of Information Programs and Services (IPS). In these capacities, I am the Department official immediately responsible for responding to requests for records under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, the Privacy Act (PA), 5 U.S.C. § 552a, and other applicable records access provisions.  I have been in the employ of the Department of

State since 1974, and have served with the Department's
Information Access Program for most of my tenure with the
Department.  I am authorized to classify and declassify national
security information pursuant to Executive Order (E.O.) 12958,
as amended, and Department of State regulations set forth in
22 C.F.R. §§ 9.7, 9.14.  I make the following statements based
upon my personal knowledge, which in turn is based on a personal
review of the records in the case files established for the
processing of the subject requests, and upon information
furnished to me in the course of my official duties.  I have
read the complaint filed by the plaintiffs in the above-
captioned matter, and I am familiar with the efforts of
Department personnel to process the subject requests.

    2.  The core responsibilities of IPS include:  records
access requests made by the need-to-know community, the public
(under the FOIA, Privacy Act and mandatory classification review
requirements of E.O.12958, as amended, or the Ethics in
Government Act), members of Congress, other government agencies,
and those that have been made pursuant to judicial processes,
such as subpoenas, court orders, and discovery requests; records
management; privacy protection; national security classification
management and declassification review; corporate records
archives management; research; the Department's Library; and the
technology that supports these activities.

*David Talbot, et al. v. Central Intelligence Agency, et al.*
*Grafeld Declaration*

3.   The purpose of this declaration is to address the Department's handling of plaintiff Jefferson Morley's FOIA requests for passport and visa records pertaining to George Joannides and David Morales during specific years.   An explanation of the administrative processing of these requests, a detailed description of the information withheld, and applicable exemptions applied follow.   In explaining the exemptions, I deal first with the bases for redacting information from the passport and visa records at issue in this case, and second with the portion of the request seeking records under code names, cryptonyms, pseudonyms, or aliases.

## I.   ADMINISTRATIVE PROCESSING OF PLAINTIFFS' REQUEST

4.   In a letter dated January 12, 2007, attorney James H. Lesar requested on behalf of his client, Jefferson Morley, "all passport and visa records pertaining to Mr. George Joannides during the years 1963-1964 and 1967-1968" (Exhibit 1). This letter was improperly addressed to the Department's Research and Liaison Branch within the Department's Office of Passport Services (PPT).   By Department regulation at 22 C.F.R. § 171.5, requests made under the Freedom of Information Act should be addressed to IPS, which is the office within the Department that is responsible for responding to FOIA requests.

4

5.   The January 12 letter was never received directly by IPS from plaintiff Morley or his representative.   IPS received the letter from PPT on February 28, 2007.   Although the letter indicated that an obituary was attached, no obituary was attached to the version IPS received from PPT.   Instead, as later indicated in the letter, two articles were attached about the assassination of Senator Robert F. Kennedy.   (The version of the letter attached as exhibit 7 to the plaintiff's amended complaint differs in that it has no articles and one obituary attached, but the obituary is for an individual other than George Joannides.)

6.   The January 12 letter asked that searches include "a search under any code names, cryptonyms, pseudonys [sic] or aliases used by Mr. Joannides," and alleged that Mr. Joannides was a deceased former CIA officer.   The letter also asked that the request be expedited and advised that plaintiff Morley and another reporter had a pending publication deadline.

7.   By letter dated February 26, 2007 (Exhibit 2), the Department's Law Enforcement Liaison Division within PPT's Office of Legal Affairs advised plaintiff Morley, through his attorney, that his letter had been forwarded to IPS for "log in and assignment of a case number."   The letter instructed

plaintiff to provide a date of birth for the subject of his request and stated that his request would then be returned to PPT for further action.

8.    By letter dated March 2, 2007 (Exhibit 3), sent by mail and by fax (to the fax number supplied by plaintiff's attorney at the end of the January 12 letter), IPS acknowledged receipt of plaintiff's request and assigned it case control number 200701176.  IPS advised plaintiff through his attorney that the request had been sent to the wrong address, contrary to the Department's published regulations at 22 C.F.R. Part 171, and that the request was not received in the proper office (i.e., IPS) until recently.  (The letter states that it was not received until February 27, 2007; in fact, although IPS had learned late in the afternoon of February 27 that PPT would be forwarding a FOIA request, the request itself was not received in IPS until February 28.)

9.    In the March 2 letter, IPS noted that the subject line of the January 12 request letter listed several individuals whose names did not appear in the body of the request.  Based upon the content of plaintiff's request letter, which referred solely to George Joannides, IPS informed plaintiff that it interpreted the names in the subject line as an inadvertent error on the part of the requester, and the subject of the

request to be "passport and visa records pertaining solely to
Mr. George Joannides... and not to any other individuals." IPS
also advised that additional information was required in order
for the Department to locate the requested records, and
described the types of information plaintiff should provide to
enable the Department to retrieve responsive records, including
date of birth. Following Department regulations published at
22 C.F.R. § 171.12(a), the IPS letter also noted that
information about a third party could not be released without
written consent or proof of death. IPS also discussed access
issues related to visa records and described steps the plaintiff
should take to identify such records. IPS also advised that,
even if the Department had been able to process his request,
plaintiff had not demonstrated a compelling need for expedited
treatment under the Department's regulations at 22 C.F.R.
§ 171.12(b). IPS explained the reasons for the denial and
informed plaintiff of his right to appeal this determination
within 30 days of receiving the letter. IPS informed plaintiff
that since the Department could not process plaintiff's request
absent additional information, plaintiff's case had been closed
and a new case would be opened to process his perfected request
upon receipt of the necessary information described in IPS'
letter.

10.  By letter dated February 21, 2007 from attorney
James H. Lesar to PPT (Exhibit 4), which was reportedly received
by PPT on March 8, 2007, Mr. Lesar stated:  "By letter dated
January 12, 2007, I submitted a request on behalf of Mr.
Jefferson Morley for visa and passport records pertaining to
George Joannides, David Morales, and Gordon Campbell during the
years 1963-64 and 1967-19681 [sic].... This is to advise that
the request for records pertaining to Gordon Campbell is
withdraw [sic]."  PPT forwarded a copy of this letter to IPS on
March 9, 2007.

11.  By letter dated April 23, 2007 (Exhibit 5), attorney
James H. Lesar advised IPS that the request sought passport and
visa records on George E. Joannides and David Morales, and he
included the dates and places of birth and death for both
individuals, as well as George Joannides' social security number
and a copy of an obituary for David Morales.  Mr. Lesar
also advised that the request for records pertaining to
Gordon Campbell was withdrawn and that his client was willing
to pay for the relevant records but did not waive his right to
seek a fee waiver.

12.  Although the requester had still not provided proof
of Mr. Joannides' death, as requested in the Department's
March 2 letter, through good faith efforts the Department was
able to confirm that the information alleged in Mr. Lesar's

April 23 letter matched a March 14, 1990 obituary published in
*The Washington Post.* By letter dated June 22, 2007 (Exhibit 6),
IPS therefore advised Mr. Lesar that the Department now had
enough information to process the request. This letter from IPS
also advised that for processing reasons separate case numbers
had been assigned to the requests for records concerning
Mr. Joannides (case number 200701176) and Mr. Morales (case
number 200703072). IPS further advised that the search would
target records pertaining to the subjects for the years 1963-64
and 1967-68, and that the plaintiff had been placed in the
"media" category for fee purposes.

13.  Passport and visa records are maintained by PPT and
the Office of Visa Services (VO). These offices were provided
with the information in the request (including the names of the
individuals and their dates and places of birth and death), and
instructed to search not only for records that themselves dated
from the years specified in the request, but also for any
records that would have applied to the years there indicated
(for example, a passport application from before 1963 for a
passport that still might have been valid in 1963). These
searches were performed by individuals employed within these
offices who are familiar with both the subject matter of the

requests and the relevant records system holdings of their
respective offices.   There are no other offices in the
Department that it would be reasonable to search for an
individual's passport or visa records.   The searches were
reasonably calculated to yield all records responsive to the
requests.   PPT and VO are able to retrieve information
concerning applications for and denials or issuances of
passports and visas by the names of individuals who received or
applied for a visa or a passport.   Each respective office has
informed IPS that it conducted its searches based on the names
of the individuals at issue in the requests, and that it further
verified that information concerning the correct individual was
retrieved based on additional identifying information such as
date and place of birth.

14.   By letter dated July 16, 2007 (Exhibit 7), IPS advised
Mr. Lesar that, with regard to plaintiff's request for records
concerning George E. Joannides (case number 200701176), searches
of the records of PPT and VO had been completed and had resulted
in the retrieval of three responsive documents.   IPS advised
that since billable costs fell below the minimum amount charged,
the request had been processed without charge and the processing
of the request now had been completed.   IPS advised that, as

explained in a separate letter from PPT also dated July 16, 2007

(Exhibit 8), these documents were released in part with

redactions made under FOIA exemption (b)(6).  IPS added that "on

national security grounds we can neither confirm nor deny the

potential existence of records under, in the words of your

request letter, 'code names, cryptonyms, pseudonys [sic], or

aliases.'"  (Alteration in original IPS letter.)

15.  By another letter dated July 16, 2007 (Exhibit 9),

IPS advised Mr. Lesar that, with regard to his request for

records concerning David Morales (case number 200703072),

searches had been initiated of the records of PPT and VO, and

that these searches had been completed and had resulted in the

retrieval of one responsive document.  IPS advised that, as

explained in a separate letter from PPT also dated July 16, 2007

(Exhibit 10), this document was released in part with redactions

under FOIA exemption (b)(6).  IPS advised that since billable

costs fell below the minimum amount charged, the request had

been processed without charge and the processing of the request

now had been completed.

## II.  FOIA EXEMPTION CLAIMED FOR PASSPORT RECORDS

### FOIA Exemption (b)(6) – Personal Privacy

16.  Title 5 U.S.C Section 552(b)(6) states that the FOIA

does not apply to:

> ...personnel and medical files and similar files the
> disclosure of which would constitute a clearly unwarranted
> invasion of personal privacy....

The courts have interpreted the language of exemption

(b)(6) broadly to encompass all information that applies to an

individual without regard to whether it was located in a

particular type of file.  Four documents in this case contain

information that has been withheld under this privacy exemption

by excising certain personal information.

17.  Inasmuch as the information withheld is personal to an

individual, there is clearly a privacy interest involved.  I am

required, therefore, to determine whether there exists any

public interest in disclosure and to weigh any such interest

against the extent of the invasion of privacy.

18.  In United States Department of Justice v. Reporters

Committee for Freedom of the Press, 489 U.S. 749 (1989), the

Supreme Court laid down two rules for determining public

interest in disclosure of information involving a privacy

interest: (1) the relevant inquiry is whether disclosure would

serve the "core purpose" for which Congress enacted the FOIA,

i.e., to show "what the government is up to," and (2) the

relevant public interest is the interest of the public in

general, not any particular interest of the person or group

seeking the information.  Accordingly, where the requester is

not the person whose privacy interest is at stake, the identity

of the requester as well as the purpose for which the information is sought is irrelevant in making the disclosure determination.

19.  I have concluded that (1), disclosure of the information would result in a clearly unwarranted invasion of personal privacy; and (2) disclosure of the information would not serve the "core purpose" of the FOIA, i.e., it would not show "what the government is up to."  Accordingly, the privacy interest clearly outweighs any public interest in disclosure of such personal information and must, therefore, prevail.

### III.  DOCUMENT DESCRIPTIONS

#### Case Number 200701176

20.  Document No. 1 is a passport application in the name of George E. Joannides.  Stamped March 18, 1960.  Three pages.  UNCLASSIFIED.  Withheld in part under FOIA exemption (b)(6).

21.  Document No. 2 is a passport application in the name of George E. Joannides.  Stamped May 22, 1962.  Three pages.  UNCLASSIFIED.  Withheld in part under FOIA exemption (b)(6).

22.  Document No. 3 is a passport application in the name of George E. Joannides.  Stamped June 1, 1964.  Four pages.  (This includes a one page "Authorization for a No Fee Passport", (Form DD 1056) dated May 22, 1964.)  UNCLASSIFIED.  Withheld in part under FOIA exemption (b)(6).

13

Case Number 200703072

23.  Document No. 1 is an application for the extension of the passport of David Sanchez Morales.  Dated May 10, 1968.  Two pages.  UNCLASSIFIED.  Withheld in part under FOIA exemption (b)(6).

24.  In all four of these documents the only information that has been withheld concerns individuals other than the passport applicants.  In Case No. 200701176, Document No. 1, the information withheld is the date and place of birth and the address of Violet Joannides, wife of the applicant, who was listed as the person to be notified in the event of death or accident.  In Document No. 2, the only information withheld is the date and place of birth of the applicant's wife.  (In this case the name and address of the person to be contacted in the event of death or accident was not deleted because it was the applicant's mother, described elsewhere in the application as born in 1898, and therefore presumed to be deceased.)  In Document No. 3, the only information withheld is the name and address of the person to be contacted in the event of death or accident and the date and place of birth of the applicant's wife, again listed as Violet Joannides.  In Case No. 200703072, Document 1, the withheld information is the address of Joan K. Morales, wife of the applicant, who was listed as the person to be notified in the event of death or accident.

*David Talbot, et al. v. Central Intelligence Agency, et al.*
*Grafeld Declaration*

25.   All of the information described above as having been deleted in these four documents is personal to an individual and there is no public interest in its disclosure.   Its release would constitute a clearly unwarranted invasion of those individuals' personal privacy and it is therefore exempt from release under FOIA exemption (b)(6).   All other information in these documents has been released.

### IV.   OTHER APPLICABLE FOIA EXEMPTIONS

26.   A portion of the request submitted by plaintiff involves unusual circumstances wherein the mere confirmation or denial of the existence of responsive records would reveal a classified fact.   While such matters are not frequently encountered in FOIA requests, they must be approached in the reasonable manner of neither confirming nor denying the existence of such records, because even mere confirmation or denial of the existence of the records would reveal information exempt from disclosure for reasons of national security.   The remainder of this declaration will address the types of information to be protected in this so-called "Glomar" manner under FOIA exemptions (b)(1) and (b)(3).

27.   The Department may neither confirm nor deny the existence of records reflecting an unacknowledged, covert or clandestine intelligence source, method or activity.   This is so

because the fact of the existence or nonexistence of records
containing such information -- unless, of course, it has been
officially acknowledged -- would be classified for reasons of
national security under Section 1.4(c) (concerning intelligence
sources and methods) of Executive Order 12958, as amended by
Executive Order 13292 of March 15, 2003 ("Executive Order
12958," or "E.O. 12958").  Further, the Director of National
Intelligence (DNI) has the responsibility and authority to
protect such information from unauthorized disclosure in
accordance with Subsection 403-1(i)(1) of the National Security
Act of 1947.  As such, a portion of plaintiff's request must be
denied pursuant to FOIA exemptions (b)(1) and (b)(3).  As in all
such instances, this determination and communication neither
confirms nor denies the existence of responsive records.

## A.  (b)(1) Protection of Classified Information (Intelligence Sources and Methods)

28.  FOIA exemption (b)(1), 5 U.S.C. § 552(b)(1), provides
that the disclosure provisions of the FOIA do not apply to
matters that are:

> (A) specifically authorized under criteria established by
> an Executive Order to be kept secret in the interest of
> national defense or foreign policy and (B) are in fact
> properly classified pursuant to such Executive order.

29.  In its letter of July 16, 2007 (Exhibit 7), IPS
informed Mr. Lesar that "on national security grounds [the

Department] can neither confirm nor deny the potential existence
of records under, in the words of your request letter, 'code
names, cryptonyms, pseudonys [sic], or aliases.'" I conclude
that this so-called "Glomar" response is necessary to preclude
possible damage to the national security by revealing
information that is properly classified in accordance with
Executive Order 12958, as amended, and is therefore protected
pursuant to FOIA exemption (b)(1). My conclusion is supported
by Executive Order 12958, which provides at Section 3.6(a) that:

> An agency may refuse to confirm or deny the existence or
> non-existence of requested records whenever the fact of
> their existence or non-existence is itself classified under
> this order or its predecessors.

Independently of this provision of the Executive Order, FOIA
exemption (b)(1) also justifies the Department's response of
neither confirming nor denying the potential existence of
records here.

30.    Section 1.4 of Executive Order 12958 specifies
categories of information that are eligible for classification.
One category of information eligible for classification is
information that concerns "intelligence activities (including
special activities), intelligence sources or methods, or
cryptology." E.O. 12958 § 1.4(c).

31.    Generally, intelligence methods are the means by
which an intelligence agency accomplishes its mission. Most

organized professions or businesses employ methods to accomplish their goals and objectives that are common to and, in some cases, unique to that business or profession.  Certain intelligence methods are of a special character necessitating the protection of the fact of their use, as well as the details of their use, from unauthorized disclosure.

    32.   On its face plaintiff's request for an individual's passport and visa records under "code names, cryptonyms, pseudonys [sic], or aliases" implicates alleged intelligence methods.   The existence or nonexistence of these alleged methods is itself a fact that would be classified as "Secret" under Section 1.4(c) and the other terms of the Executive Order. Section 1.4(c), as noted above, specifies that information may be classified if it concerns intelligence sources and methods. Section 1.2(a)(2) of E.O. 12958 states that:

>  "Secret" shall be applied to information, the unauthorized disclosure of which reasonably could be expected to cause damage to the national security that the original classification authority is able to identify or describe.

Section 6.1(j) of E.O. 12958 states that:

>  Damage to the national security means harm to the national defense or foreign relations of the United States from the unauthorized disclosure of information, taking into consideration such aspects of the information as the sensitivity, value, utility and provenance of that information.

    33.   Disclosure of cryptonyms, pseudonyms, codenames, and aliases (which I will collectively call "cryptonyms," for

simplicity), which are word and letter codes substituted for actual names or identities, could lead to the unauthorized disclosure of intelligence sources, methods, and intelligence activities. Cryptonyms are used to disguise the true name of a person or entity of operational intelligence interest or engaged in certain intelligence activities. And by knowing a cryptonym's meaning, one may be able to identify or confirm the identity of a covert intelligence officer or identify a covert program or clandestine intelligence activities.

34. Confirmation or denial of the use of cryptonyms in a specific situation or type of record, or with regard to a specific person, in and of itself would reveal intelligence, sources, methods and intelligence activities. Concomitantly, it would not be sufficient either to admit that no responsive document exists, or to admit that a responsive document does exist but then to redact any cryptonyms. In the first event, the nonexistence of responsive records would itself reveal classified national security information and shed light on intelligence sources and methods with regard to the use of cryptonyms. In the latter event, the mere identification of documents responsive to such a request as well as the presence of redactions would reveal classified national security information and intelligence sources and methods. Either way, such information would identify individuals as having a covert

or clandestine relationship (or the lack thereof) with the United States Government and would reveal the manner in which that relationship is conducted. Such disclosures would seriously damage the ability of the United States to conduct covert intelligence-gathering activities, vital to the conduct of foreign affairs and to the defense of the nation, by undermining their necessarily covert nature. Accordingly, confirming or denying the potential existence of responsive records would result in serious damage to the national security.

35. Simply stated, the fact of the existence or nonexistence of records evidencing a covert or clandestine interest in specific individuals or specific types of records is so intrinsically intertwined with intelligence sources and methods and U.S. foreign relations that this fact itself must remain classified. Therefore, the only appropriate response is for the Department to neither confirm nor deny the existence or nonexistence of such records under FOIA exemption (b)(1), as well as under exemption (b)(3), as discussed below.

### B. (b)(3) Statutory Protection of Information (National Security Act of 1947)

36. Exemption (b)(3) of the FOIA provides that the disclosure provisions of the FOIA do not apply to matters that are:

> ... specifically exempted from disclosure by statute
> ... provided that such statute (A) requires that the
> matters be withheld from the public in such a manner
> as to leave no discretion on the issue, or (B)
> establishes particular criteria for withholding or
> refers to particular types of matters to be withheld.

37.    Section 102A(i)(1) of the National Security Act of
1947, as amended, 50 U.S.C.A. § 403-1(i)(1), provides that the
Director of National Intelligence (DNI) shall protect
intelligence sources and methods from unauthorized disclosure.
This statute clearly meets the requirements of exemption (b)(3),
and plaintiff's FOIA request on its face seeks information which
is both classified and would reveal intelligence sources and
methods.  For this reason, the DNI authorized the Department to
take all necessary and appropriate measures in this case to
ensure that intelligence sources and methods are protected from
disclosure.  Accordingly, the Department's refusal to confirm or
deny the existence of records responsive to plaintiff's request
regarding cryptonyms is also supported by the requirement of the
National Security Act of 1947 that any information that would
reveal intelligence sources and methods be protected.

38.    The National Security Act's statutory requirement to
protect intelligence sources and methods does not require the
DNI or the Department to identify or describe the damage to

national security that reasonably could be expected to result from their unauthorized disclosure.  In any event, the information relating to intelligence sources and methods raised by plaintiff's request (and all such requests) is the same information relating to intelligence sources and methods that is covered by the Executive Order for classified information. Therefore, the damage to national security that reasonably could be expected to result from the unauthorized disclosure of such information is co-extensive with the damage that reasonably could be expected to result from the unauthorized disclosure of classified information, which is described above.

39.   Thus, the Department of State can neither confirm nor deny the potential that it maintains records concerning a covert or clandestine intelligence relationship with or interest in an individual.  Such information is exempt from disclosure under the FOIA pursuant to exemption (b)(3) and, independently, as described above, exemption (b)(1).

## CONCLUSION

40.   The documents described in paragraphs 20-25 have been carefully reviewed for reasonable segregation of non-exempt information, and I have determined that no additional segregation of meaningful information in the documents withheld in part can be made without disclosing information warranting

*David Talbot, et al. v. Central Intelligence Agency, et al.*
*Grafeld Declaration*

protection under the law.   I have furthermore determined that it is necessary neither to confirm nor to deny the potential existence of certain records as described above.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed this _20th_ day of September 2007


Margaret P. Grafeld

JAMES H. LESAR

ATTORNEY AT LAW
1003 K STREET, N.W., SUITE 640
WASHINGTON, D.C. 20001
———
TELEPHONE (202) 393-1921
FAX (202) 393-7310

## FREEDOM OF INFORMATIN ACT REQUEST

January 12, 2007

The Department of State
Research and Liaison Branch
1111 19th Street, N.W.
Room 500                                    VIA CERTIFIED MAIL NO.
Washington, D.C. 20524                       7005 1160 0002 9259 7662

Re: Visa and Passport Records on David
    Morales and Gordon Campbell

Dear Sir or Madam:

I represent Mr. Jefferson Morley, a reporter for The Washington Post.Com.
Pursuant to the Freedom of Information Act 5 U.S.C. 552, et seq., Mr. Morley requests
all passport and visa records pertaining to Mr. George Joannides during the years 1963-
1964 and 1967-1968. He requests that the processing of this request be expedited
pursuant to 5 U.S.C. 552(a)(6)(E)(1).

The search for these records should include a search under any code names,
cryptonyms, pseudonys or aliases used by Mr. Joannides. Mr. Joannides is known to
have used the name "Walter Newby."

Mr. Joannides is a deceased former CIA officer. (A of an obituary is attached.)
On November 20, 2006, BBC-TV ran a documentary which reported that three former
CIA officials who had worked at the CIA's JM/WAVE station in Miami, Florida during
the 1960s had been identified as appearing in photographs taken at the Ambassador Hotel
in Los Angeles the night Senator Robert F. Kennedy was assassinated. One of these
three, David Morales, has long been the subject of speculation that he was involved in the
assassination of President Kennedy, and on at least two occasions he is said to have
statements implicating himself in the President's assassination, and on one occasion, the
assassination of Senator Robert Kennedy as well.

These allegations, which appear to be backed by some credible witnesses, raise
issues of great public urgency. If true, the implications are potentially far-reaching and
explosive. If the allegations made on the BBC program are not founded in fact, the
public record should be clarified to show that as soon as possible.

GRAFELD DECLARATION
Civil Action No. 07-0277
Exhibit 1

2

Mr. Morley and another reporter have signed a contract with The New Yorker Magazine to write a story reporting on the BBC-TV allegations. Their publication deadline is March 1, 2007.

In addition to the BBC-TV documentary, these allegations were the subject of an article in The Guardian., a copy of which is attached. The Baltimore Chronicle also ran a lengthy article by a British historian calling for a reopening of both the JFK and RFK assassinations. A copy of this article is also attached.

The BBC program also generated significant discussions in the comment boards for both The Guardian and BBC-TV web sites. Furthermore, the popular news aggregator del.icio.us.com 57 people have stored the British story for future reference. Looking at the sites daily ranking, this indicates that the BBC-TV allegations are probably among the five or ten most referenced Web articles. See: http://del.icio.us/popular/?new for the period November 20-December 7, 2006.

As an author and journalist, Mr. Morley is a "representative of the news media" and cannot be charged search fees. 5 U.S.C. 552(a)(4)(A)(ii)(II).

The FOIA provides that you have ten calendar days to make a determination whether or not to expedite processing of this request. Please advise me of you decision by fax or email. My fax number is (301) 657-3699. My email address is jlesar@mindspring.com.

I hereby certify that the foregoing statements are true and correct to the best of my knowledge and belief.

Sincerely yours,

James H. Lesar

# Did the CIA kill Bobby Kennedy?

In 1968, Robert Kennedy seemed likely to follow his brother, John, into the White House. Then, on June 6, he was assassinated - apparently by a lone gunman. But Shane O'Sullivan says he has evidence implicating three CIA agents in the murder

Monday November 20, 2006
The Guardian

At first, it seems an open-and-shut case. On June 5 1968, Robert Kennedy wins the California Democratic primary and is set to challenge Richard Nixon for the White House. After midnight, he finishes his victory speech at the Ambassador hotel in Los Angeles and is shaking hands with kitchen staff in a crowded pantry when 24-year-old Palestinian Sirhan Sirhan steps down from a tray-stacker with a "sick, villainous smile" on his face and starts firing at Kennedy with an eight-shot revolver.

As Kennedy lies dying on the pantry floor, Sirhan is arrested as the lone assassin. He carries the motive in his shirt-pocket (a clipping about Kennedy's plans to sell bombers to Israel) and notebooks at his house seem to incriminate him. But the autopsy report suggests Sirhan could not have fired the shots that killed Kennedy. Witnesses place Sirhan's gun several feet in front of Kennedy, but the fatal bullet is fired from one inch behind. And more bullet-holes are found in the pantry than Sirhan's gun can hold, suggesting a second gunman is involved. Sirhan's notebooks show a bizarre series of "automatic writing" - "RFK must die RFK must be killed - Robert F Kennedy must be assassinated before 5 June 68" - and even under hypnosis, he has never been able to remember shooting Kennedy. He recalls "being led into a dark place by a girl who wanted coffee", then being choked by an angry mob. Defence psychiatrists conclude he was in a trance at the time of the shooting and leading psychiatrists suggest he may have be a hypnotically programmed assassin.

Three years ago, I started writing a screenplay about the assassination of Robert Kennedy, caught up in a strange tale of second guns and "Manchurian candidates" (as the movie termed brainwashed assassins). As I researched the case, I uncovered new video and photographic evidence suggesting that three senior CIA operatives were behind the killing. I did not buy the official ending that Sirhan acted alone, and started dipping into the nether-world of "assassination research", crossing paths with David Sanchez Morales, a fearsome Yaqui Indian.

Morales was a legendary figure in CIA covert operations. According to close associate Tom Clines, if you saw Morales walking down the street in a Latin American capital, you knew a coup was about to happen. When the subject of the Kennedys came up in a late-night session with friends in 1973, Morales launched into a tirade that finished: "I was in Dallas when we got the son of a

bitch and I was in Los Angeles when we got the little bastard." From this line grew my odyssey into the spook world of the 60s and the secrets behind the death of Bobby Kennedy.

Working from a Cuban photograph of Morales from 1959, I viewed news coverage of the assassination to see if I could spot the man the Cubans called El Gordo - The Fat One. Fifteen minutes in, there he was, standing at the back of the ballroom, in the moments between the end of Kennedy's speech and the shooting. Thirty minutes later, there he was again, casually floating around the darkened ballroom while an associate with a pencil moustache took notes.

The source of early research on Morales was Bradley Ayers, a retired US army captain who had been seconded to JM-Wave, the CIA's Miami base in 1963, to work closely with chief of operations Morales on training Cuban exiles to run sabotage raids on Castro. I tracked Ayers down to a small town in Wisconsin and emailed him stills of Morales and another guy I found suspicious - a man who is pictured entering the ballroom from the direction of the pantry moments after the shooting, clutching a small container to his body, and being waved towards an exit by a Latin associate.

Ayers' response was instant. He was 95% sure that the first figure was Morales and equally sure that the other man was Gordon Campbell, who worked alongside Morales at JM-Wave in 1963 and was Ayers' case officer shortly before the JFK assassination.

I put my script aside and flew to the US to interview key witnesses for a documentary on the unfolding story. In person, Ayers positively identified Morales and Campbell and introduced me to David Rabern, a freelance operative who was part of the Bay of Pigs invasion force in 1961 and was at the Ambassador hotel that night. He did not know Morales and Campbell by name but saw them talking to each other out in the lobby before the shooting and assumed they were Kennedy's security people. He also saw Campbell around police stations three or four times in the year before Robert Kennedy was shot.

This was odd. The CIA had no domestic jurisdiction and Morales was stationed in Laos in 1968. With no secret service protection for presidential candidates in those days, Kennedy was guarded by unarmed Olympic decathlete champion Rafer Johnson and football tackler Rosey Grier - no match for an expert assassination team.

Trawling through microfilm of the police investigation, I found further photographs of Campbell with a third figure, standing centre-stage in the Ambassador hotel hours before the shooting. He looked Greek, and I suspected he might be George Joannides, chief of psychological warfare operations at JM-Wave. Joannides was called out of retirement in 1978 to act as the CIA liaison to the House Select Committee on Assassinations (HSCA) investigating the death of John F Kennedy.

Ed Lopez, now a respected lawyer at Cornell University, came into close contact with Joann-des when he was a young law student working for the

It's Time to Re-Open the Investigation of RFK and JFK Assassination...    http://baltimorechronicle.com/2006/112206CARMICHAEL.shtml

BALTIMORE
Chronicle
OWl    PRINT
EMAIL
FEEDBACK

JFK Research Site
Browse and search the largest digital
archive available.

Politics in Pictures
Boston Globe photo archives. JFK, Jackie,
Clinton, Kerry.

Place a. Ad ...
Ads by Goooooogle

The Zapruder
Film at MPI
The Zapruder
assassination
images restored on
DVD at MPI. Order
Now!
vide1.com)

Law2000. Inc.
Computer Forensic
Experts Criminal
Civil, Corporate
JFK Law2000.net

john f.kennedy
Free information
and resources
about john f
kennedy
john-f-kennedy.selflc.com

Positive ID
Solutions
Forensic &
Investigation
Equipment Priced
to Fit Your Budget
www.AllicanHFarce. com.

Advertise on this site

The basic package
has 60 channels
featuring Free
Speech TV & Link
TV + local
channels, and it
includes FREE
Digital Video
Recorders and
HDTV Receivers.
Check for
promotional
offers!

Baltimore & Maryland
11.21 New Zealand's Earthrace Boat
and Crew To Visit Inner Harbor
on Nov. 23 & 24
11.02 This Election, the Medium Really
Is the Message

Art & Entertainment
11.21 Isikoff on Iraq: "At a minimum
negligence in the commission of
a fraud"

Environment
Ref.: What is Global Warming, and
what can citizens do about it?

Advice
11.17 How Rent Makes Poverty

U.S. News Media Criticism
11.22 2008
11.17 Alternative Media Can Balance
Establishment's Experts
11.10 Morning-After Pundits Take
Winners to Task
11.07 Midterms and the Media
10.30 Catapulting the Propaganda
with the Washington Post

Letters
Open Letters:
11.09 Rumsfeld replacement (Robert
Gates) was director of voting
company
11.07 The best defense is a good
offense, so VOTE!
11.06 Pick a Number
11.06 If You Care About Higher
Education in Maryland, the
Gubernatorial Choice is Clear:
O'Malley

Editorials & Op-Eds
11.22 It's Time to Re-Open the
Investigation of RFK and JFK
Assassinations
11.21 Congress Should Immediately
Terminate the 2001 AUMF
11.06 Statewide Questions on the
Ballot: Yes for 1, 2 and 3; No
for 4
10.25 Forget her "Pledge," She Took
an Oath: Why Pelosi is Wrong
on Impeachment
10.24 Let's March in January! An
Impeachment Call to Action

United States
11.23 Gates & the Iran Arms Sales
11.21 TH*NK*NG REALITIES
11.20 Daggers Drawn - DLC versus
DNC
11.17 Forget About Centrism: We
Must Reclaim the Inspired Edge
11.15 Delusions of Separation
11.15 Blackmail & Bobby Gates
11.15 Family Feud: Little Bush Hits
Back at Daddy
11.15 Credit Ned Lamont with
Democrats' Antiwar Position
11.15 Why Impeachment, Sadly, Is a
Non-Starter

ANALYSIS:

BALTIMORE
Chronicle
'tare,

# It's Time to Re-Open the Investigation of RFK and JFK Assassinations

by MICHAEL CARMICHAEL

Nov. 22, 2006–Planning to write a film script about the case, Shane O'Sullivan, an independent researcher, investigated the assassination of RFK. But, O'Sullivan found much more than he had hoped.

On Monday night, the BBC broadcast O'Sullivan's report on their high-profile programme, "Newsnight." O'Sullivan's findings shocked many people. Working through an exhaustive analysis of videotapes made at the Ambassador Hotel on the night of RFK's assassination, O'Sullivan identified three figures as former agents of the CIA. Two of the agents O'Sullivan identified could be seen moving away from the hotel pantry shortly after the shooting of RFK.

the assassination of JFK –could seem to be an eternal mystery that has long since passed into the realm of myth: however, that is not the case for today; technology has provided a wealth of new tools with which to examine evidence in criminal cases–even cold cases over forte years old.

Following his preliminary identifications, O'Sullivan presented the video images to more authoritative sources, men who knew the three agents personally. While there was a slender degree of uncertainty (circa 5-10%) the men in the videos were positively identified as the former CIA agents:

- o David Sanchez Morales;
- o Gordon Campbell and
- • George Joannides

Morales was known to be involved in coups d'etats throughout Latin America and he had a reputation of a dangerous man with an explosive temper who was capable of violence. To entertain his friends, Morales would tell stories about his involvement in the killing and capture of Che Guevara, coups in Latin America and other nefarious covert activities.

Two of the CIA agents in the Ambassador Hotel: Morales and Joannides are now dead, while the whereabouts of the third, Campbell, are presently unknown.

O'Sullivan interviewed Bradley Ayers, U.S. Army Captain retired, who had been stationed at JM-Wave, the Miami base for the CIA. In 1963, David Morales was the Chief of Operations at JM-Wave. Ayers and Morales trained Cuban exiles in the arts of sabotage to be deployed in covert action against the regime of Fidel Castro. On camera, Ayers identified Morales and Campbell with what he described as 95% accuracy. Following that positive identification, Ayers introduced O'Sullivan to David Rabern, a freelance mercenary who has been contracted by the CIA to participate in the Bay of Pigs invasion in 1961. Rabern had been in the ballroom of the Ambassador Hotel on the fateful night in 1968.

While Rabern did not know Morales and Campbell by name, he had noticed them talking to each other in the hotel lobby prior to the assassination. Earlier in the same year, Rabern had noticed Campbell in and around several police stations. If true, this report is rather odd, considering that the CIA has no jurisdiction

It's Time to Re-Open the Investigation of RFK and JFK Assassination...          http://baltimorechronicle.com/2006/112206CARMICHAEL.shtml

11.13 The Democrats and Civil Liberties
11.13 Impeach for Change Kicks off National Campaign
11.13 Bush's Belated Accountability Moment
11.10 What Vote-Theft Conspiracy?
11.09 The Secret World of Robert Gates
11.09 Gates of Hell: Another Constitution-Betraying Bushist in the Pentagon
11.08 Election Postmortem: What's Next?
11.08 American Voters Just Say No
11.07 Is Bush Next?
11.08 It's Election Eve, Do You Know Where Your Country Is?
11.06 America's Slide to Totalitarianism
11.06 Reader Response to Lindorff: An Intentional Strategy to Discredit Reality
11.02 America's Point of No Return
11.02 Kerry and Bush: The Joke's on Us
11.02 Eminent-Domain Chutzpah
11.01 Postcards of the Hanging: Race and Sex in Tennessee
11.01 How Neocon Favorites Duped U.S.
10.31 All the President's Lies
10.31 The "War for Oil" Comes Home
10.27 The Crimes of Greed vs. the Crimes of Government
10.27 Election Perspective: Misreading al-Qaeda on Iraq
10.24 How Democrats Might Blow It
Middle East
11.21 American Policy in Iraq Provides the Excuse Not to Leave
11.21 Killing Hope in Beit Hanoun
11.16 Bush's "New" Iraq Strategy Revealed: More Troops, More War
11.14 No Exit: The Baker Commission and the Trap of Reality
11.13 Call It What It Is: a Massacre
11.06 "The Iraqis didn't do it."
11.03 Just a wall?
11.03 Territorial fragmentation of the West Bank
11.02 Rogue President
10.25 Blood and Gravy II: The Jackal's Feast Goes on
10.23 Israel, Palestine, and Canada
10.23 Iraq: Time for Truth and Consequences
10.21 Giving Osama What He Really Wants
The Rest of the World
11.22 Chertoff's "Chilling Vision"
11.02 Space War
10.27 Hail to the Hungarians!
10.26 The Veil and the British Male Elite

We are a Public Non-profit Newspaper. Your donation is essential to our survival.

on U.S. soil. Another bizarre fact: Morales was officially stationed in Laos in 1968.

O'Sullivan found video images of Campbell with another figure who has now been identified as George Joannides, a pivotal figure in the CIA and the re-investigation of the assassination of JFK.

Joannides had been the Chief of Psychological Warfare Operations at IM-Wave. He had retired from his CIA post, but in 1978 he returned to active duty, as it were, as the liaison between the House Select Committee on Assassinations (HSCA) during its re-investigation of the assassinations of JFK and Martin Luther King.

Puzzling, perplexing and problematic, Joannides failed to inform his colleagues at the HSCA that he had ever worked at IM-Wave. This is a troubling enigma, for it suggests that he intended to maintain his covert identity-a fact that would compromise his involvement in the HSCA and jeopardize the entire congressional Investigation.

A former researcher with the HSCA, Ed Lopez, identified Joannides as the person in the Ambassador Hotel video with what he described on camera as 99% accuracy. More: Lopez recalled Joannides' obstructive practice of denying the HSCA access to crucial documents in the re-investigation of the assassination of JFK.

O'Sullivan did not stop there. Moving to Washington, he met Wayne Smith, a veteran State Department official who worked with Morales at the US embassy in Havana in the final year of the Batista regime through the Cuban Revolution in 1959 and 1960. When O'Sullivan asked him to respond to the Ambassador Hotel video, Smith immediately stated, "That's him, that's Morales." From a conversation in 1975, Smith recalled that Morales stated that JFK deserved to be assassinated. From Smith's testimony, O'Sullivan learned that Morales "hated the Kennedys"-because of their cancelling the air support for the failed Bay of Pigs invasion of 1961.

In a hotel near the CIA headquarters (now named the George H. W. Bush Center for Central Intelligence) in Langley, Virginia, O'Sullivan met with a former agent, Tom Clines who said that all of the men in the Ambassador Hotel video had been misidentified as former CIA agents. When O'Sullivan informed him that Ayers and Smith had positively identified the men as Morales, Campbell and Joannides, Clines became "disturbed," and he refused to go on camera for the interview.

Following his interview of Clines, senior journalists in Washington advised O'Sullivan to take his testimony with a grain of salt as he was known to "blow smoke" deliberately as a routine function to dissemble facts for the press and public.

Gaeton Fonzi was the lead investigator of the HSCA investigation of the assassination of JFK. In his book, The Last Investigation, Fonzi reported the testimony of Bob Walton, a man who met Morales and discussed JFK with him. According to Fonzi's account, Morales asserted his direct involvement in the assassination of JFK as revenge for the Bay of Pigs.

On the Watergate tapes, Richard Nixon always referred to the assassination of JFK as "the Bay of Pigs thing." During Eisenhower's presidency, Nixon served as the White House liason with the CIA. As Vice-President, Nixon worked directly with Allen Dulles and other senior staff at the CIA on the planning of the Bay of Pigs operation. It should be noted that George H. W. Bush has been known to have been integral to the Bay of Pigs operation since the publication of the enormously popular

*1 aman's talk Et nter. langta, meet Law fioltine: (*ali Tu_1_i*ree 1-877-421-9400 uneidor, t : 0s·m–E p m i clarteng Dec 6) Free to air Man land rosien's:*

*just because you're throwing it out doesn't make it trash.*

Goisle

Search   ✗ This site  (- Web

bestselling book of 1991, *Plausible Denial, by* Mark Lane.

During his campaign for the presidency in 1960, Nixon was shocked that JFK made public the contents of his top-secret intelligence briefings-and had moved to Nixon's right to advocate overt military intervention against Cuba. The CIA planned to overthrow Castro in an invasion manned with exiled Cubans trained by the staff at JM-Wave. From-our perspective today, it is perfectly understandable why JFK would have been compelled to make this policy position public in his presidential campaign. Had he not done so, JFK could have been tarnished with a charge of being "weak on communism." by Nixon, who had been one of the leading witch-hunters of the disgraceful McCarthy Era.

Upon his inauguration as president, JFK continued to support the plans to attack Cuba with the force of exiled Cubans-a project that Nixon had nurtured, supported and managed for the Eisenhower White House. However, JFK decided to withhold U.S. air support in order to maintain an arm's length separation from the Cuban invasion.

The Bay of Pigs became a fiasco. JFK accepted the blame, and he immediately ordered a thorough-going reorganization of the CIA. A few months later, Allen Dulles, who had been a free-wheeling manufacturer of coups d etats while serving as Director of Central Intelligence (DCI), 'retired' after a formal conversation with JFK. JFK promptly named a new director, and John McCone, who had been the director of the Atomic Energy Commission, soon took Dulles's place as DCI.

JFK's reorientation of the CIA did not stop there. Recognizing that the agency's mission to wage a covert Cold War was dangerously counterproductive, JFK ordered the CIA to make nuclear non-proliferation its top priority. Eventually, JFK would successfully negotiate the Test Ban Treaty with Nikita Khruschev in the aftermath of the Cuban Missile Crisis-by far the most significant strategic confrontation of the entire Cold War.

While rogue elements in the U.S. intelligence community have long been suspected of meddling in his assassination and those of his brother and Martin Luther King, Jr., Shane O'Sullivan's identification of three CIA agents in the Ambassador Hotel on the night of the

Shane O'Sullivan's identification of three (AA agents in the Ambassador Hotel on the night of the assassination of 121- K suggests strongly- that the case should · be reopened.

assassination of RFK suggests strongly that the case should be reopened. The third agent in the Ambassador Hotel, George Joannides, now appears to have been engaged in a sabotage mission during the HSCA investigation of JFK's assassination.

The assassination of JFK would seem to be an eternal mystery that has long since passed into the realm of myth; however, that is not the case for today; technology has provided a wealth of new tools with which to examine evidence in criminal cases-even cold cases over forty years old.

While O'Sullivan is calling for a re-opening of the case of RFK, it is only reasonable to re-open JFK's case, as well.

In 1968, I was in my final year at the University of North Carolina. From my meeting with a close associate of RFK, I worked as a college and university organizer in his presidential campaign. At the time of his assassination, RFK was the leading candidate for the presidency-far ahead of his nearest rival in the polls and definitely on track to win the November election.

Seeing the BBC broadcast of videotape evidence of three unassigned CIA agents in the Ambassador Hotel Ballroom at the

time of RFK's assassination shocked me. The federal government, Congress and the criminal justice system of the United States failed to protect the president of the United States and its leading presidential candidates. Worse. They have failed to tell the truth to the American people.

Today, on the anniversary of one of the most tragic dates in American history-I propose that the cases of RFK and JFK should be re-opened in either the 110th or the 111th Congress.

We must follow the evidence exhaustively and relentlessly, leaving no stone unturned and no document unexamined regardless of its current status: Sensitive; Secret, Top Secret or Above Top Secret. To do any less would be to become complicit in the lies and cover-ups that have denied the American people of the truth.

Michael Carmichael is a historian and author based in Oxford, England, UK. He is the founder and chief executive officer of planarymovement.org. This article is republished in the Baltimore Chronicle with permission of the author. The complete illustrated and referenced article "Death of a Presidency" by Michael Carmichael is online here.

Copyright © 2006 The Baltimore Chronicle. All rights reserved.

Republication or redistribution of Baltimore Chronicle content is expressly prohibited without their prior written consent.

This story was published on November 22, 2006.

11/25/06 5:57 PM

Jim Lesar
1003 K St NW
Washington, D.C. 20001

7005 1160 0002 9259 7662

RETURN RECEIPT
REQUESTED

RETURN RECEIPT
REQUESTED

FIRST CLASS MA

TO: Department of State
Research and Liaison Branch
1111 19th Street, N.W.
Room 400
Washington, D.C. 20524

FIRST CLASS MAIL

Expedited Freedom
of Information Request

RETURN RECEIPT
REQUESTED



United States Department of State

*Washington, D.C.   20520*

FEB 2 6 2007

In reply refer to:
CA/PPT/L/LE – JOANNIDES, George AKA NEWBY, Walter
Case Officer:  CVColeman

James H. Lesar
Attorney at Law
1003 K Street N.W., Suite 640
Washington, DC  20001

Dear Mr. Lesar:

I am responding to your letter on behalf of your client, Mr. Jefferson Morley, requesting information under the provisions of the Freedom of Information and Privacy Acts from the passport records of George Joannides AKA Walter Newby.

Your letter has been forwarded to the Office of Information Programs and Services (IPS) for log in and assignment of a case number.  Please provide a date of birth for your subject.  Your request will then be returned to this office for further action.  In the interim, you may reach the Office of IPS at the following address:

Department of State
Office of Information Programs and Services
A/ISS/IPS/RL, SA-2
Washington, DC  20522-8100
Phone:  (202) 261-8484

Sincerely,

Vanessa D. Washington
Chief, Law Enforcement Liaison
Office of Legal Affairs
Passport Services

GRAFELD DECLARATION
Civil Action No. 07-0277
Exhibit 2



**United States Department of State**

*Washington, D.C. 20520*

March 2, 2007
Case Number: 200701176

<u>Via Facsimile and Mail</u>

James H. Lesar, Esq.
Attorney at Law
1003 K Street N.W., Suite 640
Washington, DC 20001

Dear Mr. Lesar:

This is in response to your Freedom of Information Act (FOIA) request,
dated January 12, 2007, for copies of all documents relating to Mr. George
Joannides' passport and visa records during the years 1963-1964 and
1967-1968.

As an initial matter, we note that your request was improperly sent to the
wrong address, contrary to our published regulations at 22 C.F.R. Part 171.
As a result, the request was not received in the proper office until
February 27, 2007.

The subject line of your request letter indicates several individuals who do
not appear to be a part of your request. Based on the content of your request
letter, we interpret your request as concerning passport and visa records
pertaining solely to Mr. George Joannides (a.k.a. "Walter Newby"), and not
to any other individuals.

However, the request does not provide enough information for us to identify
the records sought, and we cannot process your request until you provide us
with more information than what we have received. Most useful in

---

*Office of Information Programs and Services*
*U.S. Department of State SA- 2*
*Washington, DC 20522-8100*
    *Web site: foia.state.gov*

*Inquiries:*
*Phone: 1- 202- 261- 8484*
*FAX: 1- 202- 261- 8579*
*email: FOIAStatus@state.gov*

GRAFELD DECLARATION
Civil Action No. 07-0277
Exhibit 3

-2-

permitting identification of the requested passport records would be Mr. Joannides' date of birth (and Mr. Newby's if professedly different). If you cannot provide the date of birth, we may still be able to identify the particular records you request if you provide sufficient other information about the subject, such as place of birth, country of citizenship, middle initial, and confirmation of the subject's status as a government employee. We strongly encourage you to supply this and any other additional information even if you can provide the date of birth.

To enable us to locate and identify responsive visa records, please provide as much of the following information as possible: the subject's place and date of birth; complete spellings of the name and any aliases; location of the U.S. Foreign Service post abroad where application was made; visa type (immigrant or non-immigrant); whether granted or denied; date of issuance or denial; and case number (immigrant visa only).

Since the Department cannot process your request based upon the information contained in your request letter, this case has been closed. Upon receipt of the necessary information described above, we will open a new case and begin processing your request immediately.

For your information, we would not have visa records about United States citizens, because the Department of State only issues visas to foreign nationals. For individuals who have already immigrated to the United States and have been issued a permanent resident alien card (a "green card"), their immigration records are in the custody of the United States Citizenship and Immigration Service, not the Department of State.

Also, please note that the FOIA exempts from disclosure those agency records that are otherwise protected from release by federal statutes other than the FOIA (see 5 U.S.C. § 552(b)(3)). One such statute is Section 222(f) of the Immigration and Nationality Act (8 U.S.C. § 1202(f)), which renders

---

*Office of Information Programs and Services*
*U.S. Department of State SA-2*
*Washington, DC 20522-8100*
*Web site: foia.state.gov*

*Inquiries:*
*Phone: 1-202-261-8484*
*FAX: 1-202-261-8579*
*email: FOIAStatus@state.gov*

-3-

confidential those records of the Department of State pertaining to the issuance or refusal of visas or permits to enter the United States. As a result, you should be aware that State Department visa records are generally exempt from disclosure under the (b)(3) exemption to the FOIA. This is the case regardless of whether the requester is a third party or the visa applicant himself/herself and regardless of whether the visa applicant has authorized the FOIA request or is no longer living.

Also, in general, under the provisions of the FOIA and the Privacy Act of 1974, access to information about third parties cannot be given to unauthorized third parties absent the third party's written consent. If Mr. Joannides is a living individual, please contact us for information about Department of State requirements for written consent. If he is deceased, please provide proof of death, *e.g.*, a newspaper obituary or a copy of a death certificate, or advise us that none will be forthcoming.

We wish to advise you that the cut-off date for retrieving records is either the date you have given the Department by specifying a particular time frame or the date the search is initiated. In this case the cut-off dates would be the specified time frame of 1963-1964 and 1967-1968.

**Fees:** The Freedom of Information Act requires agencies to assess fees to recover the direct costs of processing requests, unless a fee waiver has been granted.

By making a FOIA request, the requester shall be considered to have agreed to pay all applicable fees up to $25.00 unless a fee waiver has been granted. You may specify a willingness to pay a greater or lesser amount. If the estimated fees exceed this limit, you will be notified.

*Office of Information Programs and Services*
*U.S. Department of State SA- 2*
*Washington, DC 20522-8100*
    *Web site: foia.state.gov*

*Inquiries:*
*Phone: 1- 202- 261- 8484*
*FAX: 1- 202- 261- 8579*
*email: FOIAStatus@state.gov*

– 4 –

Based upon the information that you have provided, we have placed Mr. Jefferson Morley in the "Media" requester category. This category requires us to assess duplication costs after the first 100 pages.

Therefore, without an agreement to pay fees, please be advised that—once we receive enough information to process your request—it will be processed without cost up to the duplication of the first 100 pages.

Please let us know if you are willing to pay the fees that could be incurred in the processing of your request. You may set a limit of the maximum amount that you wish to pay.

We note that you have requested expedited processing. Under our regulations, 22 C.F.R. § 171.12, requests shall be given expedited treatment "whenever a requester has demonstrated that a 'compelling need' for the information exists." The burden is on the requester to demonstrate such a need.

Since you have given us no reason to believe your request implicates substantial due process rights, humanitarian interests, or an imminent threat to life or physical safety, it appears that you are requesting expeditious processing under our regulations at 22 C.F.R. § 171.12(b)(2). Under this provision, a "compelling need" exists if the requester can demonstrate that "the information is urgently needed by an individual primarily engaged in disseminating information in order to inform the public concerning actual or alleged Federal Government activity." Information is urgently needed if it "has a particular value that will be lost if not disseminated quickly. Ordinarily this means a breaking news story of general public interest. Information of historical interest only . . . would not qualify, nor would a news media publication or broadcast deadline unrelated to the breaking nature of the information."

*Office of Information Programs and Services*
*U.S. Department of State  SA- 2*
*Washington, DC 20522-8100*
   *Web site: foia.state.gov*

*Inquiries:*
*Phone: 1- 202- 261- 8484*
*FAX: 1- 202- 261- 8579*
*email:  FOIAStatus@state.gov*

−5−

Although it may be of historical interest, the information you have requested does not relate to a matter of current urgency to the American public, and you have not identified a particular value or a significant recognized interest that would be compromised if the information is not disseminated quickly. On the contrary, the events at issue occurred decades ago, and you have not demonstrated that the publication deadline mentioned in your request is related to any breaking nature of the story for which the information has been requested. Even if your letter had provided us with enough information to begin processing your request, we could not grant expedited processing because you have not satisfied the requirements of our regulations.

If you wish to appeal the denial of expedition, you may write to the Chief, Requester Liaison Division, at the address below within 30 days of receipt of this letter.

If you have any questions, please do not hesitate to contact us. We can provide faster service if you include our case number for your request (noted at the start of this letter) in your communications with us.

We are pleased to be of service to you.

Sincerely,

*Carrie B. Allen*

Carrie B. Allen
Requester Communications Branch

---

*Office of Information Programs and Services*
*U.S. Department of State  SA- 2*
*Washington, DC 20522-8100*
*Web site: foia.state.gov*

*Inquiries:*
*Phone: 1- 202- 261- 8484*
*FAX: 1- 202- 261- 8579*
*email: FOIAStatus@state.gov*

## Expeditious Processing Information Sheet

Expedited processing shall be granted to a requester after the requester requests such and demonstrates a compelling need for the information. A compelling need in deemed to exist where the requester can demonstrate one of the following:

1. **A Compelling Need** means that the failure to obtain the records on an expedited basis could reasonably be expected to pose an imminent threat to the life or physical safety of an individual.

2. **A Compelling Need** means that the information is urgently needed by an individual primarily engaged in disseminating information in order to inform the public concerning actual or alleged Federal Government activity. An individual primarily engaged in disseminating information to the public. Representatives of the news media would normally qualify; however, other persons must demonstrate that their primary activity involves publishing or otherwise disseminating information to the pubic, not just to a particular segment or group.

   (a) **Urgently Needed** means that the information has a particular value that will be lost if not disseminated quickly. Ordinarily this means a breaking news story of historical interest only, or information sought for litigation or commercial activities would not qualify nor would a news media publication or broadcast deadline unrelated to the news breaking nature of the information.

   (b) **Actual or Alleged Federal Government Activity.** The information concerns some actions taken, contemplated, or alleged by or about the Government of the United States, or one of its components or agencies, including the Congress.

3. **Substantial Due Process** rights of the requester would be impaired by the failure to process immediately; or

4. **Substantial Humanitarian** concerns would be harmed by the failure to process immediately.

A demonstration of compelling need by a requester shall be made by a statement certified by the requester to be true and correct to the best of their knowledge.

JAMES H. LESAR

ATTORNEY AT LAW
1003 K STREET, N.W., SUITE 640
WASHINGTON, D.C. 20001
———
TELEPHONE (202) 393-1921
FAX (202) 393-7310

February 21, 2007

Department of State
Research and Liaison Branch
1111 19th Street, N.W.
Washington, D.C. 20524

        Re:  January 12, 2007 FOIA Request
             of Mr. Jefferson Morley

Dear Sir or Madam:

        By letter dated January 12, 2007, I submitted a request on
behalf of Mr. Jefferson Morley for visa and passport records per-
taining to George Joannides, David Morales, and Gordon Campbell
during the years 1963-1964 and 1967-19681.  Your office received
the letter on January 18, 2007.

        This is to advise that the request for records pertaining to
Gordon Campbell is withdraw.

                            Sincerely yours,

                            James H. Lesar

GRAFELD DECLARATION
Civil Action No. 07-0277
Exhibit 4

JAMES H. LESAR

ATTORNEY AT LAW
1003 K STREET, N.W., SUITE 840
WASHINGTON, D.C. 20001

TELEPHONE (202) 393-1921
FAX (202) 393-7310    April 23, 2007

Ms. Carrie B. Allen
Requester Communications Branch
Office of Information Programs and Services
U.S. Department of State
Washington, D.C. 20522-8100        via facsimile: (202) 261-8579

           Re: <u>Case No. 200701174</u>      $2 0 0 7 0 1 1 7 6$

Dear Ms. Allen:

        Your letter to me of March 2, 2007, states that my January 12, 2007 Freedom of
Information Act request on behalf of Mr. Jefferson Morley was sent to the wrong address.
On or about that date I called the State Department and asked to be put in touch with
someone who could advise me as to whom my request should be submitted. After being
transferred at least two or three times, I eventually spoke with an officer who claimed to
know the answer. I then sent the request to the address I was given.

        The request seeks passport and visa records on George E. Joannides and David
Morales. Mr. George Joannides was born in Athens, Greece on July 5, 1922. He died in
Houston, Texas on March 9, 1990. His Social Security number was 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.

        David Morales is also a subject of this request. Mr. Morales was born August 26,
1925, in Phoenix, Arizona. He died May 8, 1978, in Tucson, Arizona. A copy of his
obituary is attached.

        As I advised in a letter dated February 21, 2007, the request for records pertaining
to Gordon Campbell is withdrawn.

        My client will agree to pay for the relevant records. However, he makes this
commitment without waiving his right to seek a public interest fee waiver.

                        Sincerely yours,

                        James H. Lesar

                        James H. Lesar

                                            GRAFELD DECLARATION
                                            Civil Action No. 07-0277
                                            Exhibit 5

Felsinger of Coolidge; eight grandchildren and one great-grandson.

## David Morales

WILLCOX: Services for David Sanchez Morales, 52, who died May 8 in Tucson, were held at Sacred Heart Catholic Church with Fr. John Williams officiating.

Burial was in Sunset Cemetery, under direction of Westlawn Chapel and Mortuary.

Mr. Morales was born Aug. 26, 1925, in Phoenix, and had maintained an Arizona home while working for the Foreign Service, much of the time as a consular. He moved to Willcox two years ago upon retirement, and became active in civic affairs, including the Willcox Lions Club and as adjutant for the American Legion Post in Willcox.

He was graduated from the University of California at Los Angeles in 1947, and was a football player while a student at Phoenix Union High School.

Surviving are his wife, Joan, of Willcox; four daughters, Juanita Gago of Studio City, Calif.; Martha J. Morales of Bakersfield, Calif., and Maureen and Marianne Morales, both of Willcox; four sons, James of Newton, Mass., Anthony of Amhurst, Mass., and Ernesto and Gregory, both of Willcox; two brothers, Raymond and Robert Morales, both of Phoenix; two sisters, Carmen Fronteres and Frances Baguio, both of Arvin, Calif., and one grandchild.

## Eleanor Dustin

BYLAS: Services for Mrs.



**United States Department of State**

*Washington, D.C. 20520*

June 22, 2007
Case Numbers: 200701176
and 200703072

James H. Lesar, Esq.
Attorney at Law
1003 K Street N.W., Suite 640
Washington, DC 20001

Dear Mr. Lesar:

This is in response to your correspondence dated April 23, 2007 requesting copies of passport and visa records pertaining to George E. Joannides and David Morales.

This is to advise you that we now have enough information about the records requested to deem your request valid. For faster processing, we have assigned separate case numbers to your requests for records concerning Joannides (case number 200701176) and Morales (200703072). We will notify you as soon as responsive material has been retrieved and reviewed.

As indicated in your letters of January 12 and February 21, our search will target records pertaining to the subjects during the years 1963-64 and 1967-68.

**Fees:** The Freedom of Information Act requires agencies to assess fees to recover the direct costs of processing requests, unless a fee waiver has been granted.

Based upon the information that you have provided, we have placed you in the "Media" requester category. This category requires us to assess duplication costs after the first 100 pages.

---

*Office of Information Programs and Services*
*U.S. Department of State SA- 2*
*Washington, DC 20522-8100*
    *Web site: foia.state.gov*

*Inquiries:*
*Phone: 1- 202- 261- 8484*
*FAX: 1- 202- 261- 8579*
*email: FOIAStatus@state.gov*

-2-

You have stated your willingness to pay all the fees incurred in the processing of this request.

If you have any questions, please do not hesitate to contact us. We can provide faster service if you include the case number(s) of your request in your communications with us.

We are pleased to be of service to you.

Sincerely,

Carrie B. Allen
Requester Communications Branch

*Office of Information Programs and Services*
*U.S. Department of State SA- 2*
*Washington, DC 20522-8100*
    *Web site: foia.state.gov*

*Inquiries:*
*Phone: 1- 202- 261- 8484*
*FAX: 1- 202- 261- 8579*
*email: FOIAStatus@state.gov*



**United States Department of State**

*Washington, D.C. 20520*

Case No.: 200701176
PPT and VO segments

JUL 16 2007

James H. Lesar, Esq.
Attorney-at-Law
1003 K Street N.W.
Suite 640
Washington, D.C. 20001

Dear Mr. Lesar:

I refer to your letters dated January 12, February 21 and April 23, 2007, requesting, on behalf of your client, Mr. Jefferson Morley, release of visa and passport records pertaining to George E. Joannides, under the provisions of the Freedom of Information Act (Title 5 USC Section 552).

We initiated searches in the following record systems: the Office of Passport Services and the Office of Visa Services. These searches have been completed, resulting in the retrieval of three documents that appear responsive to your request. The disposition of these three documents is explained in a separate letter from the Office of Passport Services. As noted in that letter, the excisions are in accordance with subsection (b)(6) of the Freedom of Information Act, as release of the excised information would constitute a clearly unwarranted invasion of the personal privacy of another person, without written authorization from that person. All non-exempt material that is reasonably segregable from the exempt material has been released. In addition, on national security grounds we can neither confirm nor deny the potential existence of records under, in the words of your request letter, "code names, cryptonyms, pseudonys [sic], or aliases."

The Freedom of Information Act provides for the recovery of the direct cost of duplicating records requested for non-commercial use by a representative of the news media. However, no fee is charged if the cost of collecting and processing the fee exceeds the amount of the fee. Since billable costs in this case do not exceed $10.00, your request has been processed without charge to you.

GRAFELD DECLARATION
Civil Action No. 07-0277
Exhibit 7

- 2 -

We have now completed the processing of your case. If you have any questions with respect to our handling of your request, you may write to the Office of Information Programs and Services, Room 8100, SA-2, Department of State, Washington, D.C. 20522-8100. Please be sure to refer to the case number shown above in all correspondence about this case.

We hope that the Department has been of service to you in this matter.

Sincerely,

Margaret P. Grafeld, Director
Office of Information Programs and Services



United States Department of State

*Washington, D.C.   20520*

July 16, 2007

In reply refer to:
CA/PPT/L/LE – JOANNIDES, George E.
Case Control Number: 200701176

James H. Lesar
Attorney at Law
1003 K. Street N.W., Suite 640
Washington, DC  20001

Dear Mr. Lesar:

Reference is made to your letters to the Department of State dated January 12, February 21, and April 23, 2007, on behalf of your client, Mr. Jefferson Morley, requesting the release of records pertaining to George E. Joannides, under the provisions of the Freedom of Information Act (5 U.S.C. § 552).

The Department of State, Passport Services has completed a search of its records. The search for passport records has resulted in the retrieval of three documents that appear to be responsive to your request. After careful review of these documents, we have determined that the documents may be released with excisions. The excisions are in accordance with subsection (b)(6) of the Freedom of Information Act. The release of this information to your client would be an invasion of the personal privacy of another person, without written authorization from that person. Please see the enclosed

GRAFELD DECLARATION
Civil Action No. 07-0277
Exhibit 8

-2-

Table of Exemptions, which identifies the subsection of the statute referenced above for a summary of the citation that is applicable. All non-exempt material that is reasonably segregable from the exempt material has been released.

Sincerely,

Gail E. Neelon, Director
Office of Legal Affairs and Law Enforcement Liaison
Bureau of Consular Affairs
Passport Services

Enclosures:
As stated

In reply refer to:
CA/PPT/L/LE – JOANNIDES, George E.
Case Control Number - 200701176


## TABLE OF EXEMPTIONS - FOIA

| Subsections | Excise | Deny | Total |
|---|---|---|---|
| (b)(6) | 3 | 0 | 3 |
| Total | 3 | 0 | 3 |


## FREEDOM OF INFORMATION ACT EXEMPTIONS
### 5 USC §552

Subsection (b)(6) exempts materials that would constitute a clearly
unwarranted invasion of the personal privacy of another person.



**United States Department of State**

*Washington, D.C. 20520*

Case No.: 200703072
PPT and VO segments
JUL 1 6 2007

James H. Lesar, Esq.
Attorney-at-Law
1003 K Street, N.W. Suite 640
Washington, D.C. 20001

Dear Mr. Lesar:

I refer to your letters dated January 12, 2007 and April 23, 2007, requesting on behalf of your client, Mr. Jefferson Morley, under the provisions of the Freedom of Information Act (Title 5 USC Section 552), release of certain records maintained by the Department of State. This case concerns the request for passport and visa records pertaining only to Mr. David Morales (DOB: August 26, 1925, Phoenix, Arizona). Your request concerning Mr. George Joannides has been treated separately.

We initiated searches in the following record systems: the Office of Visa Services, and the Office of Passport Services. These searches have been completed, resulting in the retrieval of one document that appears responsive to your request. A separate letter to you from the Office of Passport Services discusses the disposition of this one document. As noted in that letter, the excisions are in accordance with subsection (b)(6) of the Freedom of Information Act, as release of the excised information would constitute a clearly unwarranted invasion of the personal privacy of another person, without written authorization from that person. All non-exempt material that is reasonably segregable from the exempt material has been released.

The Freedom of Information Act provides for the recovery of the direct cost of duplicating records requested for non-commercial use by a representative of the news media. However, no fee is charged if the cost of collecting and processing the fee exceeds the amount of the fee. Since billable costs in this case do not exceed $10.00, your request has been processed without charge to you.

GRAFELD DECLARATION
Civil Action No. 07-0277
Exhibit 9

– · 2 –

We have now completed the processing of your case. If you have any questions with respect to our handling of your request, you may write to the Office of Information Programs and Services, Room 8100, SA-2, Department of State, Washington, D.C. 20522-8100. Please be sure to refer to the case number shown above in all correspondence about this case.

We hope that the Department has been of service to you in this matter.

Sincerely,

Margaret P. Grafeld, Director
Office of Information Programs and Services

07/16/07   MON 17:38 FAX 2029550256         CA/PPT/TD
07/16/2007  18:08 FAX  2026932654        rr.,,no              ☑003



**United States Department of State**
*Washington, D.C. 20520*

July 16, 2007

In reply refer to:
CA/PPT/L/LE – MORALES, David
Case Control Number: 200703072

James H. Lesar
Attorney at Law
1003 K Street N.W., Suite 640
Washington, DC 20001

Dear Mr. Lesar:

Reference is made to your letters to the Department of State dated January 12, February 21, and April 23, 2007, on behalf of your client, Mr. Jefferson Morley, requesting the release of records pertaining to David Morales under the provisions of the Freedom of Information Act (5 U.S.C. § 552).

The Department of State, Passport Services has completed a search of its records. The search for passport records has resulted in the retrieval of one document that appears to be relevant to your request. After careful review of this document, we have determined that the document may be released in part. The excision is in accordance with subsection (b)(6) of the Freedom of Information Act. The release of this information to your client would be an invasion of the personal privacy of another person, without written authorization from that person. Please see the enclosed Table of Exemptions, which identifies the subsection of the

GRAFELD DECLARATION
Civil Action No. 07-0277
Exhibit 10

07/16/07  MON 17:38 FAX 2029550256            CA/PPT/TD                                    ☒004
07/16/2007  18:06 FAX  2026653234        ᵣᵣᵢₙₓₚ

-2-

statute referenced above for a summary of the citation that is applicable. All non-exempt material that is reasonably segregable from the exempt material has been released.

Singerely,

Gail B. Neelon, Director
Office of Legal Affairs and Law Enforcement Liaison
Bureau of Consular Affairs
Passport Services

Enclosures:
As stated

07/16/07  MON 17:38 FAX 2029550256        CA/PPT/TD
07/16/2007 18:08 FAX 2026932654      rr1/rxs                                  ⌐...@005

-3-

In reply refer to:
CA/PPT/L/LE – MORALES, David
Case Control Number - 200701176

## TABLE OF EXEMPTIONS - FOIA

| Subsections | Excise | Deny | Total |
|---|---|---|---|
| (b)(6) | 1 | 0 | 1 |
| Total | 1 | 0 | 1 |

## FREEDOM OF INFORMATION ACT EXEMPTIONS
### 5 USC §552

Subsection (b)(6) exempts materials that would constitute a clearly unwarranted invasion of the personal privacy of another person.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                              )
                                              )
JEFFERSON MORLEY                              )
                                              )
                    Plaintiff,               )
                                              )
                                              )
        v.                                    )        Civil Action No. 07-0277 (RJL)
                                              )
                                              )
U.S. DEPARTMENT OF STATE                      )
                                              )
                    Defendant.               )
                                              )
_____)

ORDER

Upon consideration of the motion for summary judgment of defendant, the Department of

State, and the plaintiff's response thereto, it is hereby

ORDERED that the motion is GRANTED and that defendant Morley's complaint is

DISMISSED.


Date:                          _____
                               UNITED STATE DISTRICT COURT JUDGE