UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DAVID TALBOT, et al.                  :
                                      :
          Plaintiffs                  :
                                      :
     v.                               :       C. A. No. 07-0277 (RJL)
                                      :
CENTRAL INTELLIGENCE AGENCY,          :
     et al.                           :
                                      :
          Defendants                  :

### PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT
### AS TO DEFENDANT UNITED STATES DEPARTMENT OF STATE

Come now the plaintiffs, David Talbot and Jefferson Morley,
and move this Court to enter summary judgment in favor in their
favor and against defendant United States Department of State.
This motion is made pursuant to Rule 56 of the Federal Rules of
Civil Procedure.  Plaintiffs submit a Memorandum of Points and
Authorities, a Local Rule 7.1(h) Statement, a proposed order, and
the Declaration of Jefferson Morley in support of this motion.

Respectfully submitted,

JAMES H. LESAR #114413
1003 K Street, N.W.
Suite 640
Washington, D.C. 20001
Phone:  (202) 393-1921

November 19, 2007

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DAVID TALBOT, et al.          :
                              :
        Plaintiffs            :
                              :
    v.                        :    C. A. No. 07-0277 (RJL)
                              :
CENTRAL INTELLIGENCE AGENCY,  :
    et al.                    :
                              :
        Defendants            :

**PLAINTIFFS MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO THE
MOTION OF DEFENDANT DEPARTMENT OF SATE FOR SUMMARY JUDGMENT**

## Preliminary Statement

This Freedom of Information Act ("FOIA") case stems from a request by journalists Jefferson Morley ("Morley") to the Department of State ("DOS" or "State") for passport and visa records pertaining to two former Central Intelligence Agency ("CIA") officers, George Joannides ("Joannides") and David Morales ("Morales"). Requests for these records were submitted to both the Department of State ("DOS" or "State") and the CIA, but the only the request to DOS is the subject of the currently pending motions.

Pursuant to the request to it, State has produced four passport application forms with certain deletions made pursuant to 5 U.S.C. § 552(b)(6)("Exemption 6"). In addition, with respect to passport or visa records involving the use of code names, cryptonyms, pseudonyms, or aliases (hereafter collectively referred to as "cryptonyms") for Joannides and Morales, State has invoked the so-called "Glomar defense"; that is, it has refused to confirm

2

or deny the existence of such records, alleging that it would damage national security to do so, hence such information is exempt pursuant to 5 U.S.C. § 552(b)(1) ("Exemption 1").

State has moved for summary judgment. It alleges that it has completed an adequate search, and that its invocation of Exemptions 1 and 6 is warranted. For the reasons set forth below, State's motion for summary judgment should be denied and plaintiffs' should be granted.

## ARGUMENT

## I. STATE HAS NOT DEMONSTRATED THAT IT CONDUCTED AN ADEQUATE SEARCH

### A.  The Legal Standard Governing Searches

To prevail in a FOIA case, "the defending agency must prove that each document that falls within the class requested either has been produced, is unidentifiable or is wholly exempt from the Act's inspection requirements." National Cable Television Ass'n v. FCC, 479 F.2d 183, 186 (D.C.Cir.1973). Agency affidavits regarding the search for responsive records are inadequate to support summary judgment where they "do not denote which files were searched or by whom, do not reflect any systematic approach to document location, and do not provide information specific enough to enable [the plaintiff] to challenge the procedures utilized." Weisberg v. United States Dept. of Justice, 627 F.2d 365, 371 (D.C.Cir. 1980).

When the adequacy of an agency's search is in dispute, summary judgment is inappropriate as to that issue. See Founding Church of Scientology, Etc. v. Nat. Sec. Agency, 610 F.2d 834, 836-837 (D.C.

3

Cir.1979)("To accept its claim of inability to retrieve the re-
quested documents in the circumstances presented is to raise the
specter of easy circumvention of the [FOIA] . . . and if, in the
face of well-defined requests and positive indications of over-
looked materials, an agency can so easily avoid adversary scrutiny
of its search techniques, the Act will inevitably become nuga-
tory.").

It is a truism that the issue is not whether documents might
exist that are responsive to the request but rather whether the
search conducted by the agency was "<u>adequate</u>'." <u>Weisberg v. De-
partment of Justice</u>, 745 F.2d 1476, 1485 (D.C.Cir.1984)(emphasis in
original); <u>McGehee v. CIA</u>, 697 F.2d 1076, 1101 (D.C.Cir.1983).
The test governing the adequacy of an agency's search under the
FOIA is one of "reasonableness." <u>Oglesby v. Department of the
Army</u>, 920 F.2d 57, 67 n.13 (D.C.Cir. 1990). <u>Meeropol v. Meese</u>, 790
F.2d 942, 956 (D.C.Cir.1986)("[A] search need not be perfect, only
adequate, and adequacy is measured by the reasonableness of the
effort in light of the specific request"). In <u>Truitt v. Department
of State</u>, 897 F.2d 540 (D.C. Cir. 1990), this Court expatiated on
this standard, stating that:

> It is elementary that an agency responding to
> a FOIA request must 'conduct[] a search rea-
> sonably calculated to uncover all relevant
> documents,' and, if challenged, <u>must demon-
> strate 'beyond material doubt' that the search
> was reasonable</u>.   "'The issue is **not** whether
> any further documents might conceivably exist
> but rather whether the government's search for
> responsive documents was adequate.'   The ad-
> quacy of an agency's search is measured by a
> 'standard of reasonableness,' <u>and is 'depen-
> dent upon the circumstances of the case.'"</u>

4

<u>Id.</u>, at 542 (footnotes omitted)(emphasis added).  If such "doubt" exists as to the adequacy of the search, <u>Truitt</u>  counsels, "summary judgment for the agency is not proper."  <u>Id.</u> (footnote omitted).  Where "the sufficiency of the agency's identification or retrieval procedure is genuinely in issue, summary judgment is not in order[,]" <u>Founding Church</u>, <u>supra</u>, 610 F.2d at 836, and the plaintiff is entitled to take discovery on the adequacy of the search.  <u>Weisberg</u>, <u>supra</u>, 627 F.2d at 371.

Here, the State has not demonstrated "beyond material doubt," that the search that it conducted was reasonable.

### B.  <u>State's Search Was Inadequate</u>

The State Department's search was inadequate in two respects. First, Morley requested  all passport and visa records pertaining to Joannides and Morales during the years 1963-1964 and 1967-1968. There is no indication in the record that State actually searched for passports; it produced only passport applications, not copies of the passports themselves.

Second, DOS states that it searched for records based on the manes of Morales and Joannides, Declaration of Margaret P. Grafeld, ¶ 13, it does not state that it searched for variations of those names.  A search which does not include variations is inadequate because records are sometimes filed under variants of a name.  For example, sometimes a full name may be used, with the full middle name given; at other times, a name may be indexed or locatable under the name with only a middle initial or no middle name or initial at all.  Similarly, typographical errors may

5

incorrectly record a name for indexing purposes, such as "Joanides" instead of "Joannides."  Such variations need to be searched. There is no indication on the record before the Court that they have been.

## II.  IN LIGHT OF THE COUNTERVAILING EVIDENCE PRODUCED BY PLAINTIFFS, STATE'S "GLOMAR" DEFENSE IS WITHOUT MERIT AND STATE SHOULD BE ORDERED TO RELEASE ANY RESPONSIVE RECORDS EMPLOYING CRYPTONYMS FOR MORALES AND JOANNIDES

With respect to plaintiffs' request for passport or visa records involving the use of cryptonyms for Joannides and Morales, DOS has invoked the so-called "Glomar defense"; that is, it has refused to confirm or deny the existence of such records, alleging that it would damage national security to do so, hence such information is exempt pursuant to 5 U.S.C. § 552(b)(1) ("Exemption 1") and (b)(3)("Exemption 3").

With respect to Exemption 1, DOS argues that acknowledging the existence or nonexistence of    the records plaintiffs seek "'would provide  the  requesters  with  the  very  information  the[se] exemption[s] are designed to protect.'"  DOS Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment ("Def's MSJ") at 14, quoting Nation Magazine v. U.S. Customs Service, 71 F.3d 885, 894 n.8 (D.C. Cir.1995).

DOS argues that under § 1.4(c) of E.O. 12958, intelligence sources or methods are exempt from disclosure.  Def's MSJ at 17, citing Grafeld Decl., ¶ 30.  It defines "intelligence methods" very broadly as "the means by which an intelligence agency accomplishes its mission."  Id., citing Grafeld Decl., ¶ 31.  Thus, Morley's

6

request for passport and visa records under "code names, crypto-
nyms, pseudo[nyms], or aliases" in its view "implicates alleged
intelligence methods" and [t]he existence or nonexistence of these
alleged methods is itself a fact that would be classified as
'Secret' under the terms of the Executive Order."    Id. at 18,
citing Grafeld Decl., ¶ 32.

As DOS notes, § 6.1(j) of E.O. 12958 states:

> Damage to the national security means harm to
> the national defense or foreign relations of
> the United States from the unauthorized dis-
> closure of information, taking into considera-
> tion such aspects of the information as the
> sensitivity, value, utility, and provenance of
> that information.

State argues that such damage would occur here because "[c]onfir-
mation or denial of the use of cryptonyms in a specific situation
or type of record . . . with regard to a specific person, in and of
itself would reveal "intelligence . . . methods. . . ."  Id. at 19,
citing Grafeld Decl. at ¶ 34.

The problem with this line of argument is that it rests on the
false factual premise that the cryptonyms at issue here have not
previously been disclosed, and therefore the disclosure which
plaintiffs seek would be "unauthorized" disclosure jeopardizing
national security.    This however, is not the case.  A number of
cryptonyms used by Morales and Joannides have been officially re-
leased under the provisions of the President John F. Kennedy Assas-
sination Records Collection Act of 1992 ("the JFK Act").

Attachment 1 to the Declaration of Jefferson Morley ("Morley
Decl.") is a CIA cable from its JMWAVE station to CIA Headquarters

7

dated December 7, 1962.  Morley Decl,, ¶ 2 and Attachment 1.  The CIA has officially disclosed Attachment 1 to the public.  It is publicly available in the President John F. Kennedy Assassination Records Collection ("JFK Records Collection") at the National Archives and Research Administration ("NARA").  Id., ¶ 3.

Attachment 1 states that Walter D. Newby had recently been introduced as the new KUBARK representative who would handle AM-SPELL affairs.  "KUBARK" is code work for the CIA.  "AMSPELL" is a code for the Directorio Revolucionario Estudantil or "DRE".  Id, ¶ 4. At the time of the Attachment 1 cable, the CIA representative handling AMSPELL was George Joannides.  Walter D. Newby was an alias used by CIA officer George Joannides.  Id., ¶ 5.

Attachment 2 to Morley's declaration is a memorandum dated March 3, 1998 from Michelle Combs, Special Assistant for Research and Review at the Assassination Records Review Board ("ARRB"), to Jeremy Gunn, Executive Director for the ARRB.  Id., ¶ 6.  It is an official ARRB record and is publicly available in the JFK Records Collection at NARA.  Id., ¶ 7.

Referring to George Joannides, Attachment 2 states that Joannides "appears in documents in the CIA Segregated Collection under his pseudonym Walter D. Newby.  Id., ¶ 8.  He does.  Id.

Attachment 3 to the Morley Declaration is a CIA dispatch which has been officially released to the public by the CIA.  The name Stanley Zamka appears in Attachment 3.  Id., ¶ 9.  The name Stanley R. Zamka is an alias which was used by CIA officer David Morales.  Id., ¶ 10.

8

Attachment 4 to the Morley Declaration is a June 8, 1962 **cable** from Stanley R. Zamka, Chief, PM, to Chief, PW. The CIA has officially released this document to the public. It is publicly available in the JFK Records Collection at NARA. Id., ¶ 11. On June 8, 1962, David Morales was "Chief, PM." Id., ¶ 12.

Documents officially released by the CIA indicate that David Morales also used the following aliases: Miguel P. Cossio, Diego S. Mardones, Simon S. Martinez, Daniel Suarez Moreno, Thomas Allen, and Vernon Teylor. Id., ¶ 13.

In light of these disclosures, of these official past disclosures, the disclosure of the use of these cryptonyms is neither unauthorized disclosure nor disclosure which can reasonably be expected to damage the national security. Accordingly, insofar as State's "Glomar" defense is based on Exemption 1, it cannot be sustained and State must be instructed to search for and produce any responsive records which used the cryptonyms set forth above.

With respect to Exemption 3, State argues that its "Glomar defense" is warranted because the National Security Act of 1947, as amended, 50 U.S.C. § 403-1(i)(1), provides that the Director of National Intelligence (DNI) shall protect intelligence sources and methods from unauthorized disclosure, and it cites cases holding that this provision qualifies as an Exemption 3 statute. Def's MSJ at 20.

State cites the decision in Morley v. C.I.A., 453 F.Supp.2d 137, 150 (D.D.C.2006), in support of its position, noting that in that case this Court stated:

9

> the proper standard to determine whether the
> statute applies to given materials is whether
> the CIA demonstrates whether an answer to the
> FOIA request can "reasonably be expected to
> lead to disclosure of intelligence sources and
> methods." <u>Gardels v. CIA</u>, ... 689 F.2d 1100,
> 1103 (D.C.Cir.1982)(quoting <u>Halperin v. CIA</u>)
> 629 F.2d 144, 147 (D.C.Cir.1980).

There are, however, two reasons why the Exemption 3 claim as-
serted by DOS does not apply in this case.  First, the DNI has not
filed a declaration made under penalty of perjury stating that his
agency is invoking Exemption 3.  Second, as shown above, several
cryptonyms employed by Joannides and Morales have been officially
released.  Therefore, disclosure of these cryptonyms cannot "rea-
sonably be expected to lead to disclosure of intelligence sources
and methods."  The methods already have been officially disclosed.


## III.  <u>STATE'S INVOCATION OF EXEMPTION 6 IS UNWARRANTED</u>

DOS has released certain information pertaining to Joannides'
mother because she was born more than 100 years ago and is now
presumed dead.  It thereby concedes that death, or even presumed
death, is a determining factor as to whether personal information
of the type at issue in these documents may be withheld under
Exemption 6.  However, it has invoked Exemption 6 to protect
certain information pertaining to Joannides' wife, Violet
Joannides.  But according to the Social Security Death Index, she
is also deceased.  <u>See</u> Morley Decl., ¶ 14.  Thus the Exemption 6
privacy claim does not apply under the circumstances presented.
The Court should order the release of the withheld Exemption 6
information.

10

## CONCLUSION

For the reasons set forth above, defendant Department of State's motion for summary judgment should be denied and plaintiffs' cross-motion should be granted.

Respectfully submitted,

JAMES H. LESAR #114413
1003 K Street, N.W.
Suite 640
Washington, D.C. 20001
Phone:  (202) 393-1921

Counsel for Plaintiffs

11

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DAVID TALBOT, <u>et</u> <u>al</u>.                                    :
                                                               :
          Plaintiffs                                           :
                                                               :
     v.                                                        :     C. A. No. 07-0277
(RJL)
                                                   :
CENTRAL INTELLIGENCE AGENCY,          :
     <u>et</u> <u>al</u>.                                           :
                                                               :
          Defendants                                           :


**<u>ORDER</u>**

Upon consideration of the parties cross-motions for summary
judgment, and the entire record herein, it is by this Court this
_____ day of _____, 2007, hereby

ORDERED, that the Motion for Summary Judgment by the United
States Department of State be, and hereby is, DENIED; and it is
further

ORDERED, that the Cross-Motion for Summary Judmgnet by plain-
tiffs be, and hereby is, GRANTED.


                                   _____
                                   UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DAVID TALBOT, et al.               :
                                   :
            Plaintiffs             :
                                   :
    v.                             :    C. A. No. 07-0277 (RJL)
                                   :
CENTRAL INTELLIGENCE AGENCY,       :
    et al.                         :
                                   :
            Defendants             :

## PLAINTIFF'S LOCAL RULE 7.1(h) STATEMENT

Pursuant to Local Civil Rule 7.1(h), plaintiffs responds to the numbered paragraphs of defendants' material facts as follows:

1.    Admit, but aver that his counsel was advised by a State Department Freedom of Information Act officer he consulted telephonically to send the request to the State Department's Research and Liaison Office.

2-4.    Admit.

5.    Admit the first sentence.  Plaintiffs are without information or knowledge sufficient to admit or deny the remainder of this paragraph and therefor deny it.

6.    Admit.e CIA has officially disclosed Attachment 1 to the public.  It is publicly available in the President John F. Kennedy Assassination Records Collection ("JFK Records Collection") at the National Archives and Research Administration ("NARA").

7.    Admit.

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

2

Pursuant to Local Civil Rule 7.1(h), plaintiff states there the following material facts are not genuinely in dispute.

1.    Attachment 1 to the Declaration of Jefferson Morley is a CIA cable from its JMWAVE station to CIA Headquarters dated December 7, 1962.  Morley Decl., ¶ 2.

2.    The CIA has officially disclosed Attachment 1 to the public.  It is publicly available in the President John F. Kennedy Assassination Records Collection ("JFK Records Collection") at the National Archives and Research Administration ("NARA").  Id., ¶ 3.

3.    Attachment 1 states that Walter D. Newby had recently been introduced as the new KUBARK representative who would handle AM-SPELL affairs.  "KUBARK" is code for the CIA.  "AMSPELL" is a code for the Directorio Revolucionario Estudantil or "DRE".  Id., ¶ 4.

4.    At the time of the Attachment 1 cable, the CIA representative handling AMSPELL was George Joannides.  Walter D. Newby was an alias used by CIA officer George Joannides.  Id., ¶ 5.

5.    Attachment 2 to the Morley Declaration is a memorandum dated March 3, 1998 from Michelle Combs, Special Assistant for Research and Review at the Assassination Records Review Board ("ARRB"), to Jeremy Gunn, Executive Director for the ARRB.  Id., ¶ 6.

6.    Attachment 2 is an official ARRB record and is publicly available in the JFK Records Collection at NARA.  Id., ¶ 7.

7.    Referring to George Joannides, Attachment 2 states that Joannides "appears in documents in the CIA Segregated Collection under his pseudonym Walter D. Newby.  He does.  Id., ¶ 8.

3

8.   Attachment 3 to the Morley Declaration is a CIA dispatch which has been officially released to the public by the CIA.  The name Stanley Zanka appears in Attachment 3.  Id., ¶ 9.

9.   The name Stanley R. Zamka is an alias which was used by CIA officer David Morales.  Id., ¶ 10.

10.   Attachment 4 to the Morley Declaration is a June 8, 1962 memorandum from Stanley R. Zamka, Chief, PM, to Chief, PW.  The CIA has officially released Attachment 4 to the public.  It is publicly available in the JFK Records Collection at NARA.  Id., ¶ 11.

11.   On June 8, 1962, David Morales was "Chief, PM."  Id., ¶ 12.

12.   Documents officially released by the CIA indicated that David Morales also used the following aliases:

        a.   Miguel P. Cossio,

        b.   Diego S. Mardones,

        c.   Simon S. Martinez,

        d.   Daniel Suarez Moreno,

        e.   Thomas Allen,

        f.   Vernon Teylor

¶ 13.

13.   According to the Social Security Death Index, Violet Joannides, the wife of George Joannides, who was born September 19, 1918, died on May 23, 2000.  Id., ¶ 14.

14.   The Department of State ("DOS") has not specified which variants of the names George Joannides and David Morales were used in its searches.  See Declaration of Margaret P. Grafeld.

4

15.    DOS has not indicated that it searched for the actual passports of David Morales and George Joannides.    I̲d̲.

Respectfully submitted,

JAMES H. LESAR #114413
1003 K Street, N.W.
Suite 640
Washington, D.C. 20001
Phone:  (202) 393-1921

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DAVID TALBOT, et al.                     :
                                         :
          Plaintiffs                     :
                                         :
     v.                                  :     C. A. No. 07-0277 (RJL)
                                         :
CENTRAL INTELLIGENCE AGENCY,             :
     et al.                              :
                                         :
          Defendants                     :


### DECLARATION OF JEFFERSON MORLEY

I, Jefferson Morley, declare and say as follows:

1.  I am one of the plaintiffs in the above-captioned case.

2.  Attached hereto is a CIA cable from its JMWAVE station to CIA Headquarters dated December 7, 1962.  See Attachment 1.

3.  The CIA has officially disclosed Attachment 1 to the public.  It is publicly available in the President John F. Kennedy Assassination Records Collection ("JFK Records Collection") at the National Archives and Research Administration ("NARA").

4.  Attachment 1 states that Walter D. Newby had recently been introduced as the new KUBARK representative who would handle AM-SPELL affairs.  "KUBARK" is code for the CIA.  "AMSPELL" is a code for the Directorio Revolucionario Estudantil or "DRE".

5.  At the time of the Attachment 1 cable, the CIA representative handling AMSPELL was George Joannides.  Walter D. Newby was an alias used by CIA officer George Joannides.

6.  Attachment 2 is a memorandum dated March 3, 1998 from Michelle Combs, Special Assistant for Research and Review at the

2

Assassination Records Review Board ("ARRB"), to Jeremy Gunn, Executive Director for the ARRB.

7.   Attachment 2 is an official ARRB record and is publicly available in the JFK Records Collection at NARA.

8.   Referring to George Joannides, Attachment 2 states that Joannides "appears in documents in the CIA Segregated Collection under his pseudonym Walter D. Newby. He does.

9.   Attachment 3 hereto is a CIA dispatch which has been officially released to the public by the CIA. The name Stanley Zanka appears in Attachment 3.

10.  The name Stanley R. Zamka is an alias which was used by CIA officer David Morales.

11.  Attachment 4 is a June 8, 1962 memorandum from Stanley R. Zamka, Chief, PM, to Chief, PW. The CIA has officially released Attach-ment 4 to the public. It is publicly available in the JFK Records Collection at NARA.

12.  On June 8, 1962, David Morales was "Chief, PM."

13.  Documents officially released by the CIA indicated that David Morales also used the following aliases:

     a.   Miguel P. Cossio,

     b.   Diego S. Mardones,

     c.   Simon S. Martinez,

     d.   Daniel Suarez Moreno,

     e.   Thomas Allen,

     f.   Vernon Teylor

3

14. According to the Social Security Death Index, Violet Joannides, the wife of George Joannides, who was born September 19, 1918, died on May 23, 2000.

I, declare under penalty of perjury that the foregoing is true and correct. Executed this 19th day of November, 2007.

JEFFERSON MORLEY

```
.
```

```
                                                      Date: 08/18/99
                                                      Page: 1

                         JFK ASSASSINATION SYSTEM
                         IDENTIFICATION FORM
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
                         AGENCY INFORMATION

               AGENCY :  CIA
        RECORD NUMBER :  104-10170-10016
        RECORD SERIES :  JFK
  AGENCY FILE NUMBER :  80T01357A
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
                         DOCUMENT INFORMATION

           ORIGINATOR :  CIA
                 FROM :  JMWAVE
                   TO :  DIRECTOR
                TITLE :  CABLE RE WALTER D. NEWBY INTRODUCED AS REP TO HANDLE
                         AMSPELL AFFAIRS.
                 DATE :  12/07/62
                PAGES :  1
             SUBJECTS :  CABLE
                         NEWBY, WALTER,
                         AMSPELL AFFAIRS

        DOCUMENT TYPE :  PAPER, TEXTUAL DOCUMENT
       CLASSIFICATION :  SECRET
         RESTRICTIONS :  OPEN IN FULL
       CURRENT STATUS :  OPEN
  DATE OF LAST REVIEW :  02/07/98
     OPENING CRITERIA :
             COMMENTS :  JFK64-25:F27 1998.02.07.10:43:23:310031: UNABLE TO
                         LOCATE EARLIER RELEASE COPY; REPROCESSED AUG 99
```

```
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  . . . . .
                         [R] - ITEM IS RESTRICTED
```

Attachment 1

Collection (microfilm - reel 25)                    http://www.maryferrell.org/mffweb/archive/view



CLASSIFIED MESSAGE

SECRET 40

DATE : 7 DEC 62
TO    : DIRECTOR
FROM  : JMWAVE
ACTION: TFW 10
INFO  : DCP, CI/OA, S/C 2

DEC 8 0046z 62

ROUTINE

CIA HISTORICAL REVIEW PROGRAM
RELEASE IN FULL
1999

DIR CITE WAVE 2156    IN31732

GYROSE

PURSUANT TO RECENT REITERAH DISCUSSIONS AT HQS WALTER D.

NEWBY WAS INTRODUCED BY MELANDER TO AMHINT-53 DEC 4 AS NEW

KUBARK REPRESENTATIVE WHO WOULD HANDLE AMSPELL AFFAIRS. NEWBY

EXPLAINED PROCEEDING IRKUTAL ARRANGE PERSONAL AFFAIRS WOULD

RESUME CONTACTS AMSPELL WEEK DEC 10.

END OF MESSAGE

| ROUTING | INITIAL |
|---------|---------|
|         |         |
|         |         |
|         |         |
|         |         |
|         |         |

REPRODUCTION BY OTHER THAN THE ISSUING OFFICE IS PROHIBITED.    COPY NO.

# MEMORANDUM

March 3, 1998

To:    Jeremy Gunn
        Executive Director

cc:    Bob Skwirot
        CIA Team Leader

From:    Michelle Combs *Michelle Combs*
        Special Assistant for Research and Review

Subject:    CIA-IR-21 DRE Case Officer for December 1962 - April 1964

In response to ARRB's informal request for additional information and records, CIA-IR-21, CIA provided access to the Office of Personnel file for Mr. George E. Joannides. I have examined the personnel file for Mr. Joannides for the period 1961-64 and 1978-79. Mr. Joannides appears in documents in the CIA Sequestered Collection under his pseudonym Walter D. Newby.

During the period December 1962 to April 1964, Mr. Joannides was assigned as a covert action officer at JMWAVE, serving as deputy and then chief of the station's covert action branch. During this time period, Mr. Joannides was the case officer for the Cuban exile group Directorio Revolucionario Estudiantil (DRE). The descriptions of his duties and accomplishments in the personnel file are very general and contain no specific reference to his relationship with the DRE. There is no mention of the assassination of President John F. Kennedy in the file and no information relevant to the assassination in the file. There is also no indication that Mr. Joannides may have used or been known by the name "Howard" during his contacts with the DRE, although personnel files typically would not reveal this information one way or another.

During the period mid-May 1978-January 1979, Mr. Joannides was assigned to work for Scott Breckinridge, the CIA's principal coordinator to the House Select Committee on Assassination (HSCA) as a focal person to keep track of the status of HSCA requests, particularly to the Directorate of Operations. In this role, Mr. Joannides developed and maintained a log and records of HSCA requests and CIA responses and handled the day-to-day follow up to HSCA requests.

Several performance evaluation reports from the 1962-64 time period and a memoranda from Scott Breckinridge on Mr. Joannides' duties during the 1978-1979 time frame were designated assassination records and are being processed for release.

e:\combs\cia-ir21.wpd
File 4.20.1 and 4.20.4

<u>Attachment</u> 2



Attachment 3

Date: 11/03/98
Page: 1

JFK ASSASSINATION SYSTEM
IDENTIFICATION FORM

--------------------------------------------------------------------
AGENCY INFORMATION

                AGENCY :  CIA
         RECORD NUMBER :  104-10235-10259
         RECORD SERIES :  JFK
   AGENCY FILE NUMBER :  80T01357A
--------------------------------------------------------------------
DOCUMENT INFORMATION

            ORIGINATOR :  CIA
                  FROM :  CHIEF, PM
                    TO :  CHIEF, PW
                 TITLE :  MEMO: REQUEST OF THE CRC MILITARY SECTION FOR ECONOMIC
                          AID FOR PURPORTED UNDERGROUND ELEMENTS.
                  DATE :  06/08/62
                 PAGES :  1
              SUBJECTS :  CRC MILITARY

         DOCUMENT TYPE :  PAPER, TEXTUAL DOCUMENT
        CLASSIFICATION :  SECRET
          RESTRICTIONS :  OPEN IN FULL
        CURRENT STATUS :  OPEN
   DATE OF LAST REVIEW :  10/18/98
      OPENING CRITERIA :
              COMMENTS :  JFK64-69:F7,1998.10.18.13:04:12:670107:

--------------------------------------------------------------------
[R] - ITEM IS RESTRICTED

Attachment 4

3 June 1962

MEMORANDUM FOR:   Chief, PW

SUBJECT:            Request of the CRC Military Section for
                    Economic Aid for Purported Underground
                    Elements in PBRUMEN

　　　1.   The support ($1,000) requested by Captain DESPAIGNE
and Colonel MONTEAGUDO should come out of Dr. MIRO's current
funds ($25,000 per month) that is being provided him for that
very same purpose.

　　　2.   It is recommended that Dr. MIRO take a second look
at the groups he is already funding to determine whether or
not they are getting the maximum operational use of the
funds he is providing them.   If not, then Dr. MIRO should
trim each group accordingly and redistribute the funds by
either increasing or decreasing funds to those groups who
are or are not effectively advancing the "cause" that we
are all striving for so hard.

　　　3.   FYI.   If all the $25,000 is being sent into PBRUMEN
each month as claimed by each group (and the writer has very
strong reservations about this) that means that a total of at
least $200,000 Pesos are being sent each month.   The current
rate of exchange inside is about 8 to 1.   Thats a lot of hay
in any old barn.   Lets say that the exchange rate is only 6
to 1 (because of the money profiteers) here in Miami for de-
livery inside that comes to about $150,000 Pesos.   This is
still "mucho dinero" any place.   We must not lose sight of the
fact that one peso, give or take one centavo here or there, is
still one peso there.

　　　4.   Is this one of those types of funds that MIRO or any-
body else doesn't have to account for?   What, if any, intelligence
do we get from these groups who purportedly have assets in place
in PBRUMEN and ostensibly send them all these pesos each month?
Have we ever requested Dr. MIRO to crank these groups up on the
production of intelligence?

                                   STANLEY R. ZAMKA
                                   Chief, PW

ATTACHMENT: PASSAVOY Memo 297
0+1-C/PW via COS
    1 - C/IS
    1 - C/FI
    1 - PM Chrono

S E C R E T